**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------x
                               :

COMMERZBANK AG,            :

                               :      Index No.

              Plaintiff,    :      **<u>COMPLAINT</u>**

                               :

        -against-          :      **DEMAND FOR JURY TRIAL**

HSBC Bank USA, National Association,  :

                               :

             Defendant.   :

                               :

---------------------------------------------------x

# TABLE OF CONTENTS

**Page**

NATURE OF ACTION ..................................................................................................1

PARTIES ....................................................................................................................5

JURISDICTION AND VENUE ...................................................................................8

FACTUAL ALLEGATIONS ........................................................................................9

I.      THE SECURITIZATION PROCESS..................................................................9

II.     HSBC'S DUTIES AND OBLIGATIONS .......................................................11

        A.      HSBC's Duties Pertaining to the Delivery of Mortgage Files ..............13

        B.      HSBC Had a Duty to Provide Notice of Defaults and
               Enforce Repurchase Obligations Triggered by Such Notice .................19

        C.      HSBC's Duty to Act Prudently
               Upon the Occurrence of an Event of Default........................................21

        D.      HSBC Had a Duty to Address the
               Servicers' Failure to Meet Prudent Servicing Standards ......................22

        E.      HSBC Is Liable for Negligence in Performing Its Duties .....................24

III.    HSBC BREACHED ITS CONTRACTUAL,
        FIDUCIARY, AND STATUTORY DUTIES .................................................26

        A.      HSBC Failed to Provide Notice of the Sponsors'
               and Originators' Pervasive Representation and Warranty Breaches ...................26

               1.      The Originators' and Sponsors' Pervasive
                       Breaches of Representations and Warranties..............................37

        B.      HSBC Failed to Act Prudently
               Upon the Occurrence of an Event of Default........................................41

               1.      Events of Default Under the PSAs Relating to
                       Document Delivery Failures in the Covered Trusts ..................42

               2.      Events of Default Under the MHC Trusts .................................45

3.    HSBC Received Written Notice of Representation and
Warranty Violations Which Ripened into Events of Default ...................47

4.    Events of Default Concerning False Servicer Certifications ...................50

C.    HSBC Failed to Address the Servicers' Looting of Trust Assets .........................52

IV.    HSBC SUFFERED FROM CONFLICTS OF INTEREST ...............................................55

V.    HSBC'S CONDUCT INJURED COMMERZBANK  ...................................................58

CAUSES OF ACTION ............................................................................................................60

FIRST CAUSE OF ACTION (Violations of the TIA) ..........................................................60

SECOND CAUSE OF ACTION (Breach of Contract) ..........................................................62

THIRD CAUSE OF ACTION (Breach of Fiduciary Duty) ...................................................63

FOURTH CAUSE OF ACTION (Negligence—
Failure to Avoid Conflict of Interest and Perform Ministerial Acts with Due Care) ...................64

FIFTH CAUSE OF ACTION (Violation of the Streit Act) .....................................................64

SIXTH CAUSE OF ACTION (Breach of the Covenant of Good Faith) ...............................66

PRAYER FOR RELIEF ..........................................................................................................66

Plaintiff Commerzbank AG ("Plaintiff" or "Commerzbank"), by and through its attorneys, brings this action against Defendant HSBC Bank USA, National Association ("HSBC," "Defendant," or the "Trustee"), and alleges as follows:

## NATURE OF ACTION

1.      This action arises out of HSBC's role as trustee for 19 securitization trusts (the "Covered Trusts"), identified in Exhibit A, and asserts claims against HSBC for breaches of its contractual and fiduciary duties, and its duties under the federal Trust Indenture Act of 1939 (the "TIA"), 15 U.S.C. § 77aaa, *et seq.*, and New York's Streit Act, N.Y. Real Property Law § 124, *et seq.* (the "Streit Act").

2.      The Covered Trusts were created to facilitate residential mortgage-backed securities ("RMBS") transactions introduced to investors from 2005 to 2007. Ten of the RMBS transactions were sponsored by DB Structured Products, Inc. (the "DB Trusts"), four were sponsored by Nomura Credit & Capital, Inc. (the "Nomura Trusts"), two were sponsored by J.P. Morgan Mortgage Acquisition Corporation (the "J.P. Morgan Trusts"), two were sponsored by MHC I, Inc. (the "MHC Trusts"), and one was sponsored by Goldman Sachs Mortgage Company (the "Goldman Sachs Trust") (DB Structured Products, Inc., Nomura Credit & Capital, Inc., J.P. Morgan Mortgage Acquisition Corporation, MHC I, Inc., and Goldman Sachs Mortgage Company are referred to collectively as the "Sponsors").

3.      Commerzbank acquired RMBS certificates with a purchase value in excess of $204 million issued by the Covered Trusts identified in Exhibit B ("the Certificates"). Exhibit B identifies Certificates Commerzbank still holds (the "Held Certificates") and the Certificates Commerzbank has sold (the "Sold Certificates").

4.      The Certificates represent interests in the cash flows associated with the mortgage loans deposited into the Covered Trusts by the Sponsors and their affiliates or business partners. The certificateholders are the beneficiaries of the Covered Trusts. The performance of the RMBS depended on the Sponsors depositing properly underwritten mortgage loans having complete documentation into the Covered Trusts. The quality of the mortgage loans is critical, and numerous provisions of the governing agreements assure that only qualifying loans would be deposited into the Covered Trusts. Similarly, because the securities were to be "mortgage-backed," numerous other provisions seek to assure that complete documentation for each loan, including an original mortgage note and a properly assigned mortgage, would be delivered to the Trustee.

5.      The certificateholders, however, did not receive any loan or mortgage files that they could check to make certain that their contractual rights were being protected. Rather, such investors were dependent upon their trustee representative, HSBC, to police the deal and to protect their contractual and other legal rights.

6.      As trustee for the Covered Trusts, HSBC owes Commerzbank and the other certificateholders certain contractual and common law duties, as well as duties under the TIA and the Streit Act with respect to the mortgage loans owned by the Covered Trusts. HSBC and the relevant servicers (the "Servicers")[1] were required to provide notice of breaches of representations and warranties by the Sponsors and the parties who originated the mortgage loans underlying the Covered Trusts (the "Originators") concerning key attributes of the mortgage loans underlying the Covered Trusts, including the origination guidelines applicable to those loans and adherence to state laws regarding predatory lending.

---

[1] Some of the Covered Trusts employ a "Master Servicer" while others refer to the lead servicing entity as a Servicer. References herein to the Servicer include the Master Servicer to the extent applicable.

HSBC had a duty to enforce the obligation of the responsible parties (typically the Sponsors and their affiliates that served as the depositors (the "Depositors") or the Originators to repurchase loans that breached representation and warranty provisions or were missing required documentation. HSBC was also required to address defaults by the Servicers who were required to engage in prudent loss mitigation practices.

7.      HSBC was actively involved in the origination and servicing of mortgage loans and typically had very close business relationships with the Sponsors, Originators, and Depositors. Nevertheless, as trustee, HSBC was obligated to act against the financial interest of the Sponsors, Originators, and Depositors when demanded by the circumstances. HSBC, however, abandoned its obligations to protect the rights of investors.

8.      HSBC's breaches of its contractual, fiduciary, and statutory duties give rise to six distinct legal claims.

9.      <u>Breach of Contract</u>. HSBC's contractual duties are set forth in governing agreements, generally identified as pooling and servicing agreements ("PSAs").[2] HSBC breached the PSAs by failing to: (i) provide notice of representation and warranty violations by the Sponsors and Originators; (ii) provide notice of the Servicers' failure to give notice of those same representation and warranty violations; (iii) cause the responsible parties to repurchase or substitute loans that were subject to a breach of representation or warranty or missing documentation required to be delivered under the PSAs; and (iv) exercise all rights and remedies available to HSBC under the PSAs upon the occurrence of an Event of Default.

---

[2] Two of the Covered Trusts (FBRSI 2005-2 and FBRSI 2005-4) were structured using indentures, transfer and servicing agreements, and amended and restated owner trust agreements, and one of the Covered Trusts (GSAA 2005-6) was structured using a Master Servicing and Trust Agreement, all of which are the functional equivalent of a PSA. Unless expressly noted herein, when the term PSA is used, it is also referring to the aforementioned governing agreements executed in connection with those securitizations.

10.   <u>Breach of Fiduciary Duty</u>. Under common law, after an Event of Default an indenture trustee has a duty to act as a prudent person would in the exercise of his own affairs to protect the rights of certificateholders. This duty continues until the Event of Default is cured. HSBC failed to meet its fiduciary duties because it was aware Events of Default had occurred, but failed to take action to force the responsible parties to repurchase loans with representation and warranty violations or missing documentation and failed to address breaches by the Servicers.

11.   <u>Violations of the TIA</u>. The TIA requires the Trustee to provide certificateholders with notice of defaults under the operative indentures within 90 days of becoming aware of such defaults and to act prudently to protect the rights of certificateholders during the period in which the default remains uncured. HSBC violated these provisions by failing to provide notice of defaults it was aware of and failing to act prudently to protect the certificateholders' interests by exercising all rights and remedies available to HSBC under the PSAs.

12.   <u>Violation of the Streit Act</u>. HSBC violated the Streit Act by failing to "use the same degree of care and skill in their exercise as a prudent man would exercise or use under the circumstances in the conduct of his own affairs" to protect the rights of certificateholders during the pendency of an "event of default." The Streit Act applies to the extent a PSA is not "qualified" under the TIA. Thus, to the extent the TIA is deemed to not apply to any particular "mortgage investments," the Streit Act provides a similar protection and remedy.

13.   <u>Negligence</u>. HSBC had an extra-contractual duty to perform ministerial acts with due care and to avoid conflicts of interest. HSBC negligently performed ministerial acts by failing to provide notices of the numerous defaults that it was aware of under the

PSAs. HSBC violated its duty of independence by failing to take action against the Sponsors, Originators, Depositors, and Servicers because, if HSBC acted, it would have exposed systemic origination and servicing misconduct by HSBC and would have jeopardized future lucrative engagements.

14.     <u>Breach of Covenant of Good Faith</u>. HSBC violated the covenant of good faith and fair dealing by failing to give notice of defaults and failing to take action to cause the responsible parties to repurchase loans that violated representation and warranty provisions or were missing required documentation.

15.     By failing to perform its duties, HSBC has caused Commerzbank to suffer in excess of $100 million of losses.

## **PARTIES**

16.     Plaintiff Commerzbank AG is an entity organized under the laws of Germany. Commerzbank AG is the legal successor to all of Dresdner Bank AG's ("Dresdner") interests by way of merger as of May 2009, effected by way of universal succession under the German Transformation Act, with Commerzbank AG as the entity resulting from such merger. Plaintiff brings this action as a current and/or former holder of the Certificates. Commerzbank's acquisitions and other activities related to the Certificates were conducted at and through Commerzbank AG London Branch (the "London Branch").

17.     Commerzbank acquired certain of the Certificates through assignments from the following investors: (i) investor Barrington II CDO Ltd. ("Barrington 2"), which was a Cayman Islands limited company; (ii) investor Eurohypo AG New York Branch (now known as Hypothekenbank Frankfurt AG New York Branch) ("Eurohypo"), which is a wholly-owned subsidiary of Commerzbank and was the New York branch of a corporate

entity organized under the laws of Germany; and (iii) investor Palmer Square 3 Limited ("Palmer 3"), which was a private limited liability company organized under the laws of Ireland (Barrington 2, together with Eurohypo and Palmer 3, the "Assignors"). Exhibit B indicates which Certificates were acquired through assignment from Barrington 2 (the "Barrington 2 Certificates"), Eurohypo (the "Eurohypo Certificates"), and Palmer 3 (the "Palmer 3 Certificates"). Commerzbank brings both its own claims while it was a certificateholder and the claims that were assigned to it by the Assignors.

18.     The Barrington 2 Certificates were acquired as part of the collateral for Barrington 2. In May 2012, London Branch and Dynamic Credit Partners, LLC ("DCP"), in its capacity as Collateral Manager for Barrington 2, agreed to unwind Barrington 2 whereby DCP would sell the collateral assets and Commerzbank would be presented with the opportunity to purchase them. In connection with this process, London Branch acquired the Barrington Certificates between May and July 2012. On December 24, 2013, London Branch entered into an Assignment Agreement with various parties including Barrington 2 and the Bank of New York Mellon Trust Co., N.A. which provided:

> With respect to all assets of the Issuer and the Co-Issuer acquired since their respective formations (including, without limitation, any Collateral now owned or previously owned by the Issuer or Co-Issuer under the Indenture, the "Assets"), the Issuer and the Co-Issuer, effective as of the date hereof, hereby transfer and assign to Commerzbank, and the Trustee releases its lien against, any and all litigation rights, causes of action and claims arising out of, in connection with, and/or relating to (1) the Assets, whether known or unknown, whether arising before, on or after the date of this Agreement, including, without limitation, all claims related to and/or arising out of the initial purchase of the Assets, any contract claims, tort claims, malpractice claims, fraud claims (whether under common law or statutory, for aiding and abetting, fraud in the inducement, or otherwise), negligent misrepresentation claims and securities law claims and (2) to the extent not included in the foregoing,

any contract claims, tort claims, malpractice claims, fraud claims (whether under common law or statutory, for aiding and abetting, fraud in the inducement, or otherwise), negligent misrepresentation claims and securities law claims arising under other contracts to which the Issuer and/or the Co-Issuer is a party (clauses (1) and (2), collectively, the "Transferred Rights") and all rights and powers necessary to invoke and enforce the Transferred Rights, including, without limitation, the right and authority to commence, prosecute and resolve any legal actions.

19.     On December 11, 2013, Eurohypo, and London Branch entered into a

Confirmation of Assignment with respect to the Eurohypo Certificates, which Eurohypo

previously had transferred to London Branch.  The Confirmation of Assignment provided:

> In exchange for good and valuable consideration, at the time that Eurohypo transferred the Securities to Commerzbank, it was Eurohypo's intent to transfer all litigation rights, causes of action and claims arising out of, in connection with, and/or relating to (1) the Securities, whether known or unknown, whether arising before, on or after the date of this Agreement, including, without limitation, all claims related to and/or arising out of the initial purchase of the Securities, any contract claims, tort claims, malpractice claims, fraud claims (whether under common law or statutory, for aiding and abetting, fraud in the inducement, or otherwise), negligent misrepresentation claims and securities law claims and (2) to the extent not included in the forgoing any contract claims, tort claims, malpractice claims, fraud claims (whether under common law or statutory, for aiding and abetting, fraud in the inducement, or otherwise), negligent misrepresentation claims and securities law claims arising under contracts to which Eurohypo is a party, and which concern the Securities and all rights and powers necessary to invoke and enforce the Transferred Rights, including, without limitation, the right and authority to commence, prosecute and resolve any legal actions (altogether, the "Transferred Rights").

20.     On August 11, 2008, a Deed of Unwind for Palmer 3 effectuated the transfer

of all of Palmer 3's collateral assets, including the Palmer 3 Certificates, to Dresdner, acting

through its London branch. The Palmer 3 Certificates were recorded on Dresdner's accounts

in September 2008 (interests for which Commerzbank is legal successor). By letter dated

December 10, 2013, the liquidator of Palmer 3 provided Commerzbank a letter confirmation stating:

> With regard to the [unwinding of Palmer 3], this letter confirmation further memorializes the fact that is it my understanding that it was the Company's intent to effectuate the transfer of all assets of value, as provided in the Deed of Unwind, to the Sole Noteholder [Dresdner] on the terms set forth in the Deed of Unwind, and that such assets included the [Collateral Assets], and all legal rights and claims whether in tort or otherwise associated with the Collateral Assets.
>
> It is my understanding and belief that such legal rights, and claims include, but are not limited to, the Company's interest and control over any and all legal claims sounding in tort, contract, trust, or otherwise concerning any of the Collateral Assets, whether arising before or after the date of their acquisition or the date of this confirmation.

21.     Defendant HSBC is a national banking association organized and existing under the laws of the United States. HSBC does business throughout the United States and maintains its principal executive office in New York and its main office in Virginia. It serves as the trustee for the Covered Trusts. For each of the Covered Trusts, HSBC signed Certificates incorporating the PSAs. As the trustee for the Covered Trusts, HSBC owed certificateholders certain statutory, contractual, and fiduciary duties with respect to the mortgage loans owned by the Covered Trusts, which it violated.

## JURISDICTION AND VENUE

22.     This Court has jurisdiction over the TIA claims asserted in this matter under 15 U.S.C. § 77v. This Court has jurisdiction over the other claims asserted under 28 U.S.C. § 1367. This Court also has jurisdiction pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between the parties, and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

23.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and 15 U.S.C. § 77v as HSBC resides in this District, and a substantial part of the events and omissions giving rise to the claims asserted herein occurred in this District.

24.     This Court has personal jurisdiction over HSBC because HSBC maintains its principal place of business in New York. This Court also has personal jurisdiction over HSBC because a substantial part of the administration of the Covered Trusts, out of which the claims asserted herein arise, is performed in New York. Additionally, the majority of the Covered Trusts are New York trusts, with their governing agreements governed by New York law.

## FACTUAL ALLEGATIONS

## I.      THE SECURITIZATION PROCESS

25.     The process through which RMBS are created and sold is known as mortgage loan securitization. In broad terms, mortgage loans are acquired from mortgage originators and pooled together in a trust, which issues securities representing interests in the cash flows from principal and interest payments on the pool of loans after certain costs and fees are deducted.

26.     The first step in each securitization is generally the acquisition of mortgage loans by a sponsor (or "seller"), such as J.P. Morgan Mortgage Acquisition Corporation, and the sale of a large pool of such loans by the sponsor to a depositor, typically a special-purpose affiliate of the sponsor.

27.     The depositor then conveys the pool of loans to a trustee, such as HSBC, pursuant to a PSA that establishes various prioritized tranches of interests in payments made by borrowers on the loans. The trust issues certificates representing those tranches; the

certificates are sold to an underwriter; and the underwriter re-sells the certificates at a profit to investors. The sponsor (through its affiliated depositor) earns a profit on the excess of the proceeds of the sale of certificates to the underwriter over the cost of purchasing the mortgage loans. Here, HSBC acted as the trustee in connection with the relevant RMBS transactions.

28.     Pursuant to the PSAs, a servicer is appointed to manage the collection of payments on the mortgage loans in return for a monthly fee. The servicer's duties include monitoring delinquent borrowers, foreclosing on defaulted loans, monitoring compliance with representations and warranties regarding loan origination, tracking mortgage documentation, and managing and selling foreclosed properties.

29.     The trustee delivers monthly remittance reports to holders of certificates describing the performance of underlying loans and compliance with the PSA. The contents of those reports are specified in the PSA and in Item 1121 of SEC Regulation AB. *See* 17 C.F.R. § 229.1121. The servicer provides data to the trustee to include in these remittance reports.

30.     Each tranche in a loan securitization has a different level of risk and reward, and its own rating issued by a nationally recognized credit-rating agency such as Standard & Poor's or Moody's. The most senior tranches generally receive the highest ratings, AAA or AA. Junior tranches receive lower ratings, but offer higher potential returns. Senior tranches are generally entitled to payment in full ahead of junior tranches, and shortfalls in principal and interest payments are generally allocated first to junior tranches. This division of cash flows and losses is referred to as the waterfall.

31.     Because the cash flow from payments made by mortgage borrowers on the

underlying mortgage loans is the sole source of funds to pay holders of a mortgage-backed security, the credit quality of the security turns on the credit quality of, and the trust assets securing, the underlying loans, which often number in the thousands.

32.    HSBC earned fees in connection with its role as trustee, typically an annual fee based on the percentage of principal outstanding on the loans underlying the RMBS. HSBC also received significant benefits from the interest-free deposits maintained in its accounts when the servicing payments were remitted to its accounts. HSBC maintained accounts for thousands of trusts and earned significant sums from the aggregate balances on these accounts. The RMBS trustee engagements further deepened HSBC's business relationships with the sponsors and underwriters of the RMBS, leading to more lucrative future engagements.

## II.    HSBC'S DUTIES AND OBLIGATIONS

33.    HSBC's duties and obligations as the trustee for the Covered Trusts are spelled out in the PSAs and under applicable state and federal laws. These agreements govern the parties' respective rights and responsibilities in connection with the Covered Trusts. HSBC entered into PSAs with:

> (A) For four of the DB Trusts (ACE 2006-ASAP2, ACE 2006-ASAP3, ACE 2006-ASAP5 and ACE 2007-WM2): (i) ACE Securities Corporation, as Depositor; (ii) Ocwen Loan Servicing LLC, as Servicer; and (iii) Wells Fargo Bank, N.A., as Master Servicer and Securities Administrator;

> (B) For one of the DB Trusts (ACE 2005-HE5): (i) ACE Securities Corporation, as Depositor; and (ii) Wells Fargo Bank, N.A., as Master Servicer, Servicer, and Securities Administrator;

> (C) For one of the DB Trusts (ACE 2005-WF1): (i) ACE Securities Corporation, as Depositor; and (ii) Wells Fargo Bank, N.A., as Master Servicer and Securities Administrator;

> (D) For one of the DB Trusts (ACE 2005-AG1): (i) ACE Securities Corporation, as Depositor; (ii) Litton Loan Servicing LP, as Servicer; and (iii) Wells Fargo Bank, N.A., as Master Servicer and Securities Administrator;

(E) For one of the DB Trusts (ACE 2006-HE1): (i) ACE Securities Corporation, as Depositor; (ii) Ocwen Loan Servicing, LLC, as Servicer; and (iii) Wells Fargo Bank, N.A., as Servicer, Master Servicer, and Securities Administrator;

(F) For one of the DB Trusts (DBALT 2006-AR4): (i) Deutsche Alt-A Securities, Inc., as Depositor; (ii) Countrywide Home Loans Servicing LP, as Servicer; (iii) GMAC Mortgage Corporation, as Servicer; (iv) GreenPoint Mortgage Funding, Inc., as Servicer; and (v) Wells Fargo Bank, N.A. as Master Servicer and Securities Administrator;

(G) For one of the DB Trusts (ACE 2007-HE4): (i) ACE Securities Corporation, as Depositor; (ii) Ocwen Loan Servicing, LLC, as Servicer; (iii) GMAC Mortgage LLC, as Servicer; and (iv) Wells Fargo Bank, N.A., as Master Servicer and Securities Administrator;

(H) For the Goldman Sachs Trust: (i) GS Mortgage Securities Corporation, as Depositor; (ii) Deutsche Bank National Trust Company, as Custodian; and (iii) Wells Fargo Bank, N.A., as Master Servicer, Securities Administrator, and Custodian;

(I) For the J.P. Morgan Trusts: (i) J.P. Morgan Acceptance Corporation I, as Depositor; and (ii) U.S. Bank N.A., as Master Servicer and Securities Administrator;

(J) For the MHC Trusts: Indentures with (i) the trust as Issuer; and (ii) Wells Fargo Bank, N.A., as Securities Administrator;

(K) For one of the Nomura Trusts (NAA 2006-AR3): (i) Nomura Asset Acceptance Corporation, as Depositor; (ii) Nomura Credit & Capital, Inc., as Sponsor; (iii) GMAC Mortgage Corporation, as Servicer; and (iv) Wells Fargo Bank, N.A., as Master Servicer and Securities Administrator;

(L) For one of the Nomura Trusts (NHELI 2005-FM1): (i) Nomura Home Equity Loan, Inc., as Depositor; (ii) Nomura Credit & Capital, Inc., as Seller; (iii) Countrywide Home Loans Servicing LP, as Servicer; and (iv) Wells Fargo Bank, N.A., as Master Servicer and Securities Administrator;

(M) For one of the Nomura Trusts (NHELI 2005-HE1): (i) Nomura Home Equity Loan, Inc., as Depositor; (ii) Nomura Credit & Capital, Inc., as Seller; (iii) Select Portfolio Servicing, Inc., as Servicer; (iv) Option One Mortgage Corporation, as Servicer; (v) Countrywide Home Loans Servicing LP, as Servicer; and (vi) Wells Fargo Bank, N.A., as Master Servicer and Securities Administrator; and

(N) For one of the Nomura Trusts (NHELI 2006-WF1): (i) Nomura Home Equity Loan, Inc., as Depositor; (ii) Nomura Credit & Capital, Inc., as Sponsor; and (iii) Wells Fargo Bank, N.A., as Master Servicer and Securities Administrator.

### A.   HSBC's Duties Pertaining to the Delivery of Mortgage Files

34.     Each PSA sets forth a process for conveying the mortgage loans to the Covered Trusts. Typically, the Sponsors conveyed the loans to the Depositor for the Covered Trusts. Then the Depositor conveyed the mortgage loans to HSBC in its capacity as trustee for the Covered Trusts to hold for the benefit of the certificateholders. This process is set forth in Section 2.01 of the J.P. Morgan PSA,[3] which provides in relevant part:

> Concurrently with the execution and delivery of this Agreement, the Depositor does hereby transfer, assign, set over, deposit with and otherwise convey to the Trustee, without recourse, subject to Sections 2.02 and 2.05, in trust, all the right, title and interest of the Depositor in and to the Trust Fund. Such conveyance includes, without limitation: (i) the Mortgage Loans, including the right to all payments of principal and interest received on or with respect to the Mortgage Loans on and after the Cutoff Date (other than Scheduled Payments due on or before such date), and all such payments due after such date but received prior to such date and intended by the related Mortgagors to be applied after such date; (ii) all of the Depositor's right, title and interest in and to all amounts from time to time credited to and the proceeds of the Distribution Account, any Custodial Accounts or any Escrow Account established with respect to the Mortgage Loans; (iii) all of the rights of the Depositor as assignee of the Seller with respect to the Seller's rights under the Purchase and Servicing Agreement, the Servicing Agreements and the Purchase Agreements pursuant to the Acknowledgements; (iv) all of the Depositor's right, title or interest in REO Property and the proceeds thereof; (v) all of the Depositor's rights under any Insurance Policies related to the Mortgage Loans; and (vi) if applicable, the Depositor's security interest in any collateral pledged to secure the Mortgage Loans, including the Mortgaged Properties, including, but not limited to, the pledge, control and guaranty agreements and the Limited Purpose Surety Bond to have and to hold, in trust; and the Trustee

---

[3] Quotations to the J.P. Morgan PSA herein are to the PSA executed in connection with the JPALT 2006-A7 securitization. JPMMT 2006-A5 was issued pursuant to a PSA with substantially similar language and any differences are immaterial to the issues addressed in the Complaint.

> declares that, subject to the review provided for in Section 2.02, it has received and shall hold the Trust Fund, as trustee, in trust, for the benefit and use of the Holders of the Certificates and the Swap Provider and for the purposes and subject to the terms and conditions set forth in this Agreement, and, concurrently with such receipt, has caused to be executed, authenticated and delivered to or upon the order of the Depositor, in exchange for the Trust Fund, Certificates in the authorized denominations evidencing the entire ownership of the Trust Fund.

The PSAs for the DB, Goldman Sachs, MHC, and Nomura Trusts set forth a substantially similar process. *See* Ex. C § I.

35.     In addition, Section 2.02 of the J.P. Morgan PSA provides that the Trustee (or a custodian on the Trustee's behalf) is required to take physical possession of the mortgage loans and the accompanying mortgage files for the exclusive use and benefit of all current and future certificateholders. It provides:

> The Trustee, by execution and delivery hereof, *acknowledges receipt* by it or by the applicable Custodian on its behalf of the Trustee Mortgage Files pertaining to the Mortgage Loans listed on the Mortgage Loan Schedule

(Emphasis added). The PSAs for the DB, Goldman Sachs, MHC, and Nomura Trusts set forth substantially similar requirements. *See* Ex. C § II.

36.     Section 2.01 of the J.P. Morgan PSA also specifically sets forth the operative documents that must be contained in the mortgage file for the mortgage loans. It provides:

> On the Closing Date, each Custodian shall deliver to the Trustee, the Securities Administrator and the Depositor, a certification ("Custodian Certification") substantially in the form attached hereto as Exhibit L certifying that, pursuant to each related Custodial Agreement, the applicable Originator delivered and released to such Custodian, subject to and in accordance with the relevant section of each related Purchase and Servicing Agreement, Purchase Agreement or Custodial Agreement, the following documents pertaining to each of the Mortgage Loans identified in the Mortgage Loan Schedule . . . :

(i) with respect to each Mortgage Loan, the *original Mortgage Note endorsed without recourse* in proper form to the order of the Trustee, or in blank (in each case, with all necessary intervening endorsements, as applicable);

(ii) with respect to each Mortgage Loan (other than a Cooperative Loan) that is not a MERS Mortgage Loan, *the original Mortgage with evidence of recording thereon* or a recorded copy and in the case of the each MERS Mortgage Loan, the original Mortgage, noting the presence of the MIN of the Mortgage Loans and either language indicating that the Mortgage Loan is a MOM Loan if the Mortgage Loan is a MOM Loan or if the Mortgage Loan was not a MOM Loan at origination, the original Mortgage and the assignment thereof to MERS, with evidence of recording indicated thereon; or if the original Mortgage assignment has not yet been returned from the recording office, a copy of such Mortgage certified by the applicable Originator to be a true copy of the original of the Mortgage . . . ;

(iii) with respect to each Mortgage Loan (other than a Cooperative Loan) that is not a MERS Mortgage Loan, the Assignment of Mortgage in form and substance acceptable for recording in the relevant jurisdiction, such assignment being either (A) in blank, without recourse, or (B) endorsed to "HSBC Bank USA, National Association, as Trustee of J.P. Morgan Alternative Loan Trust 2006A7, Mortgage Pass-Through Certificates, without recourse";

(iv) with respect to each Mortgage Loan (other than a Cooperative Loan) that is not a MERS Mortgage Loan, *the originals of all intervening assignments of the Mortgage*, if any, with evidence of recording thereon or a recorded copy, or if the original intervening assignment has not yet been returned from the recording office, a copy of such assignment certified by the applicable Originator to be a true copy of the original of the assignment which has been sent for recording in the appropriate jurisdiction in which the Mortgaged Property is located;

(v) with respect to each Mortgage Loan (other than a Cooperative Loan), *the originals of all assumption, modification, consolidation or extension agreements, if any, with evidence of recording thereon*; or if the original assumption, modification, consolidation or extension agreements has not yet been returned from the recording office, a copy of such documents certified by the applicable Originator to be a true copy of the original of the Mortgage . . . ;

> (vi) if applicable, with respect to each Mortgage Loan (other than a Cooperative Loan), *the original policy of title insurance* (or a true copy thereof) with respect to any such Mortgage Loan, or, if such policy has not yet been delivered by the insurer, the title commitment or title binder to issue same . . . .

(Emphasis added). The PSAs for the DB, Goldman Sachs, MHC, and Nomura Trusts set forth a substantially similar process. *See* Ex. C § III.

37.     Physical possession of these documents by HSBC was necessary to transfer the ownership rights to the mortgage loans from the Sponsors and Depositors to the Covered Trusts.

38.     After a designated period, HSBC, or a custodian on its behalf, was required to issue a final certification and exception report that identified mortgage files that were missing documentation required under the J.P. Morgan PSA:

> With respect to the Mortgage Loans, in the event there exist exceptions noted on the related Custodian Certification (substantially in the form of Exhibit L), not later than 270 days after the Closing Date, the applicable Custodian shall deliver to the Trustee, the Securities Administrator and the Depositor a further certification with any applicable exceptions noted thereon.

The PSAs for the DB, Goldman Sachs, MHC, and Nomura Trusts set forth a substantially similar process. *See* Ex. C. § IV.

39.     In fulfilling its role, the custodian acted as an agent or on behalf of the Trustee. For example, the J.P. Morgan PSA provides that the custodian will act "on [HSBC's] behalf." The PSAs for the DB, Goldman Sachs, MHC, and Nomura Trusts also provide that the custodian will act on HSBC's "behalf." *See* Ex. C § XIII.

40.     The final certification, called the "FORM OF CUSTODIAN CERTIFICATION," which was attached to the J.P. Morgan PSA as Exhibit L, provides:

16

Ladies and Gentlemen:

Reference is hereby made to the Pooling and Servicing Agreement, dated as of November 1, 2006 (the "Pooling and Servicing Agreement"), among J.P. Morgan Acceptance Corporation I, as depositor, U.S. Bank National Association, as master servicer and as securities administrator, and HSBC Bank USA, National Association, as trustee. Capitalized terms used but not defined herein shall have the meanings provided in the Pooling and Servicing Agreement.

In accordance with the provisions of Section 2.01 of the Pooling and Servicing Agreement, the undersigned, as a Custodian, hereby certifies that, as to each Mortgage Loan listed on the Mortgage Loan Schedule, it has reviewed the Trustee Mortgage File and has determined that except as set forth in the attached exception report (a) all documents required to be delivered to it pursuant to Section 2.01 (a) (i) through (ix) of the Pooling and Servicing Agreement are in its possession; provided, that the Custodian has no obligation to verify the receipt of any documents the existence of which was not made known to the Custodian by the Trustee Mortgage File, and provided, further, that the Custodian has no obligation to determine whether recordation of any such modification is necessary (except as set forth in Section 2.01 of the Pooling and Servicing Agreement); (b) such documents have been reviewed by it and appear regular on their face and to relate to such Mortgage Loans; *provided, however*, that the Custodian makes no representation and has no responsibilities as to the authenticity of such documents, their compliance with applicable law, or the collectability of any of the Mortgage Loans relating thereto; (c) based upon its examination, and only as to the foregoing documents, the information set forth on the Mortgage Loan Schedule accurately reflects, within permitted tolerances, the information reviewed by the Custodian with respect to each Mortgage Loan; and (d) each Mortgage Note has been endorsed and each assignment has been assigned as required under Section 2.01 of the Pooling & Servicing Agreement.

[THE BANK OF NEW YORK TRUST COMPANY, N.A,] as successor in interest to [JPMORGAN CHASE BANK, NATIONAL ASSOCIATION], as Custodian.

The PSAs (or Custodial Agreements) for the DB, Goldman Sachs, MHC, and Nomura Trusts contain a substantially similar form of final certification. *See* Ex. C § V.

17

41.     The final certification is the key certification that HSBC (or a custodian on its behalf) was required to prepare for the Covered Trusts. In this document, HSBC certified that (i) there was full and complete loan documentation in accordance with the requirements of the PSAs for those loans specifically identified on the mortgage loan schedule, and (ii) HSBC had not obtained complete required documentation for those loans identified on the document exception report. If there was a defect with any mortgage file, then the Sponsor, relevant seller, or responsible party was obligated to cure the defect leading to the exception (typically within 90 days) or repurchase or substitute the defective loans. This is set forth in Section 2.03 of the MHC Transfer and Servicing Agreement,[4] which provides:

> If in the course of the review described in paragraph (c) above, the Custodian discovers any document or documents constituting a part of a Mortgage File is missing, does not appear regular on its face (*i.e.*, is mutilated, damaged, defaced, torn or otherwise physically altered) or appears to be unrelated to the Mortgage Loans identified in the Mortgage Loan Schedules, as applicable (each, a "**Material Defect**"), the Custodian shall identify the Mortgage Loan to which such Material Defect relates in the Final Certification. Within 90 days of its receipt of such notice, the Seller shall be required to cure such Material Defect (and, in such event, the Seller shall provide the Indenture Trustee and the Custodian with an Officer's Certificate confirming that such cure has been effected). The Seller may, in lieu of repurchasing a Mortgage Loan pursuant to this Section (d), substitute for such Mortgage Loan a Qualified Substitute Mortgage Loan subject to the provisions of Section 3.7. The failure of the Indenture Trustee to deliver, or cause the Custodian to deliver, the Final Certification within 90 days after the Closing Date shall not affect or relieve the Seller of its obligation to repurchase any Mortgage Loan pursuant to this Section (d), Section 3.7, or any other Section of this Agreement requiring the repurchase of Mortgage Loans from the Trust Fund.

---

[4] Quotations to the MHC Indenture, Transfer and Servicing Agreement, and/or Amended and Restated Owner Trust Agreement herein are to the Indenture, Transfer and Servicing Agreement, and/or Amended and Restated Owner Trust Agreement executed in connection with the FBRSI 2005-2 securitization. FBRSI 2005-4 was issued pursuant to an Indenture, Transfer and Servicing Agreement, and Amended and Restated Owner Trust Agreement with substantially similar language and any differences are immaterial to the issues addressed in the Complaint.

The PSAs for the DB, Goldman Sachs, J.P. Morgan, and Nomura Trusts set forth a substantially similar process. *See* Ex. C § VI.

42.     Section 6.11 of the J.P. Morgan PSA makes clear that the Trustee is entitled to be reimbursed for any expense incurred in enforcing repurchase obligations. The PSAs for the DB, Goldman Sachs, MHC, and Nomura Trusts contain substantially similar provisions. *See* Ex. C § VI.

43.     After the passage of a specified period of time, the Trustee could not seek substitution of loans and could merely demand repurchase. For example, Section 2.05 of the J.P. Morgan PSA provides that substitution is not an available remedy more than two years from closing. The PSAs for the DB and Nomura Trusts have similar cutoffs. *See* Ex. C § VI. In any event, because any substituted loans must be virtually identical to the initial loan, including maturity date and other terms, substitution was not generally feasible more than a year after closing because loans of the same vintage were no longer widely available to include in securitizations.

**B.      HSBC Had a Duty to Provide Notice of Defaults and Enforce Repurchase Obligations Triggered by Such Notice**

44.     The Trustee had an obligation pursuant to the PSAs to provide notice to all parties of the Sponsors' or Originators' breaches of representations and warranties under the PSAs or Mortgage Loan Purchasing Agreements ("MLPA"). For example, Section 3.7 of the MHC Transfer and Servicing Agreement provides:

> Upon discovery or receipt of written notice by the Depositor, the Master Servicer, the Securities Administrator, the Indenture Trustee or the Owner Trustee that the Seller has breached any representation or warranty set forth on the applicable Schedule B-1 through B-5, in respect of a Mortgage Loan that materially and adversely affects the value of such Mortgage Loan or the interest therein of the Noteholders or the Certificateholder, the Depositor,

the Master Servicer, the Securities Administrator, the Indenture Trustee or the Owner Trustee, as the case may be, promptly shall notify the Indenture Trustee in writing of such breach, and the Indenture Trustee shall enforce the Seller's obligations under this Agreement and cause the Seller to repurchase the related Mortgage Loan from the Trust Fund at the Repurchase Price on or prior to the Determination Date following the expiration of the 90-day period following the earlier of the date on which the breach was discovered or notice of the breach was received by the Indenture Trustee; *provided*, *however*, that, subject to Sections 3.7(d) and (e) below, in connection with any such breach that cannot reasonably be cured within such 90-day period, if the Seller shall have commenced to cure such breach within such 90-day period, the Seller shall be permitted to proceed thereafter diligently and expeditiously to cure the breach within an additional 90-day period. Notwithstanding the foregoing, in the event that the breach relates to a representation or warranty made by both one of the Originators under the terms of a Bring-Down Letter and the Assignment, Assumption and Recognition Agreements and the Seller as set forth on the applicable Schedule B-1 through B-5, the Indenture Trustee shall first enforce such Originator's obligations under the Bring-Down Letter and the applicable Assignment, Assumption and Recognition Agreement regarding repurchase or substitution before seeking satisfaction from the Seller pursuant to its obligations hereunder; *provided*, *however*, if such Originator indicates in writing to the Indenture Trustee that it does not intend to fulfill its obligations, the Indenture Trustee may immediately pursue its remedies against the Seller. In connection with the repurchase of any Mortgage Loan by one of the Originators, the Seller will remit to the Securities Administrator for deposit into the Payment Account the excess, if any, of the Repurchase Price for such Mortgage Loan over the amount received from such Originator.

The PSAs for the DB, Goldman Sachs, J.P. Morgan, and Nomura Trusts contain substantially similar provisions. *See* Ex. C § VI.

45.     In addition, after the occurrence of an Event of Default, the Trustee assumes the same duties as a common law trustee, which includes, among other things, providing beneficiaries notice of all defaults under the operative trust documents, which include the PSAs here.

46.     Congress also enacted the TIA to ensure, among other things, that investors in certificates, bonds, and similar instruments, have adequate rights against, and receive adequate performance from, the responsible trustee. 15 U.S.C. § 77bbb.

47.     Under Section 315(b) of the TIA, HSBC was required to give certificateholders notice of a default under the PSAs within 90 days of learning of such default. 15 U.S.C. § 77ooo(b).

48.     As set forth in Section III hereof, HSBC failed to give notice of numerous defaults and breaches of representations and warranties or covenants as required under the PSAs, common law, and the TIA.

**C.     HSBC's Duty to Act Prudently
Upon the Occurrence of an Event of Default**

49.     Under the PSAs and applicable law, HSBC owed a fiduciary duty to certificateholders upon the occurrence of an Event of Default. HSBC's post-default fiduciary duties are described in Section 6.01 of the J.P. Morgan PSA, which provides in relevant part, "the Trustee shall exercise such of the rights and powers vested in it by this Agreement and use the same degree of care and skill in their exercise as a prudent Person would exercise or use under the circumstances in the conduct of such Person's own affairs . . . ." The PSAs for the DB, Goldman Sachs, MHC, and Nomura Trusts impose substantially similar obligations on HSBC. *See* Ex. C § VII.

50.     The duty to act prudently to protect the interests of certificateholders is a continuing duty that remains in effect until the Event of Default is cured.

51.     In addition, Section 315(c) of the TIA provides that upon the occurrence of a default, the indenture trustee must exercise such of the rights and powers vested in it by the indenture, and must use the same degree of care and skill in its exercise as a prudent man

would exercise or use under the circumstances in the conduct of his own affairs. 15 U.S.C. § 77ooo(c).

52.     The Streit Act provides that upon the occurrence of an Event of Default, an indenture trustee must exercise such of the rights and powers vested in it by the indenture, and must use the same degree of care and skill in its exercise as a prudent man would exercise or use under the circumstances in the conduct of his own affairs.

53.     Upon the occurrence of an Event of Default, a prudent trustee would have exercised all of its rights under the PSAs to ensure that defaulted loans that were eligible for repurchase or substitution due to representation and warranty violations or because they were missing required documentation were put back to the responsible parties. A prudent trustee would have also taken steps to remedy servicing breaches that increased the loss severities dramatically on the underlying mortgage loans.

54.     As set forth in Section III, HSBC failed to exercise its duties both prior to and after the occurrence of defaults and Events of Default.

**D.     HSBC Had a Duty to Address the
         Servicers' Failure to Meet Prudent Servicing Standards**

55.     Each PSA requires the Servicers to service the loans underlying the Covered Trusts prudently.

56.     For example, Section 9.01 of the J.P. Morgan PSA provides: "The Master Servicer, on behalf of the Trustee, the Depositor and the certificateholders shall monitor the performance of the Servicers under the Purchase and Servicing Agreements and the Servicing Agreements, and shall use its reasonable good faith efforts to enforce the obligations of the Servicers to duly and punctually to perform [sic] all of their respective duties and obligations thereunder." J.P. Morgan PSA § 9.01. The Amended and Restated Flow Servicing Agreement

attached to the J.P. Morgan PSA requires Servicers to satisfy "Accepted Servicing Practices," or "those mortgage servicing practices (including collection procedures) of prudent mortgage banking institutions which service mortgage loans of the same type as such Mortgage Loan in the jurisdiction where the related Mortgaged Property is located, and which are in accordance with Fannie Mae servicing practices and procedures, for MBS pool mortgages, as defined in the Fannie Mae Guide including future updates." J.P. Morgan Amended and Restated Flow Servicing Agreement § 1.01. The PSAs for the DB, Goldman Sachs, MHC, and Nomura Trusts contain substantially similar requirements. *See* Ex. C § VIII.

57.     The PSAs for the DB, Goldman Sachs, J.P. Morgan, MHC, and Nomura Trusts provide that failure to meet prudent servicing standards is an Event of Default if left uncured for a designated period of time after notice of the default.

58.     For example, Section 6.14 of the J.P. Morgan PSA provides that an Event of Default is triggered by any failure:

> on the part of the Master Servicer duly to observe or perform in any material respect any other of the covenants or agreements (other than those referred to in (viii) and (ix) below) on the part of the Master Servicer contained in this Agreement which continues unremedied for a period of 30 days after the date on which written notice of such failure, requiring the same to be remedied, shall have been given to the Master Servicer by the Trustee or the Securities Administrator, or to the Master Servicer, the Securities Administrator and the Trustee by the Holders of more than 50% of the Aggregate Voting Interests of the Certificates . . .

*See* Ex. C § IX.

59.     Further, a Master Servicer Event of Default under the MHC PSA provides that the failure to meet prudent servicing standards is an Event of Default 30 days after a servicing officer becomes aware of such breach, without regard to whether notice is provided. *See* Ex. C § IX.

60.     Upon a Servicer default or Event of Default, the Trustee was obligated to act. The Trustee had a duty to provide notice when it became aware of breaches of the PSA by the Servicers. If the defaults were not cured within the grace period, or if the Trustee failed to give notice, the Trustee was required to take action to address the defaults. For example, the J.P. Morgan PSA provides that once a Servicer Event of Default occurrs, the Trustee shall "terminate all of the rights and obligations of the Master Servicer hereunder" *see* J.P. Morgan PSA § 6.14 (*see also* Ex. C § IX), and "shall have all the rights and powers and be subject to all the responsibilities, duties and liabilities relating thereto and arising thereafter placed on the Master Servicer hereunder." *See* J.P. Morgan PSA § 6.14. The PSAs for the DB, Goldman Sachs, MHC, and Nomura Trusts impose substantially similar obligations on HSBC. *See* Ex. C § X. More generally, HSBC, as trustee, had a duty to exercise all rights available under the PSAs to protect certificateholders' interests and do so with due care.

61.     As set forth in Section III, HSBC breached its statutory, fiduciary, and contractual duties by failing to take actions to address Servicer defaults and Events of Default.

**E.      HSBC Is Liable for Negligence in Performing Its Duties**

62.     Section 6.01 of the J.P. Morgan PSA provides in relevant part:

> Neither the Trustee nor the Securities Administrator shall have any liability arising out of or in connection with this Agreement, *except for its negligence or willful misconduct*. Notwithstanding anything in this Agreement to the contrary, neither the Trustee nor the Securities Administrator shall be liable for special, indirect or consequential losses or damages of any kind whatsoever (including, but not limited to, lost profits). *No provision of this Agreement shall be construed to relieve the Trustee or the Securities Administrator from liability for its own negligent action, its own negligent failure to act or its own willful misconduct*; *provided, however*, that:

(i) The Trustee shall not be personally liable with respect to any action taken, suffered or omitted to be taken by it in good faith in accordance with the direction of Holders of Certificates as provided in Section 6.18 hereof;

(ii) For all purposes under this Agreement, the Trustee shall not be deemed to have notice of any Event of Default unless a Responsible Officer of the Trustee has actual knowledge thereof or unless written notice of any event which is in fact such a default is received by the Trustee at the Corporate Trust Office of the Trustee, and such notice references the Holders of the Certificates and this Agreement;

(iii) For all purposes under this Agreement, the Securities Administrator shall not be deemed to have notice of any Event of Default (other than resulting from a failure by the Master Servicer (i) to remit funds (or to make Advances) or (ii) to furnish information to the Securities Administrator when required to do so) unless a Responsible Officer of the Securities Administrator has actual knowledge thereof or unless written notice of any event which is in fact such a default is received by the Securities Administrator at the address provided in Section 12.07, and such notice references the Holders of the Certificates and this Agreement;

(iv) No provision of this Agreement shall require the Trustee or the Securities Administrator to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers, if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it; and none of the provisions contained in this Agreement shall in any event require the Trustee or the Securities Administrator to perform, or be responsible for the manner of performance of, any of the obligations of the Master Servicer under this Agreement or the Servicers under the Purchase and Servicing Agreements;

(v) Neither the Trustee nor the Securities Administrator shall be responsible for any act or omission of the Master Servicer, the Depositor, the Seller, any Servicer or any Custodian.

(Emphasis added.) The PSAs for DB, Goldman Sachs, MHC, and Nomura Trusts contain substantially similar provisions. *See* Ex. C § VII.

25

63.     Every trustee also has a non-waivable duty to exercise due care in the performance of ministerial acts required to be undertaken in the course of the administration of the trust. HSBC can be held liable for its own negligence in failing to perform its requisite ministerial acts, which includes, among other things, its responsibilities to: (i) give notice to all parties to the PSAs of the breach of representations and warranties relating to the mortgage loans once it discovered the Sponsors' widespread practice of including in securitization trusts loans that breached such representations and warranties; and (ii) provide notices of servicing related breaches known to the Trustee.

64.     Every trustee—including HSBC—has an absolute duty to avoid conflicts of interest and a duty of undivided loyalty to trust investors. This duty is non-waivable and arises independently of the PSAs.

## III.   HSBC BREACHED ITS CONTRACTUAL, FIDUCIARY, AND STATUTORY DUTIES

### A.     HSBC Failed to Provide Notice of the Sponsors' and Originators' Pervasive Representation and Warranty Breaches

65.     HSBC failed to give notice of defaults that occurred when the Sponsors or Originators breached representation and warranty provisions providing that all loans met applicable loan origination guidelines. In reality, during the 2005 to 2007 time period, the Sponsors and Originators regularly disregarded their underwriting guidelines and the representations and warranties made to securitization trusts.

66.     For example, in Section 7.01 of the J.P. Morgan Mortgage Loan Sale Agreement, the Seller made the following representations and warranties:

> (a) Mortgage Loans as Described. The information set forth in the Mortgage Loan Schedule and the tape delivered by the Seller to the Purchaser is true, correct and complete in all material respects. . . .

26

(f) Compliance with Applicable Laws. Any and all requirements of any applicable federal, state or local law including, without limitation, usury, truth in lending, real estate settlement procedures, consumer credit protection, predatory and abusive lending laws, equal credit opportunity, fair housing and disclosure laws or unfair and deceptive practices laws applicable to the origination and servicing of the Mortgage Loan including, without limitation, any provisions relating to prepayment penalties, have been complied with, the consummation of the transactions contemplated hereby will not involve the violation of any such laws or regulations. Each Mortgage Loan at the time it was made complied in all material respects with applicable local, state, and federal laws, including, but not limited to, all applicable predatory and abusive lending laws.

(g) No Satisfaction of Mortgage. The Mortgage has not been satisfied, canceled, subordinated or rescinded, in whole or in part, and the Mortgaged Property has not been released from the lien of the Mortgage in whole or in part, nor has any instrument been executed that would effect any such satisfaction, cancellation, subordination, rescission or release. Neither the Seller nor the Servicer has waived the performance by the Mortgagor of any action, if the Mortgagor's failure to perform such action would cause the Mortgage Loan to be in default, and neither the Seller nor the Servicer has waived any default.

(h) Valid First or Second Lien. Except with respect to each Co-op Loan, the Mortgage is a valid, existing, perfected and enforceable first or second lien on the Mortgaged Property, including all improvements on the Mortgaged Property, free and clear of all adverse claims, liens and encumbrances having priority over the lien of the Mortgage. . . .

(i) Validity of Mortgage Documents. With respect to each Mortgage Loan, Seller or its designee has in its possession all Servicing Files, or any miscellaneous items (except for those Servicing Files disclosed to Purchaser by Seller as outstanding). . . .

(k) Title Insurance. Except with respect to each Co-op Loan and each Second Lien Mortgage Loan, the Mortgage Loan is covered by an ALTA or CLTA lender's title insurance policy. . . .

(l) No Default. There is no default, breach, violation or event of acceleration existing under the Mortgage or the Mortgage Note and no event which, with the passage of time or with notice and the

27

expiration of any grace or cure period, would constitute a default, breach, violation or event permitting acceleration . . . .

(q) Customary Provisions. The Mortgage and related Mortgage Note contain customary and enforceable provisions such as to render the rights and remedies of the holder thereof adequate for the realization against the Mortgaged Property of the benefits of the security provided thereby, including (i) in the case of a Mortgage designated as a deed of trust by trustee's sale, and (ii) otherwise by judicial foreclosure. . . .

(s) Appraisal. The Mortgage File contains an appraisal of the related Mortgaged Property, in a form acceptable to Fannie Mae or Freddie Mac and such appraisal complies with the requirements of FIRREA, and was made and signed, prior to the approval of the Mortgage Loan application, by a Qualified Appraiser. . . .

(v) Disclosure and Rescission Materials. The Mortgagor has received all disclosure materials required by applicable law with respect to the making of mortgage loans of the same type as the Mortgage Loan and rescission materials required by applicable law if the Mortgage Loan is a Refinanced Mortgage Loan and has acknowledged receipt of such materials to the extent required by applicable law and such documents will remain in the Mortgage File.

(w) LTV, PMI Policy. In the event the Mortgage Loan had an LTV greater than 80.0% at origination the Mortgage Loan has a valid and transferable PMI Policy, except that where such a policy was impermissible at origination under applicable law, such Mortgage Loan was originated in compliance with applicable law. . . . As of the date of origination, no Mortgage Loan had an LTV greater than 100%.

(x) Occupancy of the Mortgaged Property. As of the related date of origination, and to the best of Seller's knowledge as of the related Closing Date, the Mortgaged Property is lawfully occupied under applicable law. All inspections, licenses and certificates required to be made or issued with respect to all occupied portions of the Mortgaged Property and, with respect to the use and occupancy of the same, including but not limited to certificates of occupancy, have been made or obtained from the appropriate authorities and no improvement located on or part of the Mortgaged Property is in violation of any zoning law or regulation. The Mortgaged Property meets the requirement of either owner occupied or non-owner occupied property.

(y) Transfer of Mortgage Loans. The Assignment of Mortgage is in recordable form and is acceptable for recording under the laws of the jurisdiction in which the Mortgaged Property is located (except with respect to each MERS Designated Mortgage Loan). Each original Mortgage was recorded and, except for those Mortgage Loans subject to the MERS identification system, all subsequent assignments of the original Mortgage (other than the assignment to the Purchaser) have been recorded in the appropriate jurisdictions wherein such recordation is necessary to perfect the lien thereof as against creditors of the Seller, or is in the process of being recorded. . . .

(z) Delinquency. All payments required to be made prior to the Closing Date for such Mortgage Loan under the terms of the Mortgage Note have been made, the Mortgage Loan has not been dishonored, and no Mortgage Loan has been more than thirty (30) days delinquent since the related origination date.

(aa) Mortgage File. With respect to each Mortgage Loan, the Seller is in possession of a complete Mortgage File except for the documents which have been delivered to the Purchaser or the Custodian or which have been submitted for recording and not yet returned.

(bb) Ownership. Immediately prior to the payment of the Purchase Price, the Seller was the sole owner and holder of the Mortgage Loans and the indebtedness evidenced by the Mortgage Note. The Mortgage Loans, including the Mortgage Note and the Mortgage, were not assigned or pledged by the Seller and the Seller had good and marketable title thereto, and the Seller had full right to transfer and sell the Mortgage Loans to the Purchaser free and clear of any encumbrance, participation interest, lien, equity, pledge, claim or security interest and had full right and authority subject to no interest or participation in, or agreement with any other party to sell or otherwise transfer the Mortgage Loans . . . .

(dd) Underwriting Guidelines. The Mortgage Loan was underwritten in accordance with the Underwriting Guidelines in effect at the time of origination. The Mortgage Note and Mortgage are on forms acceptable to Freddie Mac or Fannie Mae and no representations have been made to a Mortgagor that are inconsistent with the mortgage instruments used; . . .

(gg) Qualified Mortgage. Each Mortgage Loan is a "qualified mortgage" within Section 860G(a)(3) of the Code.

(hh) No Fraud. No fraud, error, omission, misrepresentation, negligence or similar occurrence with respect to the Mortgage Loan has taken place on the part of the Seller, the Servicer or any originator or servicer or the Mortgagor or on the part of any other party involved in the origination of the Mortgage Loan, including without limitation the Mortgagor, any appraiser, any builder or developer, or any other party involved in the origination of the Mortgage Loan or, in the application of any insurance in relation to such Mortgage Loan. . . .

(ii) Origination Practices. The origination practices used by the Seller and the collection and servicing practices used by the Servicer with respect to each Mortgage Loan have been in all respects legal and customary in the mortgage origination and servicing industry and the collection and servicing practices used by the Servicer have been consistent with Customary Servicing Procedures. There has been no improper act or omission or alleged improper act or omission or error by the Seller or any employee, agent or representative acting on Seller's behalf, with respect to the origination or servicing of the Mortgage Loan . . .

(nn) Insurance. All required insurance policies, of whatever type, remain in full force and effect. Seller has not engaged in, and has no knowledge of the Mortgagor's having engaged in, any act or omission which would impair the coverage validity or binding effect of any such policies. No action, inaction, or event has occurred and no state of facts exists or has existed that has resulted or will result in the exclusion from, denial of, or defense to coverage under any applicable special hazard insurance policy, PMI Policy, LPMI Policy or bankruptcy bond, irrespective of the cause of such failure of coverage. In connection with the placement of any such insurance, no commission, fee, or other compensation has been or will be received by the Seller or the Servicer or any designee of the Seller or the Servicer or any corporation in which the Seller, the Servicer or any officer, director, or employee of the Seller or the Servicer had a financial interest at the time of placement of such insurance. . . .

(yy) Prepayment Penalties. With respect to any Mortgage Loan that contains a provision permitting imposition of a penalty upon a prepayment prior to maturity: (i) the Mortgage Loan provides some benefit to the Mortgagor (e.g., a rate or fee reduction) in exchange for accepting such Prepayment Penalty, (ii) the Mortgage Loan's originator had a written policy of offering the Mortgagor or

requiring third-party brokers to offer the Mortgagor, the option of obtaining a mortgage loan that did not require payment of such a penalty and (iii) the Prepayment Penalty was adequately disclosed to the Mortgagor in the mortgage loan documents pursuant to applicable state, local and federal law, and (v) notwithstanding any state or federal law to the contrary, the Servicer shall not impose such prepayment premium in any instance when the mortgage debt is accelerated as the result of the borrower's default in making the loan payments . . . .

The PSAs or MLPAs for the DB, Goldman Sachs, MHC, and Nomura Trusts contain substantially similar provisions. *See* Ex. C § XI.

67.    As noted in Section II(B), each party, including the Trustee, had an obligation to provide notice of breaches of these representations and warranties, and such notice triggered the Sponsors' or Originators' obligation to repurchase or substitute the defective loans. *See also* Ex. C § VI.

68.    HSBC knew that the Sponsors and Originators regularly disregarded their underwriting guidelines and representations and warranties made to securitization trusts long before certificateholders learned of such problems.

69.    HSBC served as trustee for hundreds, if not thousands, of RMBS trusts from 2004 to 2007, including for many transactions involving the Sponsors and Originators. In the course of administering these trusts, HSBC learned that the Sponsors and Originators had departed from their underwriting guidelines, engaged in predatory lending, and failed to ensure mortgage loans complied with state and federal laws.

70.    For example, while serving as trustee for various RMBS trusts, HSBC was presented with a large number of defaulted loans that were originated by the Sponsors and Originators here, and foreclosures were commenced often in HSBC's name.

71.    Indeed, HSBC commenced foreclosure actions from 2005 to 2008 for numerous

loans in which the Sponsors or Originators were at issue, including, for example, foreclosure

actions in which:

a. DB Structured Products, Inc. served as Sponsor. *See, e.g.*, *HSBC Bank v. Soffer*, No. 034098/2008 (N.Y. Sup. Ct. Kings Cnty. 2008); *HSBC Bank v. Lacey*, No. 2007-06-4538 (C.P. Summit Cnty. 2007); *HSBC Bank v. Wagner*, No. 2006-07-4491 (C.P. Summit Cnty. 2006) (initiating action for loan included in the ACE 2005-HE5 Trust); *HSBC Bank v. Sammour*, No. 2008-10-7645 (C.P. Summit Cnty. 2008); *HSBC Bank v. Knaff*, No. 2007-06-4315 (C.P. Summit Cnty. 2007) (initiating action for loan included in the ACE 2006-ASAP5 Trust); *HSBC Bank v. Ream*, No. 2008-04-3413 (C.P. Summit Cnty. 2008) (initiating action for loan included in the ACE 2006-HE1 Trust).

b. Fremont Investment & Loan served as Originator. *See, e.g.*, *HSBC Bank v. Palladino*, No. 09-CH-4548 (Du Page Cnty. 2008); *HSBC Bank USA, N.A. v. Addie*, No. 08-cv-2211 (C.P. Medina Cnty. 2008); *HSBC Bank v. Coyne*, No. 08-cv-1768 (C.P. Medina Cnty. 2008); *HSBC Bank v. Key*, No. 2007-03-1931 (C.P. Summit Cnty. 2007); *HSBC Bank v. Newton*, No. 36007/2007 (N.Y. Sup. Ct. Suffolk Cnty. 2007).

c. MHC I Inc. served as Sponsor. *See, e.g.*, *HSBC Bank v. Layton*, No. 2008-11-7969 (C.P. Summit Cnty. 2008) (initiating action for loan included in the FBRSI 2005-2 Trust).

d. Nomura Credit & Capital Inc. served as Sponsor. *See, e.g.*, *HSBC Bank v. Levy*, No. 112035/2006 (N.Y. Sup. Ct. 2006). *See also HSBC Bank v. Dahan*, No. 103498/2006 (N.Y. Sup. Ct. 2006); *HSBC Bank v. Swiecicki*, No. 2008-01-0441 (C.P. Summit Cnty. 2008) (initiating action for loan included in the NHELI 2005-HE1 Trust); *HSBC Bank v. Safron*, No. 2008-02-1404 (C.P. Summit Cnty. 2008); *HSBC Bank v. Oliver*, No. 2007-03-1810 (C.P. Summit Cnty. 2007) (same); *HSBC Bank v. Hindinger*, No. 2007-10-6973 (C.P. Summit Cnty. 2007) (initiating action for loan included in the NHELI 2005-HE1 Trust).

e. Ownit Mortgage Solutions Inc. served as Originator. *See, e.g.*, *HSBC Bank v. Maynard*, No. 07-cv-1415 (C.P. Medina Cnty. 2007); *HSBC Bank v. Kurz*, No. 07-cv-1493 (C.P. Medina Cnty. 2007); *HSBC Bank v. Tufts*, No. 2008-02-1788 (C.P Summit Cnty. 2008) (initiating action for loan included in the ACE 2006-HE1 Trust); *HSBC Bank v. Mosley*, No. 2007-12-8493 (C.P. Summit Cnty. 2007) (same); *HSBC Bank v. Given*, No. 2007-11-8379 (C.P. Summit Cnty. 2007) (same); *HSBC Bank v. Puma*, No. 2007-04-3005 (C.P. Summit Cnty. 2007) (same).

f. Wells Fargo Bank, N.A. served as Originator. *See, e.g.*, *HSBC Bank v. Vesely*, No. 2008-08-5559 (C.P. Summit Cnty, 2008); *HSBC Bank v. Davis*, No. 08-

cv-0317 (C.P. Medina Cnty. 2008); *HSBC v. Dammert*, No. 2007-08-5743
(C.P. Summit Cnty. 2007); *HSBC Bank v. Boggs*, No. 2008-04-3285 (C.P.
Summit Cnty. 2008).

72.     Sometimes the defaults and foreclosures occurred just months after the loan was

originated or securitized. In each foreclosure, HSBC was the named plaintiff and real party in

interest as it held title to the notes and mortgage as trustee for the benefit of the

certificateholders. As the real party in interest, it had knowledge of the contents of the

foreclosure filings.

73.     Through its review of these filings, HSBC knew that the borrowers either (i)

did not qualify for the loans because they did not have the ability to repay the loans; (ii)

were victims of predatory lending; or (iii) were given loans that did not comply with state or

federal law.

74.     Beginning in 2009 or 2010, facts began to emerge publicly demonstrating that

the Sponsors and Originators had violated the representations and warranties provided in

connection with the Covered Trusts. These facts, some of which are detailed in Exhibit F,

demonstrated that the Sponsors and Originators regularly included loans in securitizations

that did not comply with applicable underwriting guidelines, made predatory loans, and

failed to meet state and federal lending guidelines. While investors such as Commerzbank

lacked the ability to determine whether the publicly reported misconduct by the Sponsors

and Originators impacted specific loans backing the Covered Trusts, HSBC had knowledge

of specific problems with specific loans, as well as access to the mortgage loan files. At a

minimum, in its role as trustee to hundreds of RMBS trusts, HSBC was privy to information

that would have provided the "scent" of a problem with the loans underlying the Covered

Trusts. Having caught wind of the problem, HSBC had statutory and common law duties

requiring them to "nose to the source."

75.     HSBC also commenced repurchase actions against the Sponsors or Originators at issue here, including DB Structured Products, Inc. ("Deutsche Bank") (the Sponsor for ten of the Covered Trusts) and Nomura Credit & Capital, Inc. ("Nomura") (the Sponsor for four of the Covered Trusts) to compel repurchase of loans that breached representations and warranties. *See, e.g.*, Compl., *Ace Sec. Corp. Home Equity Loan Trust, Series 2006-HE4, by HSBC Bank USA, N.A. as Trustee v. DB Structured Prods., Inc.*, No. 653394/2013 (N.Y. Sup. Ct. Mar. 4, 2013); Compl., *Ace Sec. Corp. Home Equity Loan Trust, Series 2007-HE1, by HSBC Bank USA, N.A. as Trustee v. DB Structured Prods., Inc.*, No. 650327/2013 (N.Y. Sup. Ct. Jan. 29, 2013); Compl., *Deutsche Alt-A Sec. Mortg. Loan Trust, Series 2007-OA3, by HSBC Bank USA, N.A. as Trustee v. DB Structured Prods., Inc.*, No. 13-cv-02999 (S.D.N.Y. Apr. 30, 2013); Compl., *Nomura Home Equity Loan Inc., Series 2006-FM2 v. Nomura Credit & Capital, Inc.*, No. 653783/2012 (N.Y. Sup. Ct. Apr. 16, 2013). In each of the repurchase actions brought by HSBC, loan level reviews were conducted which identified breach rates with respect to loans originated during the same period as the loans in the Covered Trusts as high as 99 percent.

76.     HSBC also received written notice of systemic, widespread Sponsor breaches from monoline insurers.

77.     Monoline insurance is a form of credit enhancement that involves purchasing insurance to cover losses from any defaults. Many RMBS trusts were insured by monoline insurers. Sponsors of the mortgage loans made representations and warranties concerning the underwriting standards of the loans in the governing agreements for the insured RMBS. The governing agreements for the insured RMBS transactions have a repurchase procedure through

34

which the monoline insurers must provide notice of a breach of representation and warranty to

the responsible mortgage loan sponsor and the parties to the agreement, including the Trustee.

78.     Monoline insurers have filed many complaints against Sponsors and Originators

of the Covered Trusts for breaches of their representations and warranties in connection with

other RMBS trusts. Prior to filing suit against the mortgage loan Sponsors, the monoline insurers

were often able to obtain and carry out a forensic loan level review of the loans at issue.

79.     For example, in *Ambac Assurance Corp. v. Nomura Credit & Capital, Inc.*, No.

651359/2013 (N.Y. Sup. Ct. Apr. 15, 2013), the monoline insurer, Ambac Assurance

Corporation ("Ambac"), sued Nomura, reporting that its review of the loan files securitized by

Nomura revealed breaches of representations and warranties, including an extraordinarily high

incidence of material deviations from the underwriting standards that Nomura represented would

be followed. *Id*. Of the approximately 1,800 loan files that were reviewed by Ambac, over 95

percent contained one or more breaches of the mortgage loan representations. *Id*.

80.     Additionally, Ambac, MBIA Inc., and Syncora Guarantee Inc. each brought

actions against Countrywide Home Loans, Inc. alleging breach of representations and warranties.

*See* Compl., *Ambac Assurance Corp. v. Countrywide Home Loans, Inc.*, No. 653979/2014 (N.Y.

Sup. Ct. Dec. 30, 2014); Am. Compl., *MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, No.

602825/2008 (N.Y. Sup. Ct. Aug. 24, 2009); Compl., *Syncora Guarantee Inc. v. Countrywide

Home Loans, Inc.*, No. 650042/2009 (N.Y. Sup. Ct. May 6, 2010). Monoline insurers also

brought suits against JPMorgan Chase Bank, N.A. and GreenPoint Mortgage Funding, Inc.

alleging that both defendants breached representations and warranties. Compl., *Assured Guar.

Corp. v. EMC Mortg. LLC*, 650805/2012 (N.Y. Sup. Ct. Mar. 15, 2012); Compl., *CIFG

Assurance N.Am., Inc. v. GreenPoint Mortg. Funding, Inc.*, No. 653449/2012 (N.Y. Sup. Ct.

Mar. 4, 2013).

81.     HSBC received notice of these monoline actions as it was the trustee for the respective trusts in that action.

82.     Because the monoline insurers' findings from loan level reviews set forth both in their breach notices and publicly available lawsuits reflected these common mortgage loan Sponsors', Originators', and sellers' systemic and pervasive violations of underwriting and securitization guidelines, HSBC discovered, or should have discovered if it was carrying out its duties, that these same defective underwriting and securitization practices applied equally to the Covered Trusts containing loans originated and securitized by these same Originators and Sponsors.

83.     Apart from the multiple, highly-publicized RMBS lawsuits and the numerous government investigations on both the state and federal level, there are various other indications that the Covered Trusts' loan pools included large numbers of mortgage loans that materially breached the responsible parties' representations and warranties. For example, the Originators' and Sponsors' systemic abandonment of their underwriting guidelines has had a devastating effect on the performance of the Covered Trusts. Many of the Certificates acquired by Commerzbank were triple-A or double-A rated at the time of purchase. *See* Ex. D. Now, many are "junk" bonds that do not qualify for any investment grade rating. *See id.* These downgrades were prompted by the alarming rate of defaults and delinquencies of the mortgage loans backing the Covered Trusts and the information that has emerged concerning the Sponsors' and Originators' systemic abandonment of underwriting guidelines. *See* Ex. E. A summary of the Covered Trusts' high default and delinquency rates is attached as Exhibit E. HSBC was aware of the high level of defaults and should have carefully investigated these issues, notified

certificateholders, including Commerzbank, of the issues, and taken action to address these issues.

84.     If HSBC had provided the required notices, it would have forced the Sponsors or Originators to repurchase, or substitute if within the period specified in the PSAs, the relevant loans, and the Sponsors would not have been able to issue additional fraudulent RMBS certificates. HSBC had a continuing duty to provide such notice but failed to do so throughout its tenure as trustee. Indeed, HSBC let the statute of limitations to bring repurchase claims lapse by failing to provide notice or take other action within six years of the closing of each Covered Trust.

### 1.     The Originators' and Sponsors' Pervasive Breaches of Representations and Warranties

85.     Either the Sponsor or Originator, and sometimes both, provided representations and warranties to the Covered Trusts.

86.     The failure of the parties to the PSAs to provide notice of breaches of representations and warranties constituted a default that would have ripened into Events of Default had HSBC provided notice of the defaults.

87.     The chart below identifies each of the entities disclosed to be the Sponsors, Originators, and obligors of the loans included in the Covered Trusts.

|   | **Trust** | **Sponsor** | **Originators** | **Obligors** |
|---|---|---|---|---|
| 1 | ACE 2005-AG1 | DB Structured Products, Inc. | Ameriquest Mortgage Company; Argent Mortgage Company, LLC | DB Structured Products, Inc. |
| 2 | ACE 2005-HE5 | DB Structured Products, Inc. | Fremont Investment & Loan | DB Structured Products, Inc. |
| 3 | ACE 2005-WF1 | DB Structured Products, Inc. | Wells Fargo Bank, N.A. | DB Structured Products, Inc. |
| 4 | ACE 2006-ASAP2 | DB Structured Products, Inc. | DB Structured Products, Inc. | DB Structured Products, Inc. |

| | Trust | Sponsor | Originators | Obligors |
|---|---|---|---|---|
| 5 | ACE 2006-ASAP3 | DB Structured Products, Inc. | DB Structured Products, Inc. | DB Structured Products, Inc. |
| 6 | ACE 2006-ASAP5 | DB Structured Products, Inc. | DB Structured Products, Inc. | DB Structured Products, Inc. |
| 7 | ACE 2006-HE1 | DB Structured Products, Inc. | Fremont Investment & Loan; Ownit Mortgage Solutions, Inc. | DB Structured Products, Inc. |
| 8 | ACE 2007-HE4 | DB Structured Products, Inc. | db home lending llc (formerly known as Chapel Funding, LLC); ResMAE Mortgage Corporation | DB Structured Products, Inc. |
| 9 | ACE 2007-WM2 | DB Structured Products, Inc. | WMC Mortgage Corp. | DB Structured Products, Inc. |
| 10 | DBALT 2006-AR4 | DB Structured Products, Inc. | Countrywide Home Loans, Inc.; MortgageIT, Inc.; GreenPoint Mortgage Funding, Inc. | DB Structured Products, Inc. |
| 11 | FBRSI 2005-2 | MHC I, Inc. | Encore Credit Corporation; Finance America, LLC; Accredited Home Lenders, Inc.; ResMAE Mortgage Corporation; Quick Loan Funding, Inc. | MHC I, Inc. |
| 12 | FBRSI 2005-4 | MHC I, Inc. | ResMAE Mortgage Corporation | MHC I, Inc. |
| 13 | GSAA 2005-6 | Goldman Sachs Mortgage Co. | National City Mortgage Company; GreenPoint Mortgage Funding, Inc.; Countrywide Home Loans, Inc. | National City Mortgage Company; GreenPoint Mortgage Funding, Inc.; Countrywide Home Loans, Inc.; Goldman Sachs Mortgage Company |
| 14 | JPALT 2006-A7 | J.P. Morgan Mortgage Acquisition Corporation | Chase Home Finance, LLC; JPMorgan Chase Bank, N.A.; Countrywide Home Loans, Inc.; CTX Mortgage Company, LLC; | J.P. Morgan Mortgage Acquisition Corporation; Chase Home Finance, LLC; JPMorgan Chase Bank, N.A.; Countrywide Home |

| | Trust | Sponsor | Originators | Obligors |
|---|---|---|---|---|
| | | | Fifth Third Mortgage Company; Flagstar Bank, FSB; Greenpoint Mortgage Funding, Inc.; PHH Mortgage Corporation; Mortgage Access Corporation, d/b/a Weichert Financial Services | Loans, Inc.; CTX Mortgage Company, LLC; Fifth Third Mortgage Company; Flagstar Bank, FSB; Greenpoint Mortgage Funding, Inc.; PHH Mortgage Corporation; Mortgage Access Corporation, d/b/a Weichert Financial Services |
| 15 | JPMMT 2006-A5 | J.P. Morgan Mortgage Acquisition Corporation | Chase Home Finance, LLC; JPMorgan Chase Bank, N.A.; American Home Mortgage Corporation; CTX Mortgage Company, LLC; Countrywide Home Loans, Inc.; GreenPoint Mortgage Funding, Inc.; Market Street Mortgage Company; M&T Mortgage Corporation; NetBank, Inc.; PHH Mortgage Corporation; SunTrust Mortgage, Inc.; Weichert Financial Services | J.P, Morgan Mortgage Acquisition Corporation; Chase Home Finance, LLC; JPMorgan Chase Bank, N.A.; American Home Mortgage Corporation; CTX Mortgage Company, LLC; Countrywide Home Loans, Inc.; GreenPoint Mortgage Funding, Inc.; Market Street Mortgage Company; M&T Mortgage Corporation; NetBank, Inc.; PHH Mortgage Corporation; SunTrust Mortgage, Inc.; Weichert Financial Services |
| 16 | NAA 2006-AR3 | Nomura Credit & Capital, Inc. | Metrocities Mortgage LLC; Wachovia Mortgage Corporation; | Nomura Credit & Capital, Inc. |

|    | Trust | Sponsor | Originators | Obligors |
|----|-------|---------|-------------|----------|
|    |       |         | Alliance Bancorp.; Silver State Mortgage |          |
| 17 | NHELI 2005-FM1 | Nomura Credit & Capital, Inc. | Fremont Investment & Loan | Nomura Credit & Capital, Inc. |
| 18 | NHELI 2005-HE1 | Nomura Credit & Capital, Inc. | Option One Mortgage Corporation; Quick Loan Funding, Inc.; New Century Mortgage Corporation; Mandalay Mortgage Inc. | Nomura Credit & Capital, Inc. |
| 19 | NHELI 2006-WF1 | Nomura Credit & Capital, Inc. | Wells Fargo Bank, N.A. | Nomura Credit & Capital, Inc. |

88.     As detailed in Exhibit F, in 2009 and 2010 facts began to emerge that demonstrated that the Sponsors and Originators, and HSBC itself, systematically abandoned applicable underwriting guidelines and therefore breached representations and warranties in all securitizations. That HSBC itself was involved in origination misconduct demonstrates that it was aware of widespread systemic abandonment of underwriting guidelines and related representation and warranty breaches by other market participants.

89.     The Sponsors and Originators have been the subject of numerous investigations and lawsuits alleging systematic abandonment of underwriting guidelines in the pursuit of profits. These investigations and lawsuits contain ample evidence available to HSBC that mortgage loans originated and sponsored by the relevant Originators and Sponsors breached the associated representations and warranties. Not only do these investigations and lawsuits contain accounts from confidential witnesses and former employees, but many complaints contain detailed information based on forensic reviews of individual loans. Further, these lawsuits and investigations demonstrate that the Originators originated mortgage loans with the goal of increasing volume, rather than evaluating the borrower's ability to repay the loan, and regularly made exceptions to underwriting guidelines in the absence of sufficient compensating factors.

90.     These lawsuits, in conjunction with the poor performance of the underlying loans (which HSBC was aware of as it issued regular reports regarding performance) and the public information concerning widespread issues among Originators, were more than sufficient to provide HSBC with notice that large numbers of loans originated and sponsored by the relevant Originators and Sponsors breached the associated representations and warranties.

91.     HSBC was aware of these reports, investigations, and lawsuits, and it also had additional information concerning representation and warranty violations that it learned in the course of administering the Covered Trusts. Additionally, HSBC had access to non-public information regarding the Covered Trusts that would have confirmed the representation and warranty violations if it had conducted even a limited investigation. Thus, HSBC was aware of the defaults, but failed to provide the required notice and pursue repurchase claims.

**B.     HSBC Failed to Act Prudently
Upon the Occurrence of an Event of Default**

92.     When HSBC learned that the Master Servicers[5] or Servicers failed to provide notice of numerous breaches of representation and warranty provisions as required under the PSAs, HSBC should have acted like a prudent person would in the exercise of its own affairs and (i) taken action against the Servicers; (ii) taken steps to require the Sponsors or Originators to repurchase or substitute the loans; and (iii) notified certificateholders of the Servicers' defaults and the breaches of representation and warranty provisions. During the period that an Event of Default was in existence, HSBC had a continuing duty to enforce repurchase rights. As such, it should have, at a minimum, reviewed all defaulted loans as they defaulted and determined whether a responsible party was required to repurchase such

---

[5] In the PSAs for the DB, Goldman Sachs, J.P. Morgan, MHC, and Nomura Trusts, the Master Servicer was also the Securities Administrator or Trust Administrator and was also required to provide notices of breaches by the Master Servicer and Servicers. References to the Master Servicer herein also refer to the Master Servicer as Securities Administrator or Trust Administrator.

loans. HSBC continually failed to do so and let the statute of limitations to bring repurchase claims lapse by failing to take sufficient action within six years of the closing of each Covered Trust.

93.     The PSAs for the J.P. Morgan, MHC, and Nomura Trusts provide that the Servicers were required to provide notice of breaches of representations and warranties. *See* Ex. C § VI. For the remaining PSAs, prudent servicing standards dictate that when the Servicer becomes aware of such breach, it has a duty to provide notice.

94.     Although certain Events of Default require formal notice and an opportunity to cure, the Trustee cannot escape its duty of care by failing to provide the required notice. As set forth in Section III(A), HSBC was aware (or would have been aware if it had carried out its duties) that the Servicers, Depositors, Sponsors, and the Trustee itself, failed to provide notice of the Sponsors' and Originators' representation and warranty violations that occurred in the Covered Trusts. HSBC, however, did not provide notice of such breaches as it was required to do. Because these would have seasoned into Events of Default if notice had been provided, HSBC had a duty to act prudently to enforce repurchase provisions once it learned of such defaults.

95.     As described below, additional Events of Default occurred under the terms of the PSAs. HSBC has engaged in repeated breaches of its duty to exercise due care throughout the life of the Covered Trusts.

        **1.      Events of Default Under the PSAs Relating to Document Delivery Failures in the Covered Trusts**

96.     As discussed in Section II(A), HSBC, or a custodian acting on its behalf, had a duty to identify in final certifications and exception reports mortgage files that were missing documentation required to be delivered under the PSAs, which typically includes

documents sufficient to prove ownership of the note and mortgage or otherwise protect title. HSBC knew of numerous instances where it did not receive: (i) the original mortgage note with all intervening endorsements showing a complete chain of endorsement from the Originator to the Sponsor or Depositor, or a lost mortgage note affidavit and a duly executed assignment of mortgage for each loan that was not a MERS loan; (ii) the original recorded mortgage for each loan that was not a MERS loan; (iii) the original mortgage for those loans that were MERS loans; or (iv) the original recorded assignment or assignment of the mortgage together with all interim recorded assignments and the original lender's title policy.

97.    When HSBC prepared the final exception reports, it provided them to the Sponsors, Depositors, and Servicers indicating many of these missing documents. When the custodian prepared such reports, it provided them to HSBC, the Sponsors, Depositors, and Servicers, and the reports similarly showed many documents that were required to be delivered under the PSAs were not delivered. HSBC was aware that affected loans were not repurchased or substituted.

98.    Rather than take action to ensure the responsible parties cured such defects or substituted or repurchased the affected loans, HSBC stood by while the Sponsors and Servicers of the Covered Trusts engaged in so called "robo-signing" on a widespread basis when the missing documents were needed to foreclose on properties underlying the Covered Trusts. HSBC and the Sponsors and Servicers of the Covered Trusts have been implicated in numerous governmental reports, court orders, and press reports regarding servicing misconduct and the massive cover up of the failure to deliver documentation concerning securitized mortgage loans known as the "robo-signing" scandal. This is powerful evidence

of the systemic document delivery failures and HSBC's knowledge of such failures. Section III(C) contains a chart of the relevant Sponsors and Servicers for the Covered Trusts. HSBC's and the relevant Sponsors' and Servicers' involvement in the robo-signing scandal is summarized in Exhibit G.

99.     Events of Default occurred shortly after the final exception reports were delivered for each of the Covered Trusts under multiple provisions of the PSAs. These Events of Default triggered a continuing duty to review defaulted loans to determine if such loans should be repurchased.

100.     Each PSA provides that the Servicers' failure to adhere to prudent servicing standards ripens into an Event of Default if left uncured within a specified period after notice of such breach. For example, Section 6.14 of the J.P. Morgan PSA provides that an Event of Default occurs if the Servicer fails to prudently service the mortgage loans and such breach is not remedied within 30 days of notice of the breach. The PSAs for the DB, Goldman Sachs, MHC, and Nomura Trusts contain similar provisions. *See* Ex. C § IX.

101.     The PSA for the MHC Trust provides that the failure of the Master Servicer to perform its covenant to prudently service the mortgage loans ripens into a Master Servicer Event of Default if left uncured for a specified period after a servicing officer learns of such failure.

102.     As set forth above and in Exhibit G, when borrowers defaulted and the Servicers were required to commence foreclosures, they fabricated the documents necessary to foreclose, rather than cause the Sponsor, Depositor, or Originator to repurchase or substitute the affected loan. HSBC was aware of this fact, as it was aware of the contents of the document exception reports and that loans with exceptions had defaulted and not been repurchased or substituted.

Both the Servicers and Trustee were aware that these loans were not put back to the Sponsors or Originators and, instead, as described in Exhibit G, the Servicers robo-signed the documentation required to foreclose. These acts of robo-signing were breaches of the applicable prudent servicing standard, as a prudent Servicer would have insisted that the loans be repurchased. Having failed to provide notice, HSBC had an obligation to act prudently to address all defaults.

103.    These Events of Default triggered HSBC's duty to act prudently to protect the interests of the certificateholders in all respects, and such duty continues to this day because the document defects were not cured within the required period and the affected loans were not repurchased. HSBC had a continuing obligation to seek repurchase of loans missing required documentation throughout its tenure as trustee, including as loans on the final exception report defaulted. HSBC also had a duty to determine whether other defaulted loans should be put back to the responsible parties based on representation and warranty violations because an Event of Default had occurred. HSBC has repeatedly breached these duties throughout its tenure as trustee.

### 2.    Events of Default Under the MHC Trusts

104.    As noted, the MHC Trusts were documented using an Indenture rather than a PSA. While the same type of Events of Default occurred under the Indenture as described in Section III(B)(1), the relevant provisions are slightly different in that the Issuer's (*i.e.,* the Trust's) breach of the Indenture gives rise to an Event of Default, rather than the Servicers' breaches.

105.    Section 3.5(a) of the FBRSI 2005-2 Indenture provides in relevant part, "The Issuer, from time to time, will . . . take such other action necessary or advisable to: . . . (iii) enforce any rights with respect to the Trust Fund; or (iv) preserve and defend title to the

Trust Fund and the rights of the Indenture Trustee and the Noteholders in such Trust Fund against the claims of all persons and parties." The Indenture for FBRSI 2005-4 contains substantively identical provisions.

106.    The failure to do so is an Event of Default. For example, the Indenture for FBRSI 2005-2 provides that an Event of Default occurs when the Issuer fails:

> to observe or perform any covenant or agreement of the Issuer made in this Indenture . . . and such default shall continue or not be cured . . . for a period of 30 days after there shall have been given, by registered or certified mail, to the Issuer by the Indenture Trustee or to the Issuer and the Indenture Trustee by Noteholders representing at least 25% of the then-outstanding Notes . . . , a written notice specifying such default . . . and requiring it to be remedied and stating that such notice is a notice of Indenture Default hereunder.

The Indenture for FBRSI 2005-4 contains substantively identical provisions.

107.    As discussed above, the Trustee provided written notice that the mortgage files were incomplete. The Issuer under the MHC Trusts failed to protect the trust assets, a fact the Trustee was well aware of. As a result, an Event of Default occurred under the MHC Trusts in the first year of their existence.

108.    As detailed in Section III(A) and Exhibit F, HSBC became aware of public information indicating that the Issuer failed to protect the trust assets by enforcing the Sponsors' or Originators' repurchase obligations triggered by representation and warranty violations. Events of Default occurred as a result. This triggered a continuing obligation to protect the interests of certificateholders that HSBC breached throughout its tenure as Trustee.

### 3. HSBC Received Written Notice of Representation and Warranty Violations Which Ripened into Events of Default

109.    In addition to the Events of Default discussed above, on July 21, 2011, the Association of Mortgage Investors ("AMI") notified all major RMBS trustees, (including HSBC) that "substantial evidence [] has emerged of abuses in the servicing and monitoring of" RMBS. The letter set forth in detail the publicly available evidence demonstrating that there was widespread evidence, including some of the evidence referenced in this Complaint, that loan originators had systemically breached representations and warranties provided to securitization trusts, and that the parties servicing loans underlying securitization trusts had systemically breached their obligations under applicable servicing agreements. The letter cautioned, "[y]ou cannot be negligent in ascertaining the pertinent facts regarding the underlying collateral;" "[u]pon discovery of representation or warranty breaches, you have to notify the appropriate parties;" and "you must comply with your obligations . . . to take action to remedy the servicer Events of Default in the best interests of the certificateholders."

110.    Beginning in 2012, HSBC commenced lawsuits relating to RMBS trusts other than the Covered Trusts against certain Sponsors and Originators (including, among others, Deutsche Bank) alleging that, among other misconduct, the Originators sold a material number of loans to securitization trusts that did not comply with applicable underwriting guidelines in violation of their representations and warranties.

111.    These lawsuits, which alleged pervasive and systemic breaches of representations and warranties, demonstrate that HSBC was aware of similarly pervasive and systemic breaches of representations and warranties, in the Covered Trusts, but failed to exercise due care.

112.    For instance, between March 2012 and May 2013, HSBC, as trustee, filed complaints against Deutsche Bank in its capacity as sponsor of trusts from the ACE and DBALT

shelves. *See, e.g.*, Compl., *Deutsche Alt-A Sec. Mortg. Loan Trust, Series 2007-OA3, by HSBC Bank USA, N.A. as Trustee v. DB Structured Prods., Inc.*, No. 13-cv-02999 (S.D.N.Y. Apr. 30, 2013); Compl., *Deutsche Alt-A Sec. Mortg. Loan Trust, Series 2006-OA1, by HSBC Bank USA, N.A. as Trustee v. DB Structured Prods., Inc.*, No. 12-cv-08594 (S.D.N.Y. Nov. 27, 2012); Compl., *Deutsche Alt-A Sec. Mortg. Loan Trust, Series 2007-OA4, by HSBC Bank USA, N.A. v. DB Structured Prods., Inc.*, No. 13-cv-3685 (S.D.N.Y. May 31, 2013); Compl., *ACE Sec. Corp. Home Equity Loan Trust, Series 2007-ASAP2, by HSBC Bank USA, N.A. v. DB Structured Prods., Inc.*, No. 651936/2013 (N.Y. Sup. Ct. Nov. 4, 2013); Compl., *ACE Sec. Corp. Home Equity Loan Trust, Series 2007-ASAP1, by HSBC Bank USA, N.A. v. DB Structured Prods., Inc.*, No. 650949/2013 (N.Y. Sup. Ct. Aug. 1, 2013); Compl., *ACE Sec. Corp. Home Equity Loan Trust, Series 2007-WM1, by HSBC Bank USA, N.A. v. DB Structured Prods., Inc.*, No. 13-cv-650310 (N.Y. Sup. Ct. June 3, 2013); Compl., *ACE Sec. Corp. Home Equity Loan Trust, Series 2007-HE1, by HSBC Bank USA, N.A. v. DB Structured Prods., Inc.*, No. 650327/13 (N.Y. Sup. Ct. Jan. 29, 2013); Compl., *ACE Sec. Corp. Home Equity Loan Trust, Series 2007-WM1 by HSBC Bank USA, N.A. v. DB Structured Prods., Inc.*, No. 650312/13 (N.Y. Sup. Ct. Jan. 28, 2013); Compl., *ACE Sec. Corp. Home Equity Loan Trust, Series 2006-HE3, by HSBC Bank USA, N.A. v. DB Structured Prods., Inc.*, No. 652231/2012 (N.Y. Sup. Ct. Dec. 21, 2012); Compl., *Ace Sec. Corp. Home Equity Loan Trust, Series 2006-HE4, by HSBC Bank USA, N.A. as Trustee v. DB Structured Prods., Inc.*, No. 653394/2012 (N.Y. Sup. Ct. Mar. 4, 2013).

113.    In one of these actions, according to HSBC's Memorandum of Law in Opposition to Defendant's Motion to Dismiss forensic reviews of the loan files which revealed that Deutsche Bank "dumped into the Trust a massive number of defective loans—loans that blatantly breached

48

Deutsche Bank Structured Products Inc.'s representations and warranties." *Ace Sec. Corp. Home Equity Loan Trust, Series 2007-WM1, by HSBC Bank USA, N.A. v. DB Structured Prods., Inc.* No. 650310/2013 (N.Y. Sup. Ct. July 11, 2013).   HSBC asserted that Deutsche Bank's "*inaccuracies, misrepresentations, omissions, and other breaches were so fundamental and numerous as to preclude any notion that they were the result of mere inadvertence or accident*." Compl., *Ace Sec. Corp. Home Equity Loan Trust, Series 2007-WM1, by HSBC Bank USA, N.A. v. DB Structured Prods., Inc.* No. 650310/2013 (N.Y. Sup. Ct. June 3, 2013). To further bolster its allegations of seller breaches, HSBC referenced government investigations and reports and private litigation establishing widespread abandonment of stated underwriting and securitization standards by common originators and Deutsche Bank.

114.    In *Deutsche Alt-A Securities Mortgage Loan Trust v. DB Structured Products Inc.*, No. 12-cv-08594 (S.D.N.Y. Nov. 27, 2012), HSBC brought an action to enforce Deutsche Bank's breaches of representations and warranties in connection with DBALT 2006-OA1, a securitization containing 88.49 percent loans Countrywide Home Loans, Inc. originated loans. A forensic review revealed that 93 percent of the loan files reviewed contained breaches. HSBC alleged: "The breaches uncovered by the Forensic Review involve a high degree of borrower fraud and dishonesty concerning such core matters as borrower income, employment, occupancy of the subject property and other indebtedness." *Id*.

115.    Similarly, between May 2012 and September 2014, HSBC, as trustee, filed complaints against Nomura in its capacity as sponsor of trusts from the NEHLI and NAA shelves due to "widespread and materially adverse breaches" of seller representations and warranties. *See, e.g.*, Compl., *Nomura Home Equity Loan Inc., Series 2006-FM2 v. Nomura Credit & Capital, Inc.*, No. 653783/2012 (N.Y. Sup. Ct. Apr. 16, 2013); Compl., *Nomura Asset*

*Acceptance Corp., et al., v. Nomura Credit & Capital Inc.*, No. 652842/2014 (N.Y. Sup. Ct. Sept. 17, 2014). HSBC similarly relied on forensic reviews of the loans associated with the mortgage loans held by the trusts conducted prior to initiating suit, revealing that Nomura systemically failed to provide accurate loan level information. For example, an analysis conducted for one of the actions showed breach rates in Nomura-label trusts of over 75 percent. In short, the incredibly high rates of defaults cited by HSBC in support of put back actions involving trusts very similar to the Covered Trusts demonstrate that HSBC was well aware of the pervasive and systemic breaches of representations and warranties of the loans at issue here as well.

### 4.    Events of Default Concerning False Servicer Certifications

116.    Each PSA obligated the Servicer to certify annually that it met its obligations under the PSAs and applicable federal regulations. For example, Section 11.05 of the J.P. Morgan PSA requires the Servicer to certify, among other things,

> (A) a review of such party's activities during the preceding calendar year or portion thereof and of such party's performance under this Agreement, or such other applicable agreement in the case of a Servicing Function Participant, has been made under such officer's supervision and

> (B) to the best of such officer's knowledge, based on such review, such party has fulfilled all its obligations under this Agreement, or such other applicable agreement in the case of a Servicing Function Participant, in all material respects throughout such year or portion thereof, or, if there has been a failure to fulfill any such obligation in any material respect, specifying each such failure known to such officer and the nature and status thereof.

The PSAs for the DB, Goldman Sachs, MHC, and Nomura Trusts contain substantially similar requirements. *See* Ex. C § XII.

117.    The failure to provide a conforming certification is an Event of Default under

each of the PSAs. *See* Ex. C §§ IX, XII. A Master Servicer Event of Default under the MHC

PSA is also triggered by the breach without regard to whether or not notice is provided.

Under the remaining PSAs, HSBC was not entitled to rely on certifications that it knew to

be false and, thus, HSBC's failure to provide notice of breaches relating to false Servicer

certifications triggered its post-Event of Default duties.

118.    HSBC received certifications that it knew to be false because the Servicers

were not in fact meeting their obligations under the PSAs and failed to disclose numerous

representation and warranty violations. As discussed in Sections III(B) and III(C), the

Servicers breached the PSAs in many ways including by attempting to foreclose on

defective loans rather than tendering loans for repurchase or substitution and by looting trust

assets through multiple servicing scams. As discussed in Section III(A), HSBC was aware of

numerous representation and warranty violations that were not disclosed in the required

servicing certifications. HSBC was aware of these breaches, and therefore knew the required

servicer certifications did not conform because they were false. The PSAs only allowed the

Trustee to rely upon the certifications if it had a good faith basis to believe the certifications

were true. Events of Default were triggered as a result, and HSBC had a continuing duty to

act prudently to protect the certificateholders' interests.

119.    In addition, under the J.P. Morgan, MHC, and Nomura PSAs, the Servicers

provided a representation and warranty and covenant that all reports provided under the

PSA, including servicing compliance certifications, were accurate and complete. For

example, Exhibit I to the MHC Transfer and Servicing Agreement provides that "[t]he

information in the Annual Statement of Compliance . . . does not contain any untrue statement of

a material fact or omit to state a material fact necessary to make the statements made, in light of

the circumstances under which such statements were made, not misleading . . . ." The PSAs for

the ACE 2005-AG1; ACE 2005-HE5; ACE 2006-ASAP5; ACE 2006-HE1; ACE 2007-HE4;

and ACE 2007-WM2 Trusts contain substantially similar provisions. All parties to the PSA had

a duty to provide notice of breach of this representation and warranty. The Servicers' failure to

provide such notice resulted in Events of Default triggering HSBC's post-Event of Default

duties.

### C.    HSBC Failed to Address the Servicers' Looting of Trust Assets

120.    In addition to the servicing related defaults and Events of Default described

above, the Servicers have engaged in a variety of schemes to overcharge borrowers in

default. These scams have dramatically increased loss severities on defaulted mortgages

and, as a result, dramatically increased Commerzbank's losses.

121.    The chart below identifies each of the entities disclosed to be the Sponsors,

Servicers, and Master Servicers of the loans included in the Covered Trusts.

|   | **Trust** | **Sponsor** | **Servicers** | **Master Servicer** |
|---|---|---|---|---|
| 1 | ACE 2005-AG1 | DB Structured Products, Inc. | Litton Loan Servicing LP | Wells Fargo Bank, N.A. |
| 2 | ACE 2005-HE5 | DB Structured Products, Inc. | Wells Fargo Bank, N.A. | Wells Fargo Bank, N.A. |
| 3 | ACE 2005-WF1 | DB Structured Products, Inc. | Wells Fargo Bank, N.A. | Wells Fargo Bank, N.A. |
| 4 | ACE 2006-ASAP2 | DB Structured Products, Inc. | Wells Fargo Bank, N.A | Wells Fargo Bank, N.A. |
| 5 | ACE 2006-ASAP3 | DB Structured Products, Inc. | Wells Fargo Bank, N.A | Wells Fargo Bank, N.A. |
| 6 | ACE 2006-ASAP5 | DB Structured Products, Inc. | Ocwen Loan Servicing, LLC | Wells Fargo Bank, N.A. |
| 7 | ACE 2006-HE1 | DB Structured Products, Inc. | Wells Fargo Bank, N.A.; Ocwen Loan Servicing, LLC; Fremont Investment & Loan | Wells Fargo Bank, N.A. |
| 8 | ACE 2007-HE4 | DB Structured | GMAC Mortgage, LLC; | Wells Fargo Bank, |

| | **Trust** | **Sponsor** | **Servicers** | **Master Servicer** |
|---|---|---|---|---|
| | | Products, Inc. | Ocwen Loan Servicing, LLC | N.A. |
| 9 | ACE 2007-WM2 | DB Structured Products, Inc. | Ocwen Loan Servicing, LLC | Wells Fargo Bank, N.A. |
| 10 | DBALT 2006-AR4 | DB Structured Products, Inc. | Countrywide Home Loans Servicing LP; GMAC Mortgage Corporation; GreenPoint Mortgage Funding, Inc. | Wells Fargo Bank, N.A. |
| 11 | FBRSI 2005-2 | MHC I, Inc. | JPMorgan Chase Bank, N.A. | Wells Fargo Bank, N.A. |
| 12 | FBRSI 2005-4 | MHC I, Inc. | JPMorgan Chase Bank, N.A. | Wells Fargo Bank, N.A. |
| 13 | GSAA 2005-6 | Goldman Sachs Mortgage Company | National City Mortgage Company; Greenpoint Mortgage Funding, Inc.; Countrywide Home Loans Servicing LP | Wells Fargo Bank, N.A. |
| 14 | JPALT 2006-A7 | J.P. Morgan Mortgage Acquisition Corporation | PHH Mortgage Corporation; JPMorgan Chase Bank, N.A.; Countrywide Home Loans Servicing LP | U.S. Bank N.A. |
| 15 | JPMMT 2006-A5 | J.P. Morgan Mortgage Acquisition Corporation | JPMorgan Chase Bank, N.A.; PHH Mortgage Corporation; Chase Home Finance LLC | U.S. Bank N.A. |
| 16 | NAA 2006-AR3 | Nomura Credit & Capital, Inc. | GMAC Mortgage Corporation; Wachovia Mortgage Corporation | Wells Fargo Bank, N.A. |
| 17 | NHELI 2005-FM1 | Nomura Credit & Capital, Inc. | Countrywide Home Loans Servicing LP | Wells Fargo Bank, N.A. |
| 18 | NHELI 2005-HE1 | Nomura Credit & Capital, Inc. | Select Portfolio Servicing, Inc.; Option One Mortgage | Wells Fargo Bank, N.A. |

| | Trust | Sponsor | Servicers | Master Servicer |
|---|---|---|---|---|
| | | | Corporation; Countrywide Home Loans Servicing LP | |
| 19 | NHELI 2006-WF1 | Nomura Credit & Capital, Inc. | Wells Fargo Bank, N.A. | Wells Fargo Bank, N.A. |

122.     From 2005 until today, the Servicers have cheated borrowers and the Covered Trusts after default by, *inter alia*, charging improper and excessive fees (including, without limitation, fees for property maintenance prior to foreclosure), failing to properly oversee third-party vendors, failing to adhere to industry benchmarks for foreclosure proceedings, and procuring insurance policies for properties that were already insured.

123.     When a defaulting borrower's home is foreclosed upon and sold, the Servicer deducts its fees (which defaulting borrowers are in no position to pay themselves) and any servicing advances from sale proceeds before any funds are transferred to the securitization trust that purportedly owned the mortgage loan and thus was entitled to the net sale proceeds.

124.     These overcharges are unlawful and resulted in breaches under the PSAs because they do not meet the prudent servicing standard and were not disclosed in annual certifications provided by the Servicers. As noted in Sections III(B)(1) and III(B)(4), servicing related defaults known to the Trustee triggered the Trustee's duty to act prudently. HSBC was aware of these servicing scams, which have been the subject of high profile government investigations, lawsuits, and press coverage, including articles in banking industry publications like the *American Banker*.

125.     Exhibit H summarizes servicing misconduct involving the relevant Servicers.

IV.     **HSBC SUFFERED FROM CONFLICTS OF INTEREST**

126.    HSBC failed and unreasonably refused to take action to protect the Covered Trusts and certificateholders against Originator breaches and Servicer violations because it would reveal that HSBC was an active participant in various servicing related misconduct and imperiled lucrative business relationships with the Originators and Servicers.

127.    If HSBC had met its obligations, it would have revealed that HSBC was the named plaintiff in proceedings in which forged, perjured, or other improper evidence was introduced by its attorneys on its behalf. Thus, HSBC had a powerful incentive to keep secret the Sponsors' and Originators' malfeasance.

128.    In 2010, the Federal Reserve System ("Federal Reserve"), the Office of the Comptroller of the Currency ("OCC"), the Federal Deposit Insurance Corporation ("FDIC"), and the Office of Thrift Supervision ("OTS") conducted on-site reviews at HSBC of foreclosure processing. Interagency Review of Foreclosure Policies and Practices (April 2011), *available at* http://www.federalreserve.gov/boarddocs/rptcongress/interagency_review_foreclosures_201104 13.pdf. The purpose of the review was to evaluate the adequacy of controls and governance over foreclosure processes. *Id*. The Federal Reserve, OCC, FDIC, and OTS found "critical weakness in HSBC's foreclosure document preparation process, and oversight and monitoring of third-party vendors, including foreclosure attorneys." *Id*. In addition, the foreclosure governance process of HSBC was "underdeveloped and insufficient to manage and control operational, compliance, legal and reputational risk." *Id*.

129.    On April 13, 2011, based on the deficiencies in the review and the risk of additional issues as a result of weak controls and processes, the Federal Reserve Board initiated formal enforcement actions requiring HSBC America Holdings, Inc. and HSBC

Finance Corporation, the corporate parent and affiliate of HSBC, to "address a pattern of misconduct and negligence related to deficient practices in residential mortgage loan servicing and foreclosure processing." Press Release, Bd. of Governors of the Fed. Reserve Sys. (Apr. 13, 2011), *available at* http://www.federalreserve.gov/newsevents/press/ enforcement/20110413a.htm. The enforcement action required HSBC to improve its residential mortgage loan servicing and foreclosure practices. According to the Federal Reserve Board press release, "[t]hese deficiencies represent significant and pervasive compliance failures and unsafe and unsound practices at [HSBC]."

130.     As part of the enforcement action, HSBC North America Holdings, Inc. and HSBC Finance Corporation entered into a consent order with the Federal Reserve Board, which found that HSBC had engaged in "unsafe or unsound practices with respect to the manner in which the Bank handled various foreclosure and related activities."

131.     On April 18, 2013, HSBC settled with the Federal Reserve and OCC in relation to its deficient practices in mortgage loan servicing and foreclosure processing and agreed to pay $249 million in cash payments and other assistance to help mortgage borrowers. Press Release, Bd. of Governors of the Fed. Reserve & OCC, OCC and Federal Reserve Reach Agreement with HSBC to Provide $249 Million in Payments and Assistance (Jan. 18, 2013), *available at* http://www.occ.gov/news-issuances/news-releases/2013/nr-ia-2013-13.html.

132.     In April 2015, HSBC and Assurant Inc. ("Assurant") agreed to pay $1.8 million to end a class action lawsuit alleging that HSBC chose excessive coverage levels for forced-place flood insurance contracts and took a bonus from Assurant. Kat Greene, *HSBC, Assurant To Pay $1.8M To End Insurance Kickback Row*, Law360 (Apr. 10, 2015), http://www.law360.com/ articles/642100/hsbc-assurant-to-pay-1-8m-to-end-insurance-kickback-row. If the agreement is

approved, HSBC will be barred from ordering insurance for customers at a higher level than what they had when their policy lapsed, and HSBC will have to return 90 percent of its alleged commissions to the class of customers. HSBC chose higher, more expensive levels of insurance coverage when homeowners let policies lapse. In exchange for the underwriting business, an Assurant affiliate would kick back a portion of the premiums to HSBC.

133.   Further, on December 18, 2015, HSBC settled allegations that it received kickbacks for insurance policies it took out on its properties. *Montanez v. HSBC Mortgage Corp.*, 11-cv-04074 (E.D. Pa. Dec. 18, 2015). Upon information and belief, the Covered Trusts for which HSBC acted as trustee suffered losses from similar forced place insurance scams conducted by, among others, the same entities involved in *Montanez*.

134.   HSBC was also a leading sponsor of private-label mortgage-backed securities and securitized hundreds of millions of dollars of loans. In this role, HSBC engaged in misconduct and breached applicable representations and warranties. For example, in an action brought by the Federal Housing Finance Agency ("FHFA"), the FHFA conducted a comprehensive loan-level analysis of HSBC sponsored trusts and found that up to 13.26 percent of mortgage loans breached owner occupancy representations and warranties, and that up to 39.51 percent of mortgage loans breached loan-to-value representations and warranties. Compl. ¶¶ 96, 100, *FHFA v. HSBC N. Am. Holdings, Inc.*, No. 11-cv-06189 (S.D.N.Y. Sept. 2, 2011). Similarly, in *Deutsche Bank National Trust Co. v. HSBC Bank, USA, N.A.*, an investigation into the quality of loans sponsored by HSBC found that approximately 45 percent of the loans analyzed were determined to be in breach of one or more of the representations and warranties. No. 652001/2013 (N.Y. Sup. Ct. Nov. 12, 2013).

135.   Accordingly, because HSBC itself faced enormous repurchase liability for

loans sold in breach of representations and warranties, HSBC was disincentivized to take any action against the Servicers for the Covered Trusts or even alert the certificateholders to Servicer misconduct.

136.    Exhibits F, G, and H contain additional details concerning HSBC's misconduct in servicing and originating residential mortgage loans.

## V.    HSBC'S CONDUCT INJURED COMMERZBANK

137.    HSBC's breaches of its contractual, statutory, and fiduciary duties have caused Commerzbank in excess of $100 million of losses.

138.    If HSBC had performed its duties as trustee, it would have enforced the obligations of the Sponsors and Originators and caused them to buy back, or replace with non-defective loans, the vast majority, if not all, of the loans that ultimately defaulted and caused Commerzbank's losses. And if HSBC had enforced these repurchase or substitution obligations, as it was required to do, the Certificates would have retained their market value, as highly rated bonds with similar coupon rates are now trading at a very significant premium.

139.    HSBC's failure to address the Servicers' failure to adhere to prudent servicing practices also increased the loss severities (i.e., the amount of principal loss caused by defaults) on defaulted loans dramatically. The extended foreclosure timelines that resulted from document delivery failures and the robo-signing scandal resulted in increased servicing fees, increased property taxes and utility expenditures, which were borne by the Covered Trusts, a decline in value of the underlying properties, and ultimately less sale proceeds for the Covered Trusts and certificateholders. The overcharging for default related services and forced-placed insurance further increased loss severities as those overcharges were collected by the Servicer from foreclosure sale proceeds.

140.    If HSBC had met its contractual, statutory, and fiduciary duties to accept delivery of notes and mortgage loan files, inspect them, give notice as required, and issue accurate certifications, it would have caused the Sponsors or Originators to substitute or repurchase all loans where the Servicers, Sponsors, Depositors, and Originators failed to deliver required documentation to the Trustee or breached representations and warranties regarding the mortgage loans. This would have included numerous loans that had already defaulted or would ultimately default. Moreover, HSBC's failure to take delivery of complete note and mortgage files or adequately inspect them has placed a cloud over title and has limited the Covered Trusts' ability to efficiently foreclose on properties underlying the Covered Trusts, which has ultimately impacted the market value of the Certificates. Additionally, HSBC's failure to commence damages actions against the Servicers caused further losses and emboldened these parties to continue their lucrative servicing scams.

141.    HSBC's breaches with respect to the Sold Certificates significantly reduced the sale price Commerzbank ultimately received when it divested itself of the Certificates. When the sales were made it was apparent that HSBC had breached its duties and would not take steps to remedy its failures. The sales of the Sold Certificates were made by London Branch and the economic losses from those sales were experienced in Commerzbank in England and/or in Germany where Commerzbank is located. The sale of the Sold Certificates did not include assignment of any of Commerzbank's legal claims and therefore Commerzbank has retained all its legal claims against HSBC.

142.    HSBC's failure to meet its contractual, fiduciary, statutory, and common law duties once it became aware of defaults relating to the numerous representation and warranty breaches by the Sponsors or Originators further caused harm. If HSBC had

provided notice of representation and warranty violations and defaults and acted with due care as it was required to do upon the occurrence of a default or Event of Default, it would have caused the Sponsors or Originators to repurchase loans and required the Servicers to replace the assets they have looted from the Covered Trusts.

143.    Many, if not all, of the repurchase or substitution claims described above have lapsed due to HSBC's inaction as courts have held that the underlying representation and warranty claims that HSBC failed to pursue accrued for statute of limitations purposes on the date of the closing of the relevant securitizations.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION
### (Violations of the TIA)[6]

144.    Commerzbank repeats and realleges each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

145.    The PSAs underlying and establishing the Covered Trusts are "indentures," and HSBC is an "indenture trustee" under the TIA. 15 U.S.C. § 77aaa(7), (10).

146.    As a certificateholder, Commerzbank is a trust beneficiary entitled to the protections afforded under the TIA.

147.    The TIA applies to the PSAs and the related Certificates. 15 U.S.C. § 77ddd(a)(1).

148.    HSBC violated the TIA in at least three ways.

149.    First, TIA Section 315(b) provides that the indenture trustee must notify certificateholders of "all defaults known to the trustee, within ninety days after the occurrence

---

[6] Commerzbank acknowledges that the United States Court of Appeals for the Second Circuit has held that the TIA does not apply to RMBS similar to certain of the RMBS at issue here. Plaintiff includes a claim under the TIA with respect to those RMBS to the extent there are any further developments in the law and for purposes of preserving any rights on appeal.

thereof." 15 U.S.C. § 77ooo(b) (citing 15 U.S.C. § 77mmm(c)). As set forth above, HSBC failed to carefully investigate serious, known issues with the loans in the Covered Trusts, or to notify certificateholders of numerous defaults, including the failure of the responsible parties to cure, repurchase, or substitute mortgage loans with defective mortgage files and mortgage loans affected by breaches of representations and warranties.

150.    Second, in the case of defaults (as that term is defined in the indenture), the TIA requires that the trustee exercise its rights and powers under the governing agreement as a "prudent man would exercise or use [them] under the circumstances in the conduct of his own affairs." 15 U.S.C. § 77ooo(c). Here, as set forth above, HSBC did not act prudently after learning of numerous serious issues related to material breaches of representations and warranties, servicer defaults, and Events of Default. A prudent person would have taken action to investigate these issues carefully, pursue repurchase remedies, and cure defective mortgage loans. In addition, a prudent person would have taken action against the responsible parties for the failure to properly execute and deliver mortgage file documents.

151.    Finally, the TIA states that "[n]otwithstanding any other provision of the indenture to be qualified, the right of any holder of any indenture security to receive payment of the principal of and interest on such indenture security, on or after the respective due dates expressed in such indenture security . . . shall not be impaired or affected without the consent of such holder." 15 U.S.C. § 77ppp(b). HSBC has impaired the ability of the Covered Trusts, and consequently the certificateholders, to receive payment in connection with defective mortgage loans for which it failed to take action to correct. In addition, HSBC has impaired the ability of the Covered Trusts, and consequently the certificateholders, to receive payment by failing to enforce the repurchase remedy.

152.     These breaches materially and adversely affected the interests of the certificateholders, including Commerzbank, because they resulted in the Covered Trusts being burdened with large numbers of defective loans that should have been put back to the responsible parties.

153.     HSBC is liable to Commerzbank for damages incurred as a result of HSBC's violations of the TIA in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### (Breach of Contract)

154.     Commerzbank repeats and realleges each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

155.     The PSAs are valid and binding contracts entered into between HSBC, each Covered Trust, the Sponsors, the Servicers, and the Depositors.

156.     The PSAs provide, among other things, the terms under which HSBC acts as trustee for the Covered Trusts.

157.     As the current holder and/or former holder of Certificates or Notes issued by each Covered Trust, Commerzbank is or was an express, intended third-party beneficiary under the PSAs entitled to enforce the performance of the Trustee.

158.     HSBC breached several obligations that it undertook on behalf of Commerzbank as certificateholder including, without limitation, to:

> (a) take steps to cause the Sponsors or Originators to repurchase loans eligible for repurchase;
>
> (b) investigate and give notice to all parties to the PSAs of the breach of representations and warranties relating to the mortgage loans once it discovered the Sponsors' and Originators' widespread practice of including in securitization trusts loans which breached such representations and warranties;

(c) make prudent decisions concerning the exercise of appropriate remedies following Events of Default;

(d) provide notice of and take steps to remedy the Servicers' failure to adhere to prudent servicing standards and otherwise perform their obligations under the PSAs; and

(e) enforce the repurchase obligations of the Sponsors and/or Originators.

159.    The specific provisions breached by HSBC are further detailed herein and in the attached Exhibits hereto.

160.    HSBC's breach of its duties set forth in the PSAs, as described above, caused Commerzbank's losses on its Certificates and diminished their value.

161.    Commerzbank has performed its obligations under the PSAs.

162.    HSBC is liable to Commerzbank for the losses it suffered as a direct result of HSBC's failure to perform its contractual obligations under the PSAs.

### THIRD CAUSE OF ACTION
**(Breach of Fiduciary Duty)**

163.    Commerzbank repeats and realleges each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

164.    As set forth in detail above, HSBC owed certificateholders, including Commerzbank, a duty to exercise all powers under the PSAs to act prudently to protect certificateholders' rights once an Event of Default occurred or payments to certificateholders became impaired. This included, without limitation, duties to protect the interests of the beneficiaries of the Covered Trusts, make prudent decisions concerning the exercise of appropriate remedies following Events of Default, and enforce the repurchase obligations of the Sponsors and/or Originators.

165.    As set forth in detail above, HSBC breached its fiduciary obligations by

failing to perform these obligations and by failing to exercise due care and avoid conflicts of interest.

166.     The violations by HSBC of its fiduciary obligations impaired certificateholders' ability to fully collect the principal and interest due on their Certificates and caused losses in the value of Commerzbank's Certificates.

## FOURTH CAUSE OF ACTION
### (Negligence—Failure to Avoid Conflicts of Interest and Perform Ministerial Acts with Due Care)

167.     Commerzbank repeats and realleges each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

168.     HSBC owed certificateholders, including Commerzbank, extra-contractual duties to perform ministerial acts with due care and avoid conflicts of interests. As described above, HSBC performed or failed to perform its responsibilities in a grossly inadequate and negligent manner.

169.     HSBC's negligence and gross negligence impaired certificateholders' ability to fully collect the principal and interest due on their Certificates and caused losses in the value of Commerzbank's Certificates.

## FIFTH CAUSE OF ACTION
### (Violation of the Streit Act)

170.     Commerzbank repeats and realleges each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

171.     As a certificateholder, Commerzbank is a trust beneficiary entitled to the protections afforded under the Streit Act. The Streit Act was enacted to provide for the proper administration of mortgage trusts and requires that the trustee must exercise due care in performing its obligations. N.Y. Real Prop. Law § 124.

172.    The Certificates are "mortgage investments" subject to the Streit Act. N.Y. Real Prop. Law § 125(1).

173.    The PSAs underlying and establishing the Covered Trusts are "indentures," and HSBC is a "trustee" under the Streit Act. N.Y. Real Prop. Law § 125(3).

174.    Section 126(1) of the Streit Act provides that upon an "event of default" the indenture trustee must exercise such of the rights and powers vested in it by the indenture, and must use the same degree of care and skill in its exercise, as a prudent man would exercise or use under the circumstances in the conduct of his own affairs.

175.    As set forth above, HSBC failed to exercise its rights under the PSAs after becoming aware of "events of default" by failing to:

      (a) protect the interests of the beneficiaries of the Covered Trusts;

      (b) take steps to cause the Sponsors or Originators to repurchase loans lacking adequate documentation;

      (c) investigate and give notice to all parties to the PSAs of the breach of representations and warranties relating to the mortgage loans once it discovered the Sponsors' and Originators' widespread practice of including in securitization trusts loans which breached such representations and warranties;

      (d) make prudent decisions concerning the exercise of appropriate remedies following Events of Default;

      (e) provide notice of and take steps to remedy the Servicers' failure to adhere to prudent servicing standards and otherwise perform their obligations under the PSAs; and

      (f) enforce the repurchase obligations of the Sponsors and/or Originators.

176.    HSBC is liable to Commerzbank for damages incurred as a result of its violations of the Streit Act.

## SIXTH CAUSE OF ACTION
### (Breach of the Covenant of Good Faith)

177.    Commerzbank repeats and realleges each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

178.    At all relevant times, HSBC owed Commerzbank, as an express, intended third-party beneficiary under the PSAs, a duty of good faith and fair dealing pursuant to the PSAs that required HSBC to ensure that it did not, by act or omission, injure the rights of Commerzbank to receive the benefits and protections provided for under the PSAs.

179.    By the conduct described above, HSBC breached its duty of good faith and fair dealing under the PSAs.

180.    HSBC's breaches are material.

181.    As a result of these breaches, Commerzbank has suffered damages and will continue to suffer damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

**WHEREFORE,** Commerzbank prays for relief and judgment, as follows:

A.    Awarding compensatory damages and/or equitable relief in favor of Commerzbank against HSBC for breaches of its statutory, contractual, and fiduciary duties, its gross negligence, ordinary negligence, and negligent misrepresentations, in an amount to be proven at trial, including interest thereon;

B.    Awarding Commerzbank its reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

C.    Such other relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Commerzbank hereby demands a trial by jury on all issues triable by jury.


Dated: December 23, 2015

Respectfully submitted,

/s/ David H. Wollmuth

David H. Wollmuth
Steven S. Fitzgerald
Ryan A. Kane
Danielle D'Aquila
Robert T. Franciscovich
Roselind F. Hallinan
WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, New York 10110
Phone: (212) 382-3300
Fax: (212) 382-0050
dwollmuth@wmd-law.com
sfitzgerald@wmd-law.com
rkane@wmd-law.com
dd'aquila@wmd-law.com
rfranciscovich@wmd-law.com
rhallinan@wmd-law.com


*Attorneys for Plaintiff*