**Exhibit F**

**The Originators' and Sponsors' Pervasive
Breaches of Representations and Warranties**

A.      Accredited Home Lenders, Inc. ....................................................................1

B.      Alliance Bancorp. ........................................................................................4

C.      American Home Mortgage Corporation and Option One Mortgage Corporation..............6

D.      Argent Mortgage Company LLC and Ameriquest Mortgage Company ..........................12

E.      Countrywide Home Loans, Inc. ....................................................................15

F.      CTX Mortgage Company, LLC....................................................................26

G.      DB Home Lending LLC (formerly known
        as Chapel Funding, LLC), and DB Structured Products, Inc...........................................28

H.      Encore Credit Corporation...........................................................................31

I.      Fremont Investment & Loan.........................................................................35

J.      GreenPoint Mortgage Funding, Inc. ................................................................39

K.      Goldman Sachs Mortgage Company. .................................................................46

L.      HSBC Bank USA, National Association. ...........................................................51

M.      J.P. Morgan Mortgage Acquisition Corporation,
        JPMorgan Chase Bank, N.A., and Chase Home Finance, LLC .......................................52

N.      M&T Mortgage Corporation........................................................................60

O.      National City Mortgage Company..................................................................61

P.      New Century Mortgage Corporation ...............................................................63

Q.      Nomura Credit & Capital, Inc......................................................................69

R.      Ownit Mortgage Solutions, Inc.....................................................................72

S.      PHH Mortgage Corporation........................................................................75

T.      Quick Loan Funding, Inc. ......................................................................................76

U.      ResMAE Mortgage Corporation ...........................................................................78

V.      Silver State Mortgage Company ............................................................................80

W.      SunTrust Mortgage, Inc. ........................................................................................84

X.      Wachovia Mortgage Corporation ..........................................................................90

Y.      Wells Fargo Bank, N.A. .........................................................................................93

Z.      WMC Mortgage Corporation .................................................................................97

**A.**     **Accredited Home Lenders, Inc.**

1.     Accredited Home Lenders, Inc. ("Accredited") originated mortgage loans included in the FBRSI 2005-2 Trust.

2.     A complaint filed by Allstate Insurance Company contains allegations based on confidential witness statements in which former Accredited employees confirm that Accredited blatantly disregarded its underwriting standards. *See* Compl., *Allstate Ins. Co. v. Morgan Stanley*, No. 11-cv-651840 (N.Y. Sup Ct. July 5, 2011) ("Allstate Complaint").

3.     One confidential witness, who served as a corporate underwriter for Accredited in San Diego, California between May 2002 and November 2006, stated that "certain underwriters were consistently pressured by upper management to approve loans where there was no mitigating value except to get the loan on the books."  Allstate Complaint at ¶ 125. That same former Accredited employee "explained that certain underwriters with problem loan ratios above 45% 'were favored [by upper-level management] because they produced more loans.'"  *Id.*

4.     Another confidential witness, who served as a corporate underwriter at Accredited between August 2003 and February 2006 in Tampa, Florida reported that "[t]he problem with the whole system was the overrides. The overrides were rampant. . . . If the borrower breathed, he got the loan." *Id.* ¶ 126.

5.     Similarly, a former chief appraiser at Accredited between 2002 and June 2007 in San Diego, California explained that Accredited's misconduct extended to artificial inflation of property appraisal values. According to the former appraiser, "Accredited established a policy whereby sales managers had the authority to manipulate a professional appraiser's final opinion of market value by utilizing the values of properties that were not comparable to the property serving as collateral for the loan . . . . '[a]s of June 2006, between 12% and 15% of

[Accredited's] business was being done through management overrides.'"  *Id.* ¶ 127.

6.     The amended class action complaint filed in *Public Employees' Retirement System of Mississippi v. Merrill Lynch*, No. 08-cv-10841 (S.D.N.Y. July 6, 2010) cited the following concerning Accredited's abandonment of underwriting guidelines based on additional information provided by confidential sources:

- According to CW16, the number of overrides grew so large that Accredited was forced to institute a system to track such overrides. The system included a box on the loan file that an underwriter needed to check if a higher-level manager approved the loan "as a business decision" over the recommendation of the underwriter.

- According to CW17, a Corporate Underwriter at Accredited between June 2000 and March 2007 in both the San Diego, California, and Austin, Texas, offices, "At the end of the month, we were handed loan files and told to just sign them with no audit."

*Id.* ¶¶ 158–59.

7.     Additionally, the class action complaint filed in *Atlas v. Accredited Home Lenders Holding Co.*, No. 07-cv-488 (S.D. Cal. Aug. 24, 2007) provides testimony by former Aames Capital Corporation and Accredited employees, as follows:

- According to CW11, the Western Retail Operations Manager at Accredited from October 2006 until March 2007, "Accredited got very loosey goosey on credit. It was common to see four, five or six exceptions on a loan. . . . At Accredited, they actually pushed making the exceptions. . . ."

- Further, according to CW11, "I was frequently overridden on loans that I thought were pieces of crap. They wanted units and dollar volume and didn't care how they got there."

- CW12, a Senior Underwriter at Accredited from October 2006 through March 2007 in its Irvine office, reported that "[a]t Accredited, we were told to make exceptions on everything." . . . . [I]t wasn't until February 2007 that Accredited finally tightened its lending guidelines. According to CW12, "it was too late by then."

*Id*. ¶¶ 83–88

       8.     The Court in *Atlas v. Accredited Home Lenders Holding Co.*, No. 07-cv-488 (S.D.

Cal. Jan. 4, 2008) sustained allegations that "[d]efendants' statements regarding Accredited's

underwriting practices were allegedly false and misleading because defendants had caused

Accredited to deviate from its publicly professed standards."

**B.** **Alliance Bancorp.**

9. Alliance Bancorp was a residential mortgage lender based in Brisbane, California. Alliance Bancorp originated mortgage loans included in the NAA 2006-AR3 Trust.

10. Alliance Bancorp's abandonment of its underwriting guidelines was revealed, for example, in a suit by the Federal Home Loan Bank of Boston ("FHLB Boston"), a residential mortgage-backed securities ("RMBS") investor. FHLB Boston conducted a review of the loan files for mortgage loans underwritten by Alliance Bancorp and each loan deviated from the underwriting guidelines. *See* Am. Compl. ¶¶ 629–36 & App. VIII, *FHLB Boston v. Ally Fin. Inc.*, No. 11-10952, (D. Mass. June 29, 2012).

11. The types of deviations from the guidelines uncovered include:

- A loan file with no credit documentation whatsoever, making it impossible to evaluate the borrower's ability to repay the loan. *Id*. ¶ 573.

- A cash-out refinance loan for a property with an unrealistic appraisal value of $2.8 million. Less than 16 months before the appraisal, the home had sold for just $1.55 million. *Id.* at ¶ 572.

- A loan made using an improper appraisal value. For refinance loans that had been purchased within the prior year, the underwriting guidelines required that the sale price of the property be used to calculate the LTV ratio. If the sale price had been used, the loan could not have been made because the CLTV exceeded 100%. Because an appraised value was used instead of the sale price, the CLTV dropped below 100% and the loan was made. *Id.* App. VIII at 1–2.

- A loan to a janitor, for whom the 75th percentile income was $3,317 per month. The borrower's monthly obligations alone – including the subject transaction – were $5,587, far exceeding what could have been a reasonable repayment amount. *Id*. App. VIII at 6.

12. Allegations concerning Alliance Bancorp's poor underwriting practices have similarly appeared in several other complaints including *MBIA Insurance Corporation v. Credit*

*Suisse Securities (USA) LLC*, No. 603751/2009 (N.Y. Sup. Ct. Jan. 30, 2013) and *NCUA v. JPMorgan Chase Bank*, No. 13-cv-02012 (D. Kan. Jan. 4, 2013). These lawsuits provide ample evidence that Alliance Bancorp's loans were of such poor quality that there was a substantial likelihood that any individual loan breached the associated representations and warranties.

C.      **American Home Mortgage Corporation and Option One Mortgage Corporation**

13.     In or about April 2008, Option One Mortgage Corporation ("Option One") was acquired by American Home Mortgage Servicing, Inc., a subsidiary of American Home Mortgage Investment Corp. American Home Investment Corporation and its affiliates, including American Home Mortgage Servicing Inc. and American Home Mortgage Corporation, together with Option One and its affiliate are referred to as "American Home."  American Home originated mortgage loans in the JPMMT 2006-A5 Trust, and Option One originated mortgage loans included in the NHELI 2005-HE1 Trust.

14.     An October 2005 American Home "Credit Update" outlined the company's conscious decision to promote increasingly lax underwriting standards. Under the heading "Guideline Interpretation," the presentation set forth 30 pages of revised credit factors that made clear that American Home's underwriting guidelines were to be relaxed substantially or rendered essentially meaningless in order to allow the company to make loans to high-risk borrowers. Specifically, on each page American Home set forth the previous "interpretation" of the underwriting guidelines under a heading entitled "What We Observed in [Our] Prior History" alongside the new "interpretation" under a heading entitled "Where We Are Now."  These new interpretations included:  (i) not requiring verification of income sources on stated income loans; (ii) reducing the required documentation for self-employed borrowers; and (iii) broadening the acceptable use of second and third loans to cover the full property value.

15.     That same document also set forth American Home's "Quality Control Philosophy" regarding its lending practices. As that document made clear, underwriters and loan officers were to adhere to a philosophy that "[v]ery few things are actually NIQ's [Not Investment Quality]" when making and approving loans.

16.     Edmund Andrews, an economics reporter for *The New York Times*, recounted his own experience using American Home as a lender. Edmund L. Andrews, *My Personal Credit Crisis*, N.Y. Times, May 17, 2009, at MM46. According to Andrews, he was looking to purchase a home in 2004, and his real estate agent referred him to a loan officer at American Home. *Id*. The American Home loan officer began the ordeal by asking Andrews how large of a loan he needed. *Id*. Andrews, who had a monthly take home pay of $2,777, advised the loan officer that he had hefty child support and alimony payments to an ex-wife. *Id*. Andrews would be relying on his then-unemployed fiancée to earn enough money to meet his monthly obligations—including the mortgage. Andrews reported:

> As I quickly found out, American Home Mortgage had become one of the fastest-growing mortgage lenders in the country. One of its specialties was serving people just like me:  borrowers with good credit scores who wanted to stretch their finances far beyond what our incomes could justify. In industry jargon, we were "Alt-A" customers, and we usually paid slightly higher rates for the privilege of concealing our financial weaknesses.

> I thought I knew a lot about go-go mortgages. I had already written several articles about the explosive growth of liar's loans, no-money-down loans, interest-only loans and other even more exotic mortgages. I had interviewed people with very modest incomes who had taken out big loans. Yet for all that, I was stunned at how much money people were willing to throw at me.

> [The American Home loan officer] called back the next morning. "Your credit scores are almost perfect," he said happily. "Based on your income, you can qualify for a mortgage of about $500,000."

> What about my alimony and child-support obligations?  No need to mention them. What would happen when they saw the automatic withholdings in my paycheck?  No need to show them. If I wanted to buy a house, [the American Home loan officer] figured, it was my job to decide whether I could afford it. His job was to make it happen.

> "I am here to enable dreams," he explained to me long afterward. [The American Home loan officer]'s view was that if I'd been unemployed for seven years and didn't have a dime to my name but

> I wanted a house, he wouldn't question my prudence. "Who am I to tell you that you shouldn't do what you want to do?  I am here to sell money and to help you do what you want to do. At the end of the day, it's your signature on the mortgage—not mine."

*Id*.

17.     The American Home loan officer steered Andrews to a stated-income loan so that he would not have to produce paychecks or tax returns that would reveal his alimony and child support obligations. *Id*. The loan officer wanted to limit disclosure of Andrews' alimony and child support payments when an existing mortgage showed up under Andrews' name. *Id*. Although his ex-wife was solely responsible for that mortgage under the terms of the couple's separation agreement, the only way Andrews could explain that fact would be to produce the agreement, which would also reveal his alimony and child support obligations. *Id*. According to Andrews:

> [The American Home loan officer] didn't get flustered. If Plan A didn't work, he would simply move down another step on the ladder of credibility. Instead of "stating" my income without documenting it, I would take out a "no ratio" mortgage and not state my income at all. For the price of a slightly higher interest rate, American Home would verify my assets, but that was it. Because I wasn't stating my income, I couldn't have a debt-to-income ratio, and therefore, I couldn't have too much debt. I could have had four other mortgages, and it wouldn't have mattered. American Home was practically begging me to take the money.

*Id*.

18.     American Home ultimately approved Andrews' application. *Id*. Not surprisingly, Andrews was unable to afford his monthly mortgage payments. *Id*.

19.     American Home's poor lending practices resulted in numerous civil lawsuits. These lawsuits contained firsthand accounts from former employees and re-analysis of the loans themselves. When re-underwritten, a significant portion of American Home originated loans were found to have breached the associated representations and warranties. Some of these

complaints include *Royal Park Investments v. Merrill Lynch*, No 652607/2012 (N.Y. Sup. Ct. Dec. 14, 2012) (the "Royal Park Complaint") and *N.J. Carpenters Health Fund v. Structured Asset Mortgage Investments II*, No. 08-cv-08093 (S.D.N.Y. May 15, 2009).

20.     American Home's lack of adherence to underwriting guidelines was set forth in detail in a 165-page amended class action complaint filed on June 4, 2008. Am. Compl., *In re American Home Mortg. Sec. Litig.*, No. 07-md-1898 (TCP) (E.D.N.Y. June 4, 2008). Investors in American Home common/preferred stock alleged that the company misrepresented itself as a conservative lender, when, based on statements from more than 33 confidential witnesses and internal company documents, American Home in reality was a high risk lender, promoting quantity of loans over quality by targeting borrowers with poor credit, violating company underwriting guidelines and providing incentives for employees to sell risky loans, regardless of the borrowers' creditworthiness. *See id*.

21.     Former American Home employees recounted that underwriters were consistently bullied by sales staff when underwriters challenged questionable loans, while exceptions to American Home's underwriting guidelines were routinely applied. *See id*. ¶¶ 120–21.

22.     Former American Home employees also reported that American Home management told underwriters not to decline a loan, regardless of whether the loan application included fraud. *See id*.

23.     Another former American Home employee stated that American Home routinely made exceptions to its underwriting guidelines to be able to close loans. When American Home mortgage underwriters raised concerns to the sales department about the pervasive use of exceptions to American Home's mortgage underwriting practices, the sales department contacted American Home headquarters to get approval for the use of exceptions. Indeed, it was

commonplace to overrule mortgage underwriters' objections to approving a loan to facilitate loan approval. *See id*. ¶ 123.

24.     A former American Home auditor confirmed this account that American Home mortgage underwriters were regularly overruled when they objected to loan originations. *See id*. ¶ 124.

25.     The parties settled the litigation on January 14, 2010, for $37.25 million.

26.     In addition, according to a complaint filed by the U.S. Securities Exchange Commission (the "SEC") on April 28, 2009, senior executives of American Home made false and misleading disclosures designed to conceal American Home's financial condition from investors and violated various anti-fraud provisions of the federal securities laws. *SEC v. Strauss*, No. 09-cv-4150, April 28, 2009 (S.D.N.Y. Apr. 28, 2009).

27.     Significantly, the SEC complaint alleged that American Home issued public statements misleadingly omitting the fact that American Home originated a large portion of mortgage loans without verifying the borrowers' incomes. *Id*.

28.     Further, as set forth in the complaint filed in *Massachusetts Mutual Life Insurance Co. v. Goldman Sachs*, No. 11-cv-30126 (D. Mass. May 5, 2011) ("Mass. Mutual Complaint"), American Home regularly disregarded its underwriting standards to grow its market share. American Home's underwriters were put under intense pressure by senior management to approve mortgage loans, while American Home's incentive commission structure emphasized a high volume of closed loans rather than prudent underwriting and loan quality. Mass. Mutual Complaint ¶ 113. "For example, an internal presentation called 'Incentive Compensation' discussed new compensation features to be implemented in 2005. Per the company's new rules, underwriters were required to approve a certain minimum number of loans – five per day and

100 per month – in order to qualify for incentive compensation. Loan 'Validators' and 'Closers' were similarly paid by volume, with a minimum of closed loans (18 and 80, respectively) required in order to qualify for bonuses." *See id.* ¶ 113.

29.     A former American Home Executive Vice President stated that American Home's "underwriting practices became increasingly lax during the 2005 to 2007 time frame [and American Home] grant[ed] an ever-increasing number of loans to people unlikely to repay them. According to this former employee, 'American Home followed Countrywide' . . . in offering 'fast and sleazy products' that had very questionable underwriting requirements and were of low quality." *Id.* ¶ 114.

30.     As set forth in the Mass. Mutual Complaint, "[a] former American Home Wholesale Account Executive who worked at AHM from January 2005 through July 2007 stated that at American Home 'anybody could buy a house with zero percent down and no proof of ability to pay it [the loan] back.'" *Id.*

31.     Ultimately, American Home's loan origination and underwriting practices were so suspect that in a 2010 report, the Office of the Comptroller of the Currency (the "OCC"), identified American Home as the 10th worst subprime lender in the entire nation. *See* Press Release, Office of the Comptroller of the Currency, Worst Ten in the Worst Ten (Mar. 31, 2010), http://www.occ.gov/news-issuances/news-releases/2010/nr-occ-2010-39d.pdf ("2009 Worst Ten Report").

D.     **Argent Mortgage Company LLC and Ameriquest Mortgage Company**

32.     Argent Mortgage Company, LLC and Ameriquest Mortgage Company were subsidiaries of ACC Capital Holdings (collectively, "Ameriquest"). In 2007, Citigroup acquired Ameriquest. Ameriquest Mortgage Company originated mortgage loans included in the ACE 2005-AG1 Trust. Argent Mortgage Company, LLC originated mortgage loans included in the ACE 2005-AG1 Trust.

33.     Ameriquest systemically violated its mortgage underwriting guidelines, including by, among other things, disregarding or misstating income, assets and employment information of borrowers.

34.     As a result of a multi-state investigation by the state Attorneys General, many states commenced litigation against Ameriquest on the basis of Ameriquest's systemic disregard for its underwriting standards and predatory lending. For example, in *Washington v. ACC Capital Holdings*, the complaint alleged that Ameriquest engaged in unfair or deceptive acts or practices by making deceptive representations or omissions regarding loan terms, prepayment penalties, repeat financing, inflated appraisals and income and loan unsuitability, among other things.

35.     In connection with the multi-state investigation, the Connecticut Attorney General stated that:

> Ameriquest pressured appraisers to inflate property values so borrowers could get bigger loans, imposed upfront fees without reducing interest rates as promised and told borrowers to ignore written information about interest rates because they would give them lower rates later. The company is alleged to have given them higher interest rates instead.
>
> Ameriquest also assured some borrowers their loans would have no prepayment penalties, then inserted such payments into the final loan

> documents; delayed the time period between the loan closing and the funding; and misrepresented fees and costs.
>
> Other Ameriquest predatory practices included telling consumers that the initial fixed rate on an adjustable rate loan lasted longer than it did, and instructing them to ignore or disparaging federal truth in lending requirements.
>
> The company routinely fabricated consumers' income by claiming that recipients had phony "sewing" or "lawn" businesses. In one instance, the company falsely claimed that an elderly Connecticut woman operated a sewing business, even though she was blind.

News Release, Conn. Dep't of Banking, Conn. Dep't of Consumer Protection, & The Attorney Gen., Ameriquest to Pay $325 Million for Predatory Lending Practices that Bilked Consumers (Jan. 23, 2006), *available at* http://www.ct.gov/dob/cwp/view.asp?a=2245&q=309018.

36.    Illinois Attorney General Lisa Madigan testified before the Financial Crisis Inquiry Commission ("FCIC") that Ameriquest engaged in fraudulent practices, which included inflating home appraisals, increasing the interest rates on borrowers' loans from fixed to adjustable interest rates at closing, and promising borrowers that they could refinance costly loans with better terms in a short period of time, despite having equity to absorb another refinance. *See* Fin. Crisis Inquiry Comm'n, Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States (2010) ("FCIC Report), *available at* http://www.gpo.gov/fdsys/pkg/GPO-FCIC/content-detail.html.

37.    Ed Parker, the former head of Ameriquest's Mortgage Fraud Investigations Department, testified before the FCIC that he detected and reported fraud "at the company within one month of starting his job there . . . but senior management did nothing." *See id.* at 12.

38.    According to Prentiss Cox, a former Minnesota Assistant Attorney General, he reviewed a sampling of Ameriquest loan files and "found blatant misrepresentations of

employment." *See id.*

39.     Based on a 2010 OCC report, Ameriquest was ranked as the 9th worst mortgage originator based on the number of foreclosures. Press Release, John C. Dugan, Comptroller of the Currency, Appendix B: Activities of National Banks Related to Subprime Lending, remarks before the FCIC, Washington, D.C. (Apr. 8, 2010), *available at* http://www.occ.treas.gov/ftp/release/2010-39d.pdf.

40.     Private litigations also highlight Ameriquest's violations of its underwriting guidelines. *See, e.g.*, Compl., *Cambridge Place Inv. Mgmt., Inc. v. Morgan Stanley & Co.*, No. 10-cv-11376-NMG (D. Mass, Aug. 13, 2010); Am. Compl., *N.J. Carpenters Health Fund v. Structured Asset Mortg. Invs. II*, No. 08-cv-08093 (S.D.N.Y. May 15, 2009).

E.      **Countrywide Home Loans, Inc.**

41.      Bank of America, N.A. is an affiliate of Bank of America Corporation (collectively, "BAC"). In 2008, BAC acquired Countrywide Home Loans, Inc. and its affiliates (collectively, "Countrywide"). Countrywide originated mortgage loans included in the DBALT 2006-AR4, GSAA 2005-6, JPALT 2006-A7, and JPMMT 2006-A5 Trusts.

42.      From 2000 to 2003, Countrywide rose to prominence as a mortgage lender originating hundreds of billions of dollars' worth of loans annually and securitizing them for sale. Business expanded so rapidly that Countrywide's founder and CEO, Angelo Mozilo, stated publicly that, by 2006, Countrywide would be the nation's "dominant" home-mortgage lender. By 2004, however, Countrywide recognized that it would be unable to reach its lofty goals if it limited itself to lending to borrowers who qualified under prudent loan underwriting standards.

43.      In order to fuel Countrywide's growth, Countrywide resolved to approve any loan that could be securitized for sale to third parties, without regard to whether the loan complied with Countrywide's already lax underwriting standards. As Countrywide's CFO, David Sambol stated in a February 13, 2005 email (which was not made public until years later): "We should be willing to price virtually any loan that we reasonably believe we can sell/securitize without losing money, even if other lenders can't or won't do the deal."

44.      Additionally, the SEC has released documents showing that Countrywide adopted a "matching" strategy whereby it would provide any mortgage product feature offered by a competitor. This "matching" strategy could only be implemented through abandonment of Countrywide's supposed credit-risk-reducing underwriting guidelines. To get around its own requirements, Countrywide set up a system whereby any loan could be approved by way of

underwriting "exceptions" and coached borrowers on how to apply for loan products that
required little or no income or asset verification.

45.     Internal documents show that "exceptions" were involved in upwards of one-third
of all loans, and were based purely on the desire to increase loan volume (and profits) and not on
"compensating factors" as represented. Countrywide deliberately offloaded the worst of these
loans to securitizations sold to investors such as Commerzbank.

46.     In 2006, Countrywide internal reviews concluded that one third of all
Countrywide loans violated its underwriting guidelines. Frank Aguilera, a Countrywide
Managing Director responsible for risk management, reported the "particularly alarming" result
that 23 percent of the subprime loans, which were often included as prime or Alt-A loans in
Countrywide's securitizations, were generated as exceptions, even taking into account "all
guidelines, published and not published, approved and not yet approved."  The exception rate for
"80/20" products (which were particularly risky because they required 100 percent financing)
was even higher. Aguilera wrote at the time: "[t]he results speak towards our inability to
adequately impose and monitor controls on production operations."  Another internal review
conducted around the same time concluded that "approximately 40% of the Bank's reduced
documentation loans . . . could potentially have income overstated by more than 10% and a
significant percent of those loans would have income overstated by 50% or more."

47.     In a television special titled, "*If You Had a Pulse, We Gave You a Loan*," Dateline
NBC reported on March 27, 2009:

- To highlight just how simple it could be to borrow money,
  Countrywide marketed one of its stated-income products as the
  "Fast and Easy loan."

- As manager of Countrywide's office in Alaska, Kourosh Partow
  pushed Fast and Easy loans and became one of the company's

       top producers.

- He said the loans were "an invitation to lie" because there was so little scrutiny of lenders. "We told them the income that you are giving us will not be verified. The asset that you are stating will not be verified."

- He said they joked about it: "If you had a pulse, we gave you a loan. If you fog the mirror, give you a loan."

- Partow said that the practice of pushing through loans with false information was common and was known by top company officials. "It's impossible they didn't know."

- He lamented the decline of what he saw as a great place to work, suggesting a push to be number one in the business led Countrywide astray. He blamed Angelo Mozilo, a man he long admired, for taking the company down the wrong path. According to former senior account executive Bob Feinberg, Countrywide's problem was not limited to stated income loans. Countrywide also became a purveyor of loans that many consumer experts contend were a bad deal for borrowers, with low introductory interest rates that later could skyrocket.

- In many instances, Feinberg said, that meant borrowers were getting loans that were "guaranteed to fail."

Chris Hansen, *If You Had a Pulse, We Gave You a Loan*, (NBC Dateline Mar. 22, 2009),

*available at* http://www.msnbc.msn.com/id/29827248/ns/dateline_nbc-the_hansen_files_with

_chris_hansen.

      48.    On June 4, 2009, the SEC sued Angelo Mozilo and other Countrywide executives

alleging securities fraud. *See* Compl., *SEC v. Mozilo*, No. 09-cv-3994 (C.D. Cal. June 4, 2009).

Specifically, the SEC alleged that Mozilo and the others misled investors about the credit risks

that Countrywide created with its mortgage origination business, telling investors that

Countrywide was primarily involved in prime mortgage lending, when it was actually heavily

involved in risky sub-prime loans with expanded underwriting guidelines. *Id*. Mozilo and the

other executives settled the charges with the SEC for $73 million on October 15, 2010. *See* Walter Hamilton & E. Scott Reckard, *Angelo Mozilo, Other Former Countrywide Execs Settle Fraud Charges*, L.A. Times, Oct. 16, 2010, at A1.

49.     Internal Countrywide emails the SEC released in connection with its lawsuit show the extent to which Countrywide systematically deviated from its underwriting guidelines. For example, in an April 13, 2006 email from Mozilo to other top Countrywide executives, Mozilo stated that Countrywide was originating home mortgage loans with "serious disregard for process, compliance with guidelines and irresponsible behavior relative to meeting timelines." Email from Angelo Mozilo, CEO, Countrywide Financial, to Eric Sieracki, Stan Kuland, Dave Sambol, David Spector & John Murray, Managing Directors, Countrywide Financial (Apr. 23, 2006 7:42 PM PST), *available at www.paperlessarchives.com/FreeTitles/FinancialCrisis Email.pdf.* Mozilo also wrote that he had "personally observed a serious lack of compliance within our origination system as it relates to documentation and generally a deterioration in the quality of loans originated versus the pricing of those loan[s]." *Id.*

50.     Indeed, in September 2004, Mozilo had voiced his concern over the "clear deterioration in the credit quality of loans being originated," observing that "the trend is getting worse" because of competition in the non-conforming loans market. With this in mind, Mozilo argued that Countrywide should "seriously consider securitizing and selling ([Net Interest Margin Securities]) a substantial portion of [Countrywide's] current and future sub prime [sic] residuals." Email from Angelo Mozilo, CEO, Countrywide to Stan Kurland & Keith McLaughlin, Managing Directors, Countrywide Financial (Sept. 1, 2004 8:17 PM PST), *available at www.paperlessarchives.com/FreeTitles/FinancialCrisisEmail.pdf.*

51.     To protect themselves against poorly underwritten loans, parties that purchase

loans from an originator frequently require the originator to repurchase any loans that suffer Early Payment Default.

52.     Countrywide sold a product called the "Pay Option ARM."  This loan was a 30-year adjustable rate mortgage that allowed the borrower to choose between various monthly payment options, including a set minimum payment. In a June 1, 2006 email, Mozilo noted that most of Countrywide's Pay Option ARMs were based on stated income and admitted that "[t]here is also some evidence that the information that the borrower is providing us relative to their income does not match up with IRS records."  Email from Angelo Mozilo to Carlos Garcia, former CFO, Countrywide Financial, Jim Furash, former President, Countrywide Bank, Stan Kurland & Dave Sambol, Managing Directors, Countrywide Financial (June 1, 2006 10:38 PM PST), *available at www.paperlessarchives.com/FreeTitles/ FinancialCrisisEmail.pdf.*

53.     An internal quality control report emailed on June 2, 2006, showed that for stated income loans, 50.3 percent of loans indicated a variance of 10 percent or more from the stated income in the loan application. *See* Email from Clifford Rossi, Chief Risk Officer, Countrywide, to Jim Furash, Executive, CEO, Countrywide Bank, N.A., among others (June 2, 2006 12:28 PM PST), *available at www.paperlessarchives.com/FreeTitles/FinancialCrisisEmail.pdf.*

54.     Countrywide, apparently, was "flying blind" on how one of its popular loan products, the Pay Option ARM loan, would perform, and admittedly, had "no way, with any reasonable certainty, to assess the real risk of holding these loans on [its] balance sheet."  Email from Angelo Mozilo to David Sambol, Managing Director Countrywide Financial (Sept. 26, 2006 10:15 AM PST), *available at www.paperlessarchives.com/FreeTitles/FinancialCrisis Email.pdf*. Yet such loans were securitized and passed on to unsuspecting investors such as Commerzbank.

55.     With growing concern over the performance of Pay Option ARM loans in the waning months of 2007, Mozilo advised that he "d[id]n't want any more Pay Options originated for the Bank."  Email from Angelo Mozilo to Carlos Garcia, former Managing Director, Countrywide Financial (Nov. 3, 2007 5:33 PM PST), *available at www.paperlessarchives.com/ FreeTitles/FinancialCrisisEmail.pdf*. In other words, if Countrywide was to continue to originate Pay Option ARM loans, it was not to hold onto the loans. Mozilo's concerns about Pay Option ARM loans were rooted in "[Countrywide's] inability to underwrite [Pay Option ARM loans] combined with the fact that these loans [we]re inherently unsound unless they are full doc, no more than 75% LTV and no piggys." *Id.*

56.     In a March 27, 2006 email, Mozilo reaffirmed the need to "oversee all of the corrective processes that will be put into effect to permanently avoid the errors of both judgement [sic] and protocol that have led to the issues that we face today" and that "the people responsible for the origination process understand the necessity for adhering to the guidelines for 100% loan-to-value ("LTV") sub-prime product. This is the most dangerous product in existence and there can be nothing more toxic and therefore requires that no deviation from guidelines be permitted irrespective of the circumstances."  Email from Angelo Mozilo to the former Countrywide Managing Directors (Mar. 27, 2006 8:53 PM PST), *available at www.paperlessarchives.com/ FreeTitles/FinancialCrisisEmail.pdf.*

57.     Yet Countrywide routinely found exceptions to its underwriting guidelines without sufficient compensating factors. In an April 14, 2005 email, Frank Aguilera, a Countrywide managing director, explained that the "spirit" of Countrywide's exception policy was not being followed. He noted a "significant concentration of similar exceptions" that "denote[d] a divisional or branch exception policy that is out side [sic] the spirit of the policy."

Email from Frank Aguilera, Managing Director, Countrywide, to John McMurray, Managing

Director, Countrywide (Apr. 14, 2005 12:14 PM PDT), *available at www.paperlessarchives.com*

*/FreeTitles/FinancialCrisisEmail.pdf*. Aguilera explained:  "The continued concentration in these

same categories indicates either a) inadequate controls in place to mange [sic] rogue production

units or b) general disregard for corporate program policies and guidelines."  *Id*. Aguilera

observed that pervasive use of the exceptions policy was an industry-wide practice.

58.     "It appears that [Countrywide Home Loans]' loan exception policy is more

loosely interpreted at [Specialty Lending Group] than at the other divisions. I understand that

[Correspondent Lending Division] has decided to proceed with a similar strategy to appease their

complaint customers. . . . [Specialty Lending Group] has clearly made a market in this

unauthorized product by employing a strategy that Blackwell has suggested is prevalent in the

industry. . . ." *Id*.

59.     Internal reports created months after an initial push to rein in the excessive use of

exceptions with a "zero tolerance" policy showed the use of exceptions remained excessive.

Email from Frank Aguilera, Managing Director, Countrywide, to Brian Kuelbs, Managing

Director, Countrywide, among others (June 12, 2006 10:13 AM PST), *available at*

*www.paperlessarchives.com/FreeTitles/FinancialCrisisEmail.pdf.*

60.     In February 2007, nearly a year after pressing for a reduction in the overuse of

exceptions and as Countrywide claimed to be tightening lending standards, Countrywide

executives found that exceptions continued to be used at an unacceptably high rate. Frank

Aguilera stated that any "[g]uideline tightening should be considered purely optics with little

change in overall execution unless these exceptions can be contained."  Email from Frank

Aguilera, Managing Director, Countrywide, to Mark Elbuam, Managing Director, Countrywide,

among others (Feb. 21, 2007 4:58 PM PST).

61.     John McMurray, a former Countrywide managing director, expressed his opinion in a September 2007 email that "the exception process has never worked properly."  Email from John McMurray, Managing Director, to Jess Lederman, Managing Director, Countrywide (Sept. 7, 2007 10:12 AM PST), *available at www.paperlessarchives.com/ FreeTitles/ FinancialCrisisEmail.pdf.*

62.     Countrywide conceded that the poor performance of loans it originated was, in many cases, due to poor underwriting. In April 2007, Countrywide noticed that its high combined loan-to-value ("CLTV") ratio stated income loans were performing worse than those of its competitors. After reviewing many of the loans that went bad, a Countrywide executive stated that "in most cases [poor performance was] due to poor underwriting related to reserves and verification of assets to support reasonable income."  Email from Russ Smith, Countrywide to Andrew Gissinger, Managing Director, Countrywide (Apr. 11, 2007 7:58 AM PST), *available at www.paperlessarchives.com/FreeTitles/FinancialCrisisEmail.pdf.*

63.     Not surprisingly, Countrywide's complete disregard for proper loan underwriting has spawned numerous lawsuits. As part of these lawsuits, plaintiffs have performed forensic analyses and re-underwritten entire loan files. The staggering number of loans breaching the associated representations and warranties discovered in these cases would have alerted even the most casual of observers that Countrywide loans breached the associated representations and warranties. *See, e.g.*, Compl., *Mass. Mutual Life Ins. Co. v. Countrywide Fin. Corp.*, No. 11-cv-10414 (D. Mass. Sept. 1, 2011); Compl., *Allstate Ins. Co. v. Countrywide Fin. Corp.*, No. 10-cv-9591 (S.D.N.Y. Dec. 27, 2010); Compl., *AIG v. Bank of Am.*, No. 652199/2011 (N.Y. Sup. Ct. Aug. 8, 2011).

64.     This is evident from an SEC Quarterly Report filed by BAC for the period ending

March 31, 2011, which disclosed over $13.5 billion in outstanding repurchase requests based on

breach of representation and warranty claims.  These repurchase claims were unquestionably

meritorious as evidenced by the sums BAC was paying to resolve them.  For example, as

reported in the SEC Quarterly Report, BAC paid $577 million during the 3 months ending March

31, 2011 and $1.1 billion for the 3 months ending March 31, 2010, in order to resolve $723

million and $1.2 billion of repurchase claims on both BAC and legacy Countrywide originations.

These repurchase claims resulted in a loss on the related loans totaling $346 million and $707

million respectively. Bank of Am. Corp., Quarterly Report (Form 10-Q) (May 5, 2011) Further,

in August 2014, BAC reached a $16.5 billion settlement with the Department of Justice to

resolve federal and state claims against BAC and its former and current subsidiaries,

including Countrywide.

65.     The resolution required BAC to provide much needed relief to underwater

homeowners and potential homebuyers. In connection with the settlement, defendants "made

admissions concerning their conduct, including that they were aware that many of the residential

mortgage loans they had made to borrowers were defective, that many of the representations and

warranties they made to the GSEs about the quality of the loans were inaccurate, and that they

did not self-report to the GSAs mortgage loans they had internally identified as defective." *Bank

of America to Pay $16.65 Billion in Historic Justice Department Settlement for Financial Fraud

Leading up to and During the Financial Crisis*, Department of Justice Office of Public affairs

(Aug. 21, 2014), http://www.justice.gov/opa/pr/ bank-america-pay-1665-billion-historic-justice-

department-settlement-financial-fraud-leading.

Specifically, BAC admitted, among other things, the following statements concerning

Countrywide's conduct:

- "[F]rom 2005 to 2007, Countrywide originated an increasing number of loans as exceptions to its Loan Program Guides.  At the same time, employees of Countrywide received information indicating that there was an increased risk of poor performance for certain mortgage programs and products that were being included in RMBS.  Despite having access to this information, Countrywide's RMBS offering documents generally did not disclose the extent to which underlying loans were originated as exceptions to its Loan Program Guides.  Nor did Countrywide disclose in its RMBS offering documents the results of certain reviews and internal reports related to loan performance." *Id.* at 6.

- "Countrywide originated an increasing number of loans as exceptions to its Loan Program Guides. . . .an internal Countrywide email indicated that during May 2006, for prime loans, exceptions constituted by dollar amount approximately 30% of funding for certain fixed loans, 40% for Pay-Option ARMs, and 50% for expanded criteria hybrid loans." *Id.* at 10.

- "During the period from August 2005 to 2007, Countrywide received information regarding the performance and characteristics of loans that it originated under various products and programs and securitized into RMBS. That information suggested that certain products had the potential to perform poorly, particularly in a challenging economic environment." *Id.* at 11.

- "On February 3, 2006, an article in Inside Mortgage Finance Publications reported on a study that Countrywide presented at the American Securitization Forum Conference.  The article reported that a Countrywide executive had stated that 'Pay Option Arms were found to be the riskiest product on the market. . . . Throughout 2006 and 2007, Countrywide continued to originate Pay-Option ARMs, including as exceptions to its Loan Program Guides, and to securitize these Pay-Option ARMs into RMBS.  As disclosed in Offering Documents, in certain RMBS backed by Pay-Option ARMs, as many as 90% of the loans that backed the certificates were originated under reduced documentation programs." *Id.* at 13-14.

- "Countrywide also received information indicating that some borrowers who applied for loans in which they stated their incomes without providing verification may have been overstating their incomes on their loan applications." *Id.* at 14.

- In May 26, 2006, a report found "that approximately 40% of [Countrywide's] reduced documentation loans in the portfolio could potentially have income overstated by more than 10% and a significant percent of those loans would have income overstated by 50% or more." *Id.*

- "Although Countrywide originated an increasing number of mortgage loans as exceptions to its Loan Program Guides from 2005 to 2007, Countrywide generally did not disclose in its RMBS Offering Documents the scope of the exceptions to its Loan program Guides. Throughout this time period, Countrywide received information on risks associated with certain mortgage products and programs. Countrywide did not disclose in its RMBS Offering Documents the results of certain reviews and internal reports that analyzed this information." *Id.* at 15.

66.     "A significant percentage of loans that Countrywide sold to [government-sponsored entities ("GSEs")] during 2004 to 2008 were originated by Countrywide's prime retail division, known as the Consumer Markets Division ("CMD"). During this time, Countrywide was aware that many of the residential mortgage loans originated through CMD were defective and/or otherwise ineligible for sale to the GSEs." *Id.* at 28.

F.    **CTX Mortgage Company, LLC**

67.    CTX Mortgage Company, LLC ("CTX Mortgage") is the mortgage service division of Centex, which was acquired by PulteGroup, Inc. in 2009. CTX Mortgage is engaged in the business of, among other things, the origination of mortgage loans.

68.    CTX Mortgage originated loans that were included in the JPALT 2006-A5 and JPMMT 2005-A7 Trusts.

69.    According to an audit report issued by the U.S. Department of Housing and Urban Development ("HUD") on December 17, 2008, CTX Mortgage failed to properly underwrite mortgage loans based on HUD's review of a sample of loans. "These loans had material underwriting deficiencies that affected the insurability of the loans. In addition, CTX Mortgage's written quality control plan did not contain all of HUD's required elements." *See* Audit Report, U.S Dep't of Housing and Urban Development, CTX Mortgage Did Not Follow HUD's Requirements When Underwriting 12 FHA Loans and Developing Its Quality Control Plan (Dec. 17, 2008), *available at* http://www.hud.gov/offices/oig/reports/files/ig0971003.pdf.

70.    The HUD's audit report further states that CTX's underwriting department was poorly staffed and inadequately trained. CTX Mortgage senior management officials told HUD that their loan business dramatically increased in 2006 and 2007 and that due to increased volume, they increased their underwriting staff. *Id.* CTX officials also told HUD that the new staff was inexperienced and not adequately trained with regard to those loans. *Id.* "As a result of the inexperienced staff, CTX Mortgage management officials noticed that their default rates increased in 2007." *Id.*

71.    HUD also found that CTX Mortgage did not have adequate controls. *Id.* Specifically, it found that CTX's quality control plan lacked 10 of HUD's required elements,

including requirements for elevating findings of fraud, proper review of early payment default loans, and adequate review of appraisals. *Id.* As a result of these quality control deficiencies, the HUD found that CTX Mortgage was unable to "ensure the accuracy, validity, and completeness of its loan originations." *Id*.

**G.     DB Home Lending LLC (formerly known
            as Chapel Funding, LLC), and DB Structured Products, Inc.**

72.     Chapel Funding Corporation was a subsidiary of Chapel Funding LLC
(collectively, "Chapel"). Chapel was acquired by Deutsche Bank AG in 2006 and operates under
the name DB Home Lending LLC. DB Structured Products, Inc. ("DBSP") is a wholly owned
subsidiary of Deutsche Bank AG. Deutsche Bank AG and its affiliates, including DB Home
Lending LLC and DBSP, are referred to as "Deutsche Bank."  DBSP served as the sponsor of
securitizations including for the DB Trusts. DB Home Lending LLC originated mortgage loans
included in the ACE 2006-HE4 Trust and DBSP originated mortgage loans included in the ACE
2006-ASAP2, ACE 2006-ASAP3, and ACE 2006-ASAP5 Trusts.

73.     Mortgage originators like Chapel allowed Deutsche Bank to formulate and dictate
the underwriting standards at the origination level and guarantee a constant stream of loans to
securitize and sell to investors and other investment banks. Because Deutsche Bank needed high
volumes of loans to securitize—and because it passed off the default risk to investors—Deutsche
Bank had every incentive to, and in fact did, lower the underwriting standards at Chapel.

74.     A bipartisan memorandum from Senators Carl Levin and Tom Conburn
summarized the overwhelming evidence that Deutsche Bank-controlled originators did not
comply with their stated underwriting guidelines: "Deutsche Bank underwrote securities using
loans from subprime lenders known for issuing high risk, poor quality mortgages, and sold risky
securities to investors across the United States and around the world. They also enabled the
lenders to acquire new funds to originate still more high risk, poor quality loans."  Permanent
Subcomm. on Investigations, Wall Street and the Financial Crisis: Anatomy of a Financial
Collapse (2011).

75.     In addition, the FCIC, after concluding its own, separate investigation, also issued

a report of its findings concerning the financial crisis brought about by Deutsche Bank's RMBS misconduct. *See generally* FCIC Report. In its report, the FCIC specifically found that Deutsche Bank's due diligence practices were insufficient: "Some mortgage securitizers did their own due diligence, but seemed to devote only limited resources to it. . . . Deutsche Bank . . . had only small due diligence teams."  FCIC Report at 168.

76.     DBSP acted as a conduit through which Deutsche Bank could purchase nonprime loans for its RMBS from several correspondent mortgage originators to "make it easy for 'as big a seller or as small a seller' as exists to sell to Deutsche," as reported by *American Banker.* Jody Shenn, "Deutsche Group Buying Loans via Correspondents." Am. Banker, Jun. 8, 2004.

77.     Through this program, run by Maxine Matteo, Managing Director and co-head of Correspondent Lending at a Deutsche Bank subsidiary responsible for overseeing DBSP, DBSP provided guarantees to smaller mortgage lenders that DBSP would purchase loans *even before the loans had been originated* in order to encourage these smaller lenders to originate and sell more mortgage loans to DBSP for securitization and sale to investors. In June 2004, *American Banker* reported that, in so doing, Deutsche Bank was able to assert even more control over the loans that it purchased than it had previously.

78.     Subsequent government investigations have revealed that Deutsche Bank's control over these correspondent lenders did not extend to ensuring the quality of the underlying loans. In fact, DBSP's originators disregarded underwriting guidelines, and as a result, the loans they contributed to various RMBS trusts breached the associated representations and warranties.

79.     These details regarding Deutsche Bank can be found in the U.S. Senate Permanent Subcommittee on Investigations report (the "2011 Senate Report"). According to the 2011 Senate Report, starting as early as 2005, Deutsche Bank began internally disparaging the

quality of the loans it was securitizing. Wall Street and the Financial Crisis: Anatomy of a

Financial Collapse (2011), *available at* http://www.hsgac.senate.gov//imo/media/doc/

Financial_Crisis/FinancialCrisisReport.pdf?attempt=2.

80.     Greg Lippmann was global head of one of Deutsche Bank's trading desks for

structured financial products. Those desks were responsible for trading a variety of RMBS and

other asset backed securities on the secondary market. According to the 2011 Senate Report,

throughout 2006 and early 2007, Lippmann routinely disparaged ACE (the special purpose

vehicle that acted as the depositor for DBSP loans) in emails as a disreputable company, even

though it was controlled by Deutsche Bank. *Id.* at 319-20.

81.     Further, because Deutsche Bank generally outsourced its due diligence to Clayton

Holdings Inc. ("Clayton"), a third party due diligence firm, it had the benefit of independent

third-party view of the loans it was originating and securitizing into RMBS trusts. Nevertheless,

as Clayton disclosed to the FCIC, Deutsche Bank still securitized almost half of the loans

Clayton rejected for failing to comply with underwriting guidelines.

82.     Not surprisingly, Deutsche Bank's complete disregard for proper loan

underwriting has spawned numerous lawsuits. As part of these lawsuits, plaintiffs have

performed forensic analyses and re-underwritten entire loan files and discovered a staggering

number of loans breaching the associated representations and warranties. *See, e.g.*, Compl.,

*FHFA v. Deutsche Bank AG*, No. 11-cv-06192 (S.D.N.Y. Sept. 2, 2011).

**H.**   **Encore Credit Corporation**

83.     Encore Credit Corporation ("Encore"), founded in 2002, was a subprime lender specializing in nonconforming borrowers and focused on Alt-A and subprime loans, including interest-only loans and ARMs. Encore (later known as Performance Credit Corporation) was acquired by Bear Stearns Residential Mortgage Corporation ("Bear Stearns") in February 2007, to act as another channel for the origination of subprime loans. Encore originated mortgage loans included in the FBRSI 2005-2 Trust.

84.     Encore has faced a number of Truth in Lending Act lawsuits alleging a host of deceptive loan origination practices. Allegations against Encore include predatory lending, failing to disclose material terms of the loan, improperly inflating appraisals, forcing homebuyers to sign blank loan documents and altering documents without borrowers' consent. *See* Compl., *Lindsay v. Encore Credit Corp.*, No. 10-cv-2464 (N.D. Ga. Aug. 6, 2010); Compl., *Pieleanu v. Mortg. Elec. Reg. Sys.*, No. 08-cv-07404 (N.D. Ill. Dec 29, 2008); Compl., *Smith v. Encore Credit Corp.*, No. 08-cv-01462 (N.D. Ohio June 17, 2008); Compl., *Welch v. Countrywide Home Loans*, No. 09-cv-00168 (E.D. Cal. Jan. 20, 2009); Compl., *Martinez v. Encore Credit Corp.*, No. 09-cv-05490 (C.D. Cal. July 27, 2009).

85.     In 2007, Encore reported that "ECC Capital experienced an increase in repurchase claims related to early payment defaults (EPD) on mortgage loans for which the borrower has missed the first payment due to the purchaser of the loan or investor. This increase in repurchase claims led to the need to increase ECC Capital's reserve for losses that are incurred in connection with the repurchase and disposition of repurchased loans or the costs incurred in directly settling any repurchase obligation with an investor. During the third and fourth quarters of 2006, ECC Capital entered into settlement agreements with 11 purchasers of its loans paying or accruing a

total of $35.4 million to extinguish various EPD and representation and warranty repurchase

claims. Loans sold to these 11 purchasers during 2006 represented the majority of ECC Capital's

sales volume for the year." News Release, ECC Cap. Corp., ECC Capital Corporation Reports

Results for Three Months Ended March 31, 2007 (2007), *available at*

http://www.prnewswire.com/news-releases/ecc-capital-corporation-reports-results-for-three-

months-ended-march-31-2007-58267032.html.

      86.    Further, in January 2009, a lawsuit was filed in the Eastern District of California

against Encore and several other defendants alleging that Encore engaged in a scheme to coerce

low-income borrowers into loans that they could not afford. Compl., *Welch v. Countrywide*

*Home Loans*, No. 09-cv-00168 (E.D. Cal. Jan. 20, 2009). The complaint alleged that defendants

did not assess borrowers' credit risk, debt-to-income ("DTI") ratios, or any other objective

factors designed to assess repayment ability. *Id*. Moreover, the plaintiffs claimed that Encore

encouraged appraisers to overstate and did overstate appraisal values in order to push more loans

through the system. *Id*. In July 2009, a similar complaint was filed in the Central District of

California against Encore, among others, alleging that Encore was involved in originating loans

based upon false and inflated appraisal values. Compl., *Martinez v. Encore Credit Corp.*, No. 09-

cv-05490 (C.D. Cal. July 27, 2009).

      87.    Encore's complete disregard for proper loan underwriting has been the subject of

numerous lawsuits in which plaintiffs have performed forensic analyses and re-underwritten

entire loan files and uncovered substantial breaches of Encore's underwriting guidelines. *See*

Compl., *FHFA v. JPMorgan Chase & Co.*, No. 11-cv-06188 (S.D.N.Y. Sept. 2, 2011); Compl.,

*FHLB Chicago v. Bank of Am.*, No. 10-cv-07560 (N.D. Ill. Oct. 15, 2010);.

      88.    Media reports also exposed Encore's practice of ignoring its stated underwriting

guidelines and failing to evaluate its borrowers' true repayment ability. As illustrated in a news article published in *The Oregonian* on February 5, 2008, Encore ignored its stated underwriting guidelines, falsified incomes, did not determine whether the borrowers could afford to repay their loans, forged documents and put borrowers into loans they obviously could not afford to repay. *Bill Would Help Declaw Mortgage Predators*, Oregonian, http://satellite.tmcnet.com/news/2008/02/05/3251503.htm (last updated Feb. 5, 2008). *The Oregonian* recounted the story of borrower Paul Hoffhine Jr., a mentally disabled man who subsisted on Social Security payments of $624 per month. *Id*. Hoffhine had inherited a house from his parents in the 1980s that was completely paid off. *Id*. In February 2004, Encore cold-called Hoffhine and talked him into taking out a loan on the property so that Hoffhine could take equity out of the property in the form of cash. *Id*. The loan had monthly payments of $489.46. *Id*. Thus, Hoffhine's DTI ratio was over 78 percent based solely on the mortgage loan extended by Encore. *Id*. Hoffhine's other debts were not used to calculate the 78+ percent DTI ratio above, and therefore, if he had other debts, his DTI ratio would have been even higher. *Id*. However, in the offering documents describing Encore's underwriting guidelines, it was stated that the maximum DTI ratios allowed under Encore's guidelines were only 50 percent-55 percent. *Id*. Accordingly, Encore did not follow its underwriting guidelines for DTI ratios. *Id*.

89.     Even worse, according to *The Oregonian*, a few months later, in December 2004, Encore persuaded Hoffhine to refinance and take out a new loan. *Id*. The monthly payment on the new loan increased his payments to $617 per month, just $7 less than Hoffhine's entire monthly income, generating a DTI ratio of over 98 percent. *Id*. Encore again ignored its stated underwriting guidelines requiring a maximum DTI ratio of 55 percent. *Id*.

90.     Even more disturbing was the fact that Encore engaged in fraudulent activity

related to the loan. *The Oregonian* reported that, in Hoffhine's loan file, there was "a document claiming that Hoffhine was earning $3,500 a month as a handyman . . . [u]nderneath [which was] a scrawled signature – Paul Hauck Hoffhine Jr." *Id*. The news article reported that Hoffhine denied making the statement or signing the document, which was an obvious forgery containing fraudulent information. *Id*. The article quoted Hoffhine: "They forged my signature, [and] they inflated my income." *Id*. After being threatened with a lawsuit, Encore quickly and quietly settled with Hoffhine.

91.     As a result of these business practices, in May 2009, Encore was listed as number 17 on the Center for Public Integrity's list of top 25 subprime lenders responsible for the subprime economic meltdown, based on over $22 billion in high-risk, high-interest loans that the company originated between 2005 and 2007. *Who's Behind the Financial Meltdown?: The Subprime 25*, Center for Public Integrity, http://www.publicintegrity.org/2009/05/06/ 13005/no-17-subprime-25-encore-credit-corp-ecc-capital-corpbear-stearns-cos-inc (last updated May 19, 2014 12:19 PM).

I.      **Fremont Investment & Loan**

92.     Fremont Investments & Loan ("Fremont") originated mortgage loans included in the ACE 2005-HE5, ACE 2006-HE1, AND NHELI 2005-FM1 Trusts. Fremont was one of the country's largest subprime lenders until March 2007, when the Federal Deposit Insurance Corporation (the "FDIC") effectively forced Fremont out of the subprime lending business for extending subprime credit "in an unsafe and unsound manner."

93.     Following an extensive investigation, the FDIC issued a Cease & Desist Order to Fremont, concluding that Fremont was, in fact, "operating with inadequate underwriting criteria and excessive risk in relation to the kind and quality of assets held by [Fremont]," "operating with a large volume of poor quality loans," and "engaging in unsatisfactory lending practices." Order to Cease & Desist at 2–3., *In re Fremont Inv. & Loan*, No. FNIC-07-035b (Mar. 7, 2007).

94.     Further, the 2011 Senate Report found that "from 2004 to 2007, in exchange for lucrative fees, Goldman Sachs helped lenders like . . . Fremont . . . securitize high risk, poor quality loans, obtain favorable credit ratings for the resulting residential mortgage backed securities (RMBS), and sell the RMBS securities to investors, pushing billions of dollars of risky mortgages into the financial system."  2011 Senate Report at 377.

95.     The 2011 Senate Report found that Goldman Sachs commissioned a study of Fremont loans that demonstrated that 50 percent of Fremont loans securitized by Goldman Sachs failed to comply with stated underwriting guidelines. *Id.* at 515. The report further stated: "Despite these and other indications of Fremont's poor quality loans, Goldman continued to underwrite and market securities backed by Fremont loans."  *Id.*

96.     Senator Carl Levin, at a hearing before the Senate Permanent Subcommittee on Investigations ("Investigations Subcommittee"), singled out Fremont as a lender "known for

poor quality loans." *Wall Street and the Financial Crisis: The Role of Bank Regulators: Hearing Before Subcomm. On Homeland Security and Governmental Affairs Comm., Permanent Subcomm. On Investigations*, 111th Cong. 9 (Apr. 3, 2010) (statement of Carl Levin, Chairman, Permanent Subcomm. on Investigations). Senator Levin recounted how an analyst with S&P raised concerns about the quality of Fremont-originated loans in a Goldman Sachs RMBS offering:

> In January 2007, S&P was asked to rate an RMBS being assembled by Goldman Sachs using subprime loans from Fremont Investment and Loan, *a subprime lender known for loans with high rates of delinquency*. On January 24, 2007, an analyst wrote seeking advice from two senior analysts: "I have a Goldman deal with subprime Fremont collateral. *Since Fremont collateral has been performing not so good, is there anything special I should be aware of?*" One analyst responded: "*No, we don't treat their collateral any differently.*" The other asked: "are the FICO scores current?" "Yup," came the reply. Then "You are good to go." In other words, *the analyst didn't have to factor in any greater credit risk for an issuer known for poor quality loans, even though three weeks earlier S&P analysts had circulated an article about how Fremont had severed ties with 8,000 brokers due to loans with some of the highest delinquency rates in the industry*. In the spring of 2007, Moody's and S&P provided AAA ratings for 5 tranches of RMBS securities backed by Fremont mortgages. By October, both companies began downgrading the CDO. Today all five AAA tranches have been downgraded to junk status.

*Id*.

97.     In August 2010, Cambridge Place Investment Management Inc. ("Cambridge") filed an action against various investment banks in which Cambridge submitted testimony from numerous confidential witnesses concerning Fremont's systemic disregard of its underwriting guidelines. As set forth in an August 15, 2010 article in the Myrtle Beach Sun-News:

> Cambridge hinges much of its case on 63 confidential witnesses who testified in court documents about the reckless lending practices that dominated the subprime market during the real estate boom.

> Fremont, for example, regularly approved loans with unrealistic stated incomes – such as pizza delivery workers making $6,000 a month, according to the lawsuit.
>
> Other Fremont witnesses said in court documents that loan officers spotted and ignored fraudulent information, such as falsified pay stubs, every day.

David Wren, *Myrtle Beach Area Loans Lumped Into Spiraling Mortgage-Backed Securities*, Myrtle Beach Sun-News, Jan. 13, 2011, at A.

98.     On December 21, 2011, the Federal Housing Finance Agency ("FHFA") filed an amended complaint against UBS Americas, Inc., alleging securities laws violations concerning RMBS purchases made by Freddie Mac and Fannie Mae. *See generally FHFA v. UBS Ams., Inc.*, No. 11-cv-05201 (S.D.N.Y. Dec. 21, 2011). In the complaint, FHFA alleged:

> A confidential witness who previously worked at Fremont in its system operations and underwriting sections stated that Fremont consistently cut corners and sacrificed underwriting standards in order to issue loans. He noted that "Fremont was all about volume and profit," and that when he attempted to decline a loan, he was regularly told "you have signed worse loans than this." The same witness also said that employees at Fremont would create documents that were not provided by the borrowers, including check stubs and tax documents, in order to get loans approved. The confidential witness stated that Fremont regularly hired underwriters with no experience, who regularly missed substantial numbers of answers on internal underwriting exams. He explained that like many Fremont employees, he quit because he was uncomfortable with the company's practices.

*See id.* In May 2012, the court denied a motion to dismiss the complaint. *See FHFA v. UBS Ams., Inc.*, 858 F. Supp. 2d 306 (S.D.N.Y. 2012). On July 25, 2013, FHFA announced that it had reached an agreement to settle the case for $885 million.

99.     Fremont was also included in the 2008 "Worst Ten in the Worst Ten" Report, ranking 1st in Miami, Florida; 3rd in Riverside, California; 4th in Denver, Colorado and Sacramento, California; 5th in Stockton, California; 6th in Detroit, Michigan and Las Vegas,

Nevada; 7th in Bakersfield, California; and 10th in Memphis, Tennessee. *See* Press Release, Office of the Comptroller of the Currency, Worst Ten in the Worst Ten (Nov. 13, 2008), *available at* http://www.occ.treas.gov/news-issuances/news-releases/2009/nr-occ-2009-112b.pdf (the "2008 Worst Ten Report"). In the 2009 "Worst Ten of the Worst Ten" Report, Fremont holds the following positions:  2nd in Fort Myers-Cape Coral, Florida and Fort Pierce-Port St. Lucie, Florida; 4th in Riverside-San Bernardino, California; 5th in Stockton-Lodi, California and Vallejo-Fairfield-Napa, California; 7th in Las Vegas, Nevada and Modesto, California; and 8th in Bakersfield, California and Merced, California. *See* 2009 Worst Ten Report.

**J.**   **GreenPoint Mortgage Funding, Inc.**

100.   GreenPoint Mortgage Funding, Inc. ("GreenPoint"), based in Novato, California, was the wholesale mortgage banking unit of Capital One. Capital One acquired GreenPoint when it purchased GreenPoint's holding company, North Fork Bancorp, in December 2006. Capital One shut down GreenPoint's operations less than one year later on August 21, 2007.

101.   GreenPoint originated mortgage loans included in the DBALT 2006-AR4, GSAA 2005-6, JPALT 2006-A7, and JPMMT 2006-A5 Trusts.

102.   According to a press release issued by Capital One on August 20, 2007, GreenPoint had an "originate and sell" (*i.e.*, OTD) business model with a focus on "prime non-conforming and near-prime markets, especially the Alt-A mortgage sector." Capital One eventually liquidated GreenPoint in December 2008, taking an $850 million write-down due to mortgage-related losses associated with GreenPoint's origination business.

103.   When originating stated income loans, GreenPoint often inflated the borrowers' income by as much as 5 percent. A September 12, 2008 article on Bloomberg reported on GreenPoint's underwriting practices:

> Many Alt-A loans go to borrowers with credit scores higher than subprime and lower than prime, and carried lower interest rates than subprime mortgages.
>
> So-called no-doc or stated-income loans, for which borrowers didn't have to furnish pay stubs or tax returns to document their earnings, were offered by lenders such as GreenPoint Mortgage and Citigroup Inc. to small business owners who might have found it difficult to verify their salaries. . . .
>
> To grow, the market had to embrace more borrowers, and the obvious way to do that was to move down the credit scale,' said Guy Cecala, publisher of Inside Mortgage Finance. Once the door was opened, it was abused. . . .

> Almost all stated-income loans exaggerated the borrower's actual income by 5 percent or more, and more than half increased the amount by more than 50 percent, according to a study cited by Mortgage Asset Research Institute in its 2006 report to the Washington-based Mortgage Bankers Association.

Dan Levy & Bob Ivry, *Alt-A Mortgages Next Risk for Housing Market as Defaults Surge*, Bloomberg, Sept. 12, 2008, http://www.bloomberg.com/apps/news?pid=newsarchive &sid=arb3xM3SHBVk.

104.    Notably, in 2009, an action was commenced against GreenPoint to force GreenPoint to repurchase the loans it had contributed to an RMBS trust. The plaintiff alleged that GreenPoint pervasively failed to follow its underwriting guidelines during the origination of the loans. Compl. ¶¶ 35–39, *U.S. Bank Nat'l Ass'n v. GreenPoint Mortg. Funding, Inc.*, No. 600352/2009 (N.Y. Sup. Ct. Feb. 5, 2009) (alleging pervasive misrepresentations of borrowers' income, assets, employment, intent to occupy the property, inflated appraisal values and violations of GreenPoint's underwriting guidelines regarding credit scores, DTI  and LTV).

105.    The allegations were based on a forensic analysis of mortgage loans originated by GreenPoint. Of 1,030 randomly sampled loans, 93 percent were in violation of GreenPoint's underwriting guidelines. *U.S. Bank Nat'l Ass'n v. GreenPoint Mortg. Funding, Inc.*, No. 600352/2009, 2010 WL 841367, at *7 n.4 (N.Y. Sup. Ct. Mar. 3, 2010). The complaint survived a motion to dismiss. *See id.* at *8.

106.    Syncora Guarantee ("Syncora"), a monoline insurer, sued J.P. Morgan Securities, LLC, as successor to Bear Stearns, in connection with an RMBS underwritten by Bear Stearns and exclusively collateralized by GreenPoint-originated loans. After sustaining large losses due to the poor performance of GreenPoint loans, Syncora hired an independent consultant to

"reunderwrite" 1,431 GreenPoint loans, 400 of which were randomly selected without regard to

payment status. Over 92 percent of the 1,431 loans contained misrepresentations, and over 85

percent of the randomly selected 400 loans contained misrepresentations. The misrepresentations

uncovered include:

- Rampant fraud, primarily involving misrepresentation of the borrower's income, assets, employment, or intent to occupy the property as the borrower's residence (rather than as an investment), and subsequent failure to so occupy the property;

- Failure by the borrower to accurately disclose his or her liabilities, including multiple other mortgage loans taken out to purchase additional investment property;

- Inflated and fraudulent appraisals; and

- Pervasive violations of GreenPoint's own underwriting guidelines without adequate, or any, compensating factors, and in disregard of prudent mortgage lending practices, including loans made to borrowers (i) who made unreasonable claims as to their income, (ii) with multiple, unverified social-security numbers, (iii) with credit scores below the required minimum; (iv) with debt-to-income and loan-to-value ratios above the allowed maximums, or (v) with relationships to the applicable originator or other non-arm's-length relationships.

*See* Compl. ¶¶ 7, 181–82, *Syncora Guar. Inc. v. J.P. Morgan Sec. LLC*, No. 651566/2011 (N.Y.

Sup. Ct. June 6, 2011).

107. GreenPoint's own employees have corroborated these findings. A confidential

witness in *Federal Home Loan Bank of Indianapolis v. Banc of America Mortgage Securities,*

*Inc.* confirmed that (i) GreenPoint employees faced intense pressure to close loans at any cost;

(ii) GreenPoint managers overrode employees' decisions to reject loans and approved loans

based upon inflated incomes; (ii) GreenPoint approved loans that contained exceptions for which

there were no reasonable compensating factors; and (iv) GreenPoint failed to adhere to sound

underwriting guidelines. This confidential witness was a senior loan underwriter at GreenPoint

41

from October 1997 through August 2007. *See* Compl. ¶ 265, *Fed. Home Loan Bank of Indianapolis v. Banc of Am. Mortg. Sec., Inc.*, No. 49D051010PL045071 (Ind. Sup. Ct. Oct. 15, 2010) ("FHLB Indianapolis").

108.    According to that confidential witness, sales staff and managers at GreenPoint received bonuses based on the number of loans closed. As she said, "sales had tremendous authority" at GreenPoint, and "[t]hey were in business to make more money. They would try to find any way to close a loan." *Id*. ¶ 266.

109.    Between 2005 and 2007, the confidential witness said that stated income loans became increasingly popular and GreenPoint managers approved loans based upon inflated incomes that she believed should not have been approved. She saw a lot of loans with stated "income that was more than could be justified by the borrower's employment."  When she denied loans because she believed the income was inflated, sometimes the underwriting managers, operations managers and the regional operations manager overrode her decisions. *Id*. ¶ 267.

110.    More often than not, the confidential witness believed that her managers overrode her denials due to the incentives that they received based upon loan volume. As she said, "They were making the decision because they had to hit certain sales numbers."  She was aware of such targets because of comments made in operations meetings about the company needing to meet certain goals. *Id*. ¶ 268.

111.    The FHLB Indianapolis suit survived a motion to dismiss, with the court holding, "the plaintiff has, indeed, stated a claim upon which relief can be granted on the issue of underwriting guidelines."  *Fed. Home Loan Bank of Indianapolis v. Bank of Am. Mortg. Sec., Inc.*, No. 49D051010PL045071, 2012 WL 2844690 (Ind. Sup. Ct. July 3, 2012).

112.     In *Allstate Bank v. J.P. Morgan Chase, N.A.*, Allstate Bank, an RMBS investor,

sued JPMorgan Chase, N.A., the RMBS underwriter, for misrepresentations in RMBS offering

documents. Allstate's complaint relied on several confidential witnesses. One confidential

witness, who was an underwriting analyst at GreenPoint from 2003 to 2007, stated that

GreenPoint reviewed only 10 percent of the loans it originated for fraud. He thought this was a

"mistake" because the fraud and misrepresentation uncovered in the 10 percent sample indicated

that many more loans likely contained fraud. But the remaining 90 percent of the loans were not

reviewed. Am. Compl. ¶ 485, *Allstate Bank v. JPMorgan Chase, N.A.*, No. 01869/2011

(S.D.N.Y. May 10, 2012).

113.     That confidential witness also stated that sales personnel ran GreenPoint, and

senior management was comprised of people from sales who were incentivized to push the

volume of mortgage loans, not adherence to the underwriting guidelines or due diligence.

Managers' bonuses were tied to production volume, and they were not penalized if loans were

later found to be fraudulent or if the borrower defaulted on the first payment. He stated that

GreenPoint's management deliberately overlooked misrepresentations from mortgage loan

brokers, particularly if the broker brought in a high volume of loans. Problem brokers were

rarely suspended, and even when they were, there was never a review of the loans they

originated that were already in the pipeline. *Id*. ¶ 486.

114.     Another confidential witness was a Wholesale Account Manager at GreenPoint

from 2004 to 2006. That confidential witness stated that GreenPoint employees understood that

if a mortgage loan could eventually be sold to Wall Street, GreenPoint was to approve and fund

the mortgage loan. The majority of the loan products originated in the confidential witness'

office were stated income-stated asset loans and pay-option ARMs. Despite the risk inherent in

these products, the sales force "never learned of negative loan performance" and their compensation was in no way tied to loan performance. *Id*. ¶ 487.

115.   Another confidential witness was an Underwriting Supervisor at GreenPoint from 2005 to 2006 and supervised five underwriters and three conditions specialists. That confidential witness stated that GreenPoint management authorized exceptions to loan underwriting guidelines in order to approve applications, even when there were no compensating factors justifying the exceptions. The confidential witness was aware that management overrode decisions to refuse funding in locations known for fraud and property flipping, even when evidence of fraud was found. According to the confidential witness, "if the borrower is breathing and could sign loan documents, they could get a loan" from GreenPoint. *Id*. ¶ 488.

116.   The complaint also alleged that many of GreenPoint's loans were granted by the over 18,000 brokers that were approved to transact with GreenPoint—a large enough number that GreenPoint could not exercise any realistic degree of control. Typically, new brokers were actively monitored for only the first five to seven loans submitted, usually during only the first 90 days of being approved. *Id*. ¶ 490.

117.   In November 2013, an action was commenced against GreenPoint to force GreenPoint to repurchase loans that it had contributed to a securitization trust. The plaintiff alleged that GreenPoint pervasively failed to follow its underwriting guidelines during the origination of the loans. Compl. ¶¶ 35–49, *U.S. Bank Nat'l Ass'n v. GreenPoint Mortg. Funding, Inc.*, No. 651954/2013 (N.Y. Sup. Ct. Nov. 6, 2013) (alleging pervasive misrepresentations of borrowers' income, assets, employment, intent to occupy the property, inflated appraisal values and violations of GreenPoint's underwriting guidelines regarding credit scores, DTI ratios, and LTV ratios). The allegations were based on a forensic analysis of loans originated by

GreenPoints. Of 166 randomly sampled loans, nearly 40 percent were in violation of GreenPoint's representations and warranties. *Id.* ¶ 2.

118.    GreenPoint's pervasive disregard of underwriting standards resulted in its inclusion among the worst ten originators in the 2008 "Worst Ten in the Worst Ten" Report. GreenPoint was identified 7th worst in Stockton, California, and 9th worst in both Sacramento, California, and Las Vegas, Nevada. *See* 2008 Worst Ten Report. In the 2009 "Worst Ten in the Worst Ten" Report, GreenPoint was listed as 3rd worst in Modesto, California; 4th worst in Stockton, Merced and Vallejo-Fairfield-Napa, California; 6th worst in Las Vegas, Nevada; and 9th in Reno, Nevada. *See* 2009 Worst Ten Report.

**K.**   **Goldman Sachs Mortgage Company**

119.    Goldman Sachs Mortgage Company ("Goldman Sachs") frequently served as the sponsor of securitizations, including for the GSAA 2005-6 Trust.

120.    Goldman Sachs and its affiliates participated in all aspects of the mortgage finance market as warehouse lender, loan originator, loan purchaser, loan servicer, financial advisor, underwriter and sponsor of RMBS and other securities linked to the mortgage market. As a result, Goldman Sachs had a unique perspective on mortgage origination practices.

121.    Goldman Sachs provided billions of dollars in "warehouse" lines of credit to finance unsold loans held by major subprime originators, such as Washington Mutual Bank, Countrywide, Fremont and New Century Financial Corporation with its affiliates. The originators repaid borrowings on these lines of credit with the proceeds of sales of loan pools to Goldman Sachs and other RMBS sponsors.

122.    From 2004 to 2006, Goldman Sachs acquired $53 billion in mortgage loans from its warehouse-line borrowers and other subprime originators, including Countrywide, Washington Mutual Bank, Fremont and New Century Financial Corporation with its affiliates.

123.    From 2004 to 2006, Goldman Sachs issued 318 RMBS offerings totaling $184 billion, roughly a quarter of which were backed by subprime loans.

124.    Goldman Sachs directly owned and operated loan servicers and a loan originator. In 2005, Goldman Sachs invested in subprime mortgage servicer Avelo, acquiring it outright in 2007. In 2005, Goldman Sachs acquired subprime mortgage originator Senderra Funding LLC. In 2007, Goldman Sachs acquired mortgage loan servicer Litton Loan Servicing LP.

125.    Goldman Sachs participated in mortgage securitizations as an underwriter for Countrywide, Washington Mutual Bank and other RMBS issuers. Goldman Sachs also served as

financial advisor to Washington Mutual Bank in a multi-billion restructuring in late 2007, through which it gained extensive knowledge of Washington Mutual Bank's mortgage securitization business. A senior Goldman Sachs Managing Director also served on the board of directors of Countrywide.

126.    As a purchaser and financer of mortgage loans, Goldman Sachs had unfettered access to numerous loan originators and their loan files and was intimately familiar with those originators' policies and practices.

127.    Numerous investigations and lawsuits contain ample evidence available to HSBC Bank USA, National Association and Goldman Sachs demonstrating that the originators from whom Goldman Sachs purchased loans systematically disregarded their underwriting standards, originated mortgage loans with the goal of increasing volume, rather than evaluating the mortgagor's ability to repay the loan and regularly made exceptions to their underwriting guidelines in the absence of sufficient compensating factors.

128.    In April 2011, the Investigations Subcommittee issued the 2011 Senate Report, reporting on abuses in the market for RMBS and other mortgage-related investments.

129.    The 2011 Senate Report devoted over 200 pages to exposing for the first time "how Goldman engaged in securitization practices that magnified risk in the market by selling high risk, poor quality mortgage products to investors around the world."  2011 Senate Report at 376.

130.    In late 2006 and early 2007, Goldman Sach's Mortgage Department initiated an intensive review of its mortgage-loan inventory, originator relationships, warehouse lines of credit and RMBS and CDO holdings, in order to analyze its exposure to the mortgage loan

market and to identify and demand repurchase of defective or fraudulent loans under its loan purchase agreements with loan originators.

131.    On February 2, 2007, Daniel L. Sparks, head of the Goldman Sachs Mortgage Department, reported to senior executives that his team was "working on putting loans in the deals back to the originators (New Century, WAMU, and Fremont – all real counterparties), as there seem to be issues potentially including some fraud at origination, but resolution will take months and be contentious."  *Id.* at 484.

132.    In response, Goldman Sachs decided to "re-underwrite" every loan purchased from specific originators, including New Century Financial Corporation with its affiliates, Fremont, Washington Mutual Bank, and, later, Countrywide, in order to thoroughly identify defective or fraudulently originated loans owned by Goldman Sachs and then demand their repurchase by their originators.

133.    Goldman Sachs initially focused on New Century Financial Corporation with its affiliates and Fremont loans finding that 26 percent and 50 percent, respectively, were defective and often fraudulent, and failed to comply with the mortgage originators' underwriting guidelines. *Id.* at 485-86.

134.    Later, in June 2007, Goldman Sachs reviewed loans originated by Countrywide and determined that, like Fremont loans, 50 percent were defective and often fraudulent, and subject to repurchase. *Id.* at 486-87.

135.    As the 2011 Senate Report further revealed: "Goldman originated and sold RMBS securities that it knew had poor quality loans that were likely to incur abnormally high rates of default. At times, Goldman went further and sold RMBS securities to customers at the same time it was shorting the securities and essentially betting that they would lose value."  *Id.* at 513.

48

136.     Goldman Sachs often relied on outside firms to conduct reviews of mortgage loans underlying its RMBS. One of the largest such firms was Clayton. As the 2011 FCIC Report concluded:  "Because of the volume of loans examined by Clayton during the housing boom, the firm had a unique inside view of the underwriting standards that originators were actually applying—and that securitizers were willing to accept."  FCIC Report, at 166.

137.     For each loan pool they reviewed, Clayton checked (among other things) adherence to underwriting guidelines, whether non-compliant loans had sufficient "compensating factors" and accuracy of electronic loan data provided to investors. *See id*.

138.     According to Clayton, approximately 23 percent of the 111,999 loans that it reviewed for Goldman Sachs violated origination standards represented in Goldman Sachs disclosure documents, including the certificate offering materials. *Id*. at 167. Goldman Sachs allowed one third of those non-compliant loans—about 7 percent of the total pool—to be included in RMBS sold to investors such as Commerzbank.

139.     In RMBS transactions, the more junior tranches protect the most senior tranches by absorbing losses on defaulted loans. However, this protection, or "credit enhancement," is typically limited to roughly 5 percent of the underlying loan principal. As a result, a 7 percent defect rate among loans underlying an RMBS transaction would be more than enough to undermine the value of senior tranches such as the Certificates.

140.     Moreover, the percentage of defective loans in pools underlying Goldman Sachs RMBS was almost certainly much greater than 7 percent. Goldman Sachs only rejected loans from the small samples reviewed in its "due diligence."  No loans were rejected from the un-sampled loans, and there was no system to prevent loans rejected from one sample from being

included in subsequent securitizations (where they would likely remain undetected by future

sampling).

141.    As the 2011 FCIC Report found:

> [M]any prospectuses indicated that the loans in the pools either met guidelines outright or had compensating factors, even though Clayton's records show that only a portion of the loans were sampled . . . . [O]ne could reasonably expect [the unsampled loans] to have many of the same deficiencies, at the same rate, as the sampled loans. Prospectuses for the ultimate investors in the mortgage-backed securities did not contain this information, or information on how few of the loans were reviewed, raising the question of whether the disclosures were materially misleading, in violation of the securities laws.

FCIC Report at 167.

**L.**     **HSBC Bank USA, National Association**

142.     HSBC Bank USA, National Association and its affiliates or agents ("HSBC")
have engaged in the same type of misconduct as the Originators and Sponsors for the Covered
Trusts.

143.     Investigations and lawsuits contain ample evidence of HSBC's own systematic
disregard of its underwriting standards and origination practices, which further demonstrates
HSBC's failure to remedy or address origination and underwriting violations within trusts where
it served as trustee.

144.     For example, on September 2, 2011, FHFA, as conservator for Fannie Mae and
Freddie Mac, filed lawsuits against seventeen of the largest financial institutions involved in the
packaging, marketing and sale of RMBS that Fannie Mae and Freddie Mac purchased during the
period from 2005 to 2007, including HSBC and its affiliates. Each of FHFA's complaints alleged
that the defendants "falsely represented that the underlying mortgage loans complied with certain
underwriting guidelines and standards, including representations that significantly overstated the
borrowers' capacity to repay their mortgage loans" and the "percentage of loans secured by
owner-occupied residences." *See* Compl., *FHFA v. HSBC N. Am. Holdings Inc.*, No.
06189/2011 (N.Y. Sup. Ct. Sept. 2, 2011).

145.     Additionally, in *FDIC v. Chase Mortg. Finance Corp.*, No. 12-cv-06166
(S.D.N.Y. Aug. 10, 2012), the FDIC filed an action against various investment banks including
HSBC for the systemic abandonment of its underwriting guidelines.

**M.     J.P. Morgan Mortgage Acquisition Corporation,**
**       JPMorgan Chase Bank, N.A., and Chase Home Finance, LLC**

146.    Chase Home Finance, LLC ("CHF") and JPMorgan Chase Bank, N.A.
(collectively, the "Chase Originators") compose the mortgage-lending arm of JPMorgan Chase
Bank, N.A. JPMorgan Chase Bank, N.A. is the sole owner of J.P. Morgan Mortgage Acquisition
Corporation and is a subsidiary of J.P. Morgan Chase & Co. (collectively, "JPMorgan"). CHF
and JPMorgan Chase Bank, N.A. originated mortgage loans included in the JPALT 2006-A7 and
JPMMT 2006-A5 Trusts. J.P. Morgan Acquisition Corporation served as the sponsor for JPALT
2006-A7 and JPMMT 2006-A5 Trusts.

147.    JPMorgan's systematic breaches of mortgage loan representations and warranties
is evidenced by a memo circulated by employees instructing mortgage associates how to tweak
data they entered into the automated underwriting program ("ZiPPY") to get loans approved by
the automated underwriting program. *See* Mark Friesen, *Chase Mortg. Memo Pushes 'Cheats &
Tricks'*, Oregonian, http://www.oregonlive.com/business/index.ssf/
2008/03/chase_mortgage_memo_pushes_che.html) (last updated Mar. 28, 2008) ("Chase ZiPPY
Memo").

148.    The Chase ZiPPY Memo listed the steps that mortgage associates could use to
manipulate the date entered into the ZiPPY automated underwriting program to recommend a
mortgage using the "Stated Income/Stated Asset" underwriting guidelines for borrowers. *See*
Chase ZiPPY Memo.

149.    Strikingly, "Step 3" stated: "If you do not get Stated/Stated, try resubmitting with
slightly higher income. Inch it up $500 to see if you can get the findings you want. Do the same
for assets."  In other words, the Chase ZiPPY Memo instructed mortgage associates to inflate

borrower income to "trick" ZiPPY into recommending the use of Stated Income/Stated Asset underwriting guidelines.

150. In addition, the Chase ZiPPY Memo told mortgage associates not to report gift funds, but to include gift funds in the borrower's bank account and to include all income as base income.

151. In November 2011, James Theckston, a former regional vice president at CHF in southern Florida, was interviewed regarding the company's lending and securitization practices for a *New York Times* article. Nicholas D. Kristof, *A Banker Speaks, With Regret*, N.Y. Times, Dec. 1, 2011, at A39. Theckston's team wrote $2 billion in mortgages in 2007 alone. *Id*. According to Theckston, CHF engaged in high-risk lending practices such as making no-documentation loans to borrowers with insufficient resources. *Id*. "On the application, you don't put down a job; you don't show income; you don't show assets; but you still got a nod," he said. *Id*. "If you had some old bag lady walking down the street and she had a decent credit score, she got a loan. . . . You've got somebody making $20,000 buying a $500,000 home, thinking that she'd flip it. It was crazy, but the banks put programs together to make those kinds of loans." *Id*.

152. These excesses were driven by JPMorgan's vertically integrated securitization business model. Theckston stated: "The bigwigs of the corporations knew [about declining lending standards], but they figured we're going to make billions out of it, so who cares? . . . The government is going to bail us out. And the problem loans will be out of here, maybe even overseas." *Id*. Because risky loans were securitized and sold to investors, CHF created incentive structures that rewarded risky lending. *Id*. Theckston said that some CHF account executives earned commissions seven times higher from subprime loans rather than prime mortgages. *Id*. As a result, those executives looked for unsophisticated borrowers with less education or limited

English abilities and convinced them to take out non-prime loans. *Id*. Theckston's own 2006 performance review indicated that 60 percent of his evaluation depended on him increasing the production of high-risk loans. *Id*.

153.    Numerous other former Chase Originator employees have come forward with evidence of the Chase Originators' risky lending practices and abandonment of underwriting guidelines. According to an amended complaint filed in *FHLB of Boston v. Ally Fin. Inc.*, No. 11-cv-10952 (D. Mass. June 29, 2012) (the "FHLB Boston Complaint"), in which a senior underwriter at JPMorgan from 2001 to 2008 claimed that managers often overturned the decisions of lower-level underwriters to reject stated-income loans. "If the manager felt the income made sense and the underwriter didn't, the manager could overturn it."  *Id*.

154.    That action involved a trust with a high percentage of mortgage loans originated by JPMorgan. The Federal Home Loan Banks (the "FHLB") conducted an analysis of the specific loans that remain in the mortgage pool of certain securitizations trusts and found high rates of delinquency and foreclosure evidencing a pervasive disregard of sound underwriting practices in the origination of those loans. According to the FHLB's analysis, as of March 31, 2011, 57.51 percent of the loans were loans in which the borrowers were at least 90 days delinquent, had foreclosure proceedings pending, or the mortgage holder had recovered title from the borrower.

155.    In the FHLB Boston Complaint, a loan processor and assistant to the branch manager at a Florida branch of CHF from April 2006 until August 2007 noted that many employees inflated borrowers' income on orders from the branch manager to get loans approved. The loan processor stated, "It was very common to take stuff out of the loan file."  *Id*. ¶ 519. Loan officers would often bring their loans to the branch manager for instructions on what the

stated income should be to make a loan close. "The branch manager often fixed the loan . . . [he] figured out what LTV [the borrower] needed to close the loan and inflated the income to make the loan work." *Id.* ¶ 521. Branch managers would also call the regional managers above them for instructions on problem loans. *Id.*

156.    "[A]ccording to a former Wholesale Account Executive with CHF from 2002 to 2008, CHF's underwriting process was subject to abuse by brokers who purposely originated loans for people they knew could not repay them. Additionally, CHF's proprietary automated underwriting system 'ZiPPy' had extremely loose guidelines and was easily and often overridden. The former Account Executive acknowledged that had ZiPPy's requirements not been so loose or if other measures had been taken in the underwriting process, the loans it approved would otherwise not have seen the light of day." *See* Am. Compl., *Fort Worth Employees' Ret. Fund v. J.P. Morgan Chase & Co.*, No. 09-cv-03701 (S.D.N.Y. Apr. 9, 2010).

157.    Yet another witness interviewed for the FHLB Boston Complaint, a senior loan underwriter at CHF from December 2004 to August 2005, said that CHF loan personnel also knowingly permitted borrowers to submit false income data, saying that, "[y]ou'd see self-employed people, like a landscaper, who stated they made $10,000 a month." FHLB Boston Complaint ¶ 524. When borrowers stated unreasonable income levels, management would push the loans through regardless. *Id.* The witness said that in addition to being told to accept unreasonable stated incomes, employees were not permitted to question appraisals that appeared to be inflated. *Id.* ¶ 525. He recalled a subdivision in California in which CHF accepted appraisal values that were double the sales prices of identical homes sold just a few months ago. *Id.*

158.    According to a former senior underwriter at CHF from March 2002 through January 2008, when processing loans that required verification of assets, "we really were not

verifying them, what we would do is look to see if a borrower was making, say $15,000 a month, if that's [what] they were listing. We would hope to see assets that would compare to or be comparable to that type of income." *See* Am. Compl., *Plumbers' & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No. 09-cv-3209 (E.D.N.Y. Mar. 8, 2010) ("Plumbers' & Pipefitters' Complaint"). The former senior underwriter believed that in 2006, 20 percent to 30 percent of the loans that were approved were approved only based on management overriding underwriters' initial rejection of the loans. *See id*.

159.    A former senior processor, junior underwriter, and compliance controller who worked at CHF between December 2002 and October 2007, stated in the Plumbers' & Pipefitters' Complaint that loan processors were not provided with all of the relevant borrower information: "there was some information that was being withheld from us." *Id*. ¶ 84. The witness further claimed that employees were actively encouraged not to investigate or verify suspicious information in loan applications. *Id*. ¶ 87.

160.    Another complaint alleged that several CHF confidential witnesses confirmed employees would "coach" borrowers to falsify the loan applications and that forgeries were used to "verify" the borrower's assets. A senior underwriter from CHF saw the real names on bank statements crossed out, with the borrower's name typed in its stead. Am. Compl., *Prudential Insurance Co. of America v. J.P. Morgan Securities*, No. 12-cv-03489 (D.N.J. Aug. 30, 2012).

161.    CHF's departure from industry standards was confirmed by Jamie Dimon, CEO of JPMorgan. On January 13, 2010, Dimon testified under oath to the FCIC that "the underwriting standards in our mortgage business, for example, should have been higher, and we wish we had done an even better job in managing our leveraged lending and mortgage-backed securities exposures." *See The Causes and Current State of the Financial Crisis: Hearing*

*Before the Fin. Crisis Inquiry Comm., Permanent Subcomm. On Investigations*. (2010) (statement of Jamie Dimon, Chairman and CEO, JP Morgan Chase & Co.). JPMorgan also "misjudged the impact of more aggressive underwriting standards and should have acted sooner and more substantially to reduce the loan-to-value ratios." *Id*. Dimon further testified that JPMorgan would, in the wake of the financial crisis, enhance its mortgage underwriting standards, "returning to traditional 80 percent loan to value ratios and requiring borrowers to document their income." *Id*.

162.     On September 15, 2010, William Collins Buell VI, formerly of J.P. Morgan Securities, told the FCIC: "[T]here was a very competitive process to offer a wider and wider array of products to borrowers . . . there was a tremendous amount of competition to try to make products that people could actually get . . . and that investors and lenders would be interested in buying." *See* FCIC Report at 583. This competition led to a reduction in diligence and oversight on the part of JPMorgan. Buell confirmed that from 2005 to 2007, JPMorgan's underwriting guidelines and origination standards were "deteriorating." *Id*.

163.     Additionally, according to documents provided to the FCIC, as of August 31, 2010, Fannie Mae had required JPMorgan to repurchase 6,456 loans originated by its subsidiaries JPMorgan and CHF with an unpaid principal balance of $1.359 billion. Fannie Mae had also requested that JPMorgan repurchase an additional 1,561 JPMorgan and CHF loans with an outstanding principal balance of $345 million. Likewise, in 2007, Freddie Mac required JPMorgan to repurchase 5,427 CHF loans with an unpaid principal balance of $1.188 billion.

164.     JPMorgan's abandonment of underwriting guidelines and systematic securitization of non-compliant mortgage loans was further revealed by a "whistle-blower", former employee Alayne Fleischmann. See Matt Taibbi, The $9 Billion Witness: Meet

JPMorgan Chase's Worst Nightmare, Rolling Stone, Nov. 6, 2014, *available at*
http://www.rollingstone.com/politics/news/the-9-billion-witness-20141106.  According to the
article, Fleischmann, a securities law attorney, began working as a transaction manager at
JPMorgan in 2006 and quickly uncovered JPMorgan's securitization of defective loans, which
she described as "massive criminal securities fraud."

165.    For example, in late 2006, Fleischmann reviewed a pool of GreenPoint-originated
loans that were "suspiciously old," which meant that they "had either been previously rejected by
Chase or another bank, or were what are known as 'early payment defaults.'"  At this time,
Fleischmann also encountered high percentages of overstated incomes in pools of loans.  After a
meeting regarding these issues, Fleischmann pleaded with Greg Boester, a managing director, to
reconsider securitizing the loans, saying that the bank could not sell the high-risk loans as low-
risk securities without committing fraud, however her pleas were ignored. Id.

166.    Fleischmann later brought her concerns to another managing director, William
Buell, sending him a later in early 2007 warning of the consequences of reselling defective loans
and giving detailed descriptions of breakdowns in JPMorgan's diligence process, however her
concerns were again dismissed.  After alerting her bosses to JPMorgan's fraud, Fleischmann was
terminated in February 2008. Fleischmann would later reveal JPMorgan's RMBS fraud to the
United States attorney office. Id.

167.    Finally, in November 2013, JPMorgan entered into a $13 billion settlement with
the Department of Justice ("DOJ") to resolve federal and state civil claims arising out of the
fraudulent packaging, marketing, sale and issuance of RMBS by JPMorgan and Washington
Mutual Bank. As part of the settlement, JPMorgan acknowledged it made serious
misrepresentations to the public about numerous RMBS transactions. The resolution required

JPMorgan to provide much needed relief to underwater homeowners and potential homebuyers. Under the terms of the settlement, JPMorgan receives credit for modifying loans, including securitized loans. JPMorgan has modified loans that did not qualify for modification under prudent servicing standards or the governing servicing agreements in order to receive credit because the investors, not JPMorgan would bear the loss.

N.     **M&T Mortgage Corporation**

168.     M&T Mortgage Corporation ("M&T") was engaged in the business of the origination of mortgage loans. M&T Mortgage Corporation is a subsidiary of M&T Bank, whose parent company is M&T Bank Corporation.

169.     M&T originated loans that were included in the JPMMT 2006-A5 Trust.

170.     M&T has a history of fraudulent practices, even recently in connection with fraudulent loans. *See* Dan Herbeck, *Mick Whipple, once a rising star at M&T, now targeted in probe of fraudulent loans*, Buffalo News, April 26, 2014, a*vailable at* http://www.buffalonews. com/city-region/mick-whipple-once-a-rising-star-at-mt-now-targeted-in-probe-of-fraudulent-loans-20140426 (citing the termination of an M&T Bank loan officer for allegations that he had arranged millions of dollars of fraudulent loans to struggling local businesses that, under normal M&T bank procedures, should not have qualified for loans). The FBI also investigated the matter. *Id.*

171.     Individual M&T employees have even been sentenced for their fraudulent mortgage schemes. In one instance, an M&T banking liaison was sentenced for creating false documents purporting to verify assets for straw buyers, which included her brother and others. *Former Maryland M&T Bank employee sentenced for role in mortgage Fraud*, National Mortgage Professional, December 21, 2009, *available at* http://nationalmortgageprofessional.com/news/18927/former-maryland-mt-bank-employee-sentenced-role-mortgage-fraud. She also sent false verification letters concerning the buyers' income and assets on M&T Bank letterhead to banks and mortgage lenders to facilitate the fraud scheme, created a fictitious M&T Bank employee, and used the fictitious employee's name to sign some of the false verification letters. *Id.*

O.      **National City Mortgage Company.**

172.     National City Mortgage Company was a division of National City Bank, which was a wholly owned subsidiary of National City Corporation. Collectively, these entities are referred to as "National City."  National City originated loans in the GSAA 2005-6 Trust.

173.     In a June 2008 article, *The Wall Street Journal* described how National City was once seen as a conservative lender, but then had "pushed into the mortgage industry, gambling on subprime and home-equity loans."  Damian Paletta et al., *National City is Under Scrutiny*, Wall St. J. (June 6, 2008), http://www.wsj.com/articles/SB121271764588650947. By the end of the first quarter of 2008, National City had $4.2 billion in delinquent loans and leases on its books. *Id*. In June 2008, National City entered into a confidential "memorandum of understanding" with the OCC, which effectively put the bank on probation. *Id*.

174.     National City has been subject to class action lawsuits as a result of its misconduct. In 2008, investors brought a securities fraud class action lawsuit against National City alleging that National City misrepresented the quality of its mortgage loans. *See* Am. Class Action Complaint, I*n Re National City Corp. Sec., Derivative & ERISA Litig.*, No. 08-nc-70004 (N.D. Ohio June 13, 2008). On August 8, 2011, it was announced that the case had settled for $168 million.

175.     In November 2010, National City settled a class action lawsuit for $22.5 million. The class action plaintiffs alleged that National City had an extensive, undisclosed history of grossly imprudent lending and underwriting practices. *See* Second Am. Compl., *Argent Classic Convertible Arbitrage Fund (Bermuda) Ltd. v. National City Co.*, No. 08-NC-70016 (N.D. Ohio Feb. 18, 2010). In August 2011, National City settled another securities fraud class action lawsuit for $168 million dollars. *See* Am. Compl., *In Re National City Corp. Sec., Derivative & ERISA*

61

*Litg.*, No. 08-NC-70004 (N.D. Ohio June 13, 2008). In the class action, plaintiffs had alleged that

National City misrepresented the nature and quality of its mortgage loans.

P.      <u>**New Century Mortgage Corporation**</u>

176.    New Century Mortgage Corporation and NC Capital Corporation were

subsidiaries of New Century Financial Corporation (collectively, "New Century"). New Century

was founded in 1995 in Irvine, California, and grew to be one of the nation's largest subprime

lenders—originating $60 billion in loans in 2006 alone. New Century Mortgage Corporation

originated mortgage loans included in the NHELI 2005-HE1 Trust.

177.    New Century failed amid revelations that its financial records contained numerous

accounting errors, government investigations and a liquidity crisis when its Wall Street backers

pulled the financial plug on loan funding. The circumstances leading to its collapse tell the story

of a company that was far more concerned with originating mortgages to fuel the securitization

machine than in the quality of those mortgages.

178.    A June 2, 2008 article in the *Columbus Dispatch* summarized New Century's

reputation in the industry:

- The California-based mortgage company catered to the riskiest borrowers, even those with credit scores as low as 500. Its brokers cut deals by asking few questions and reviewing even fewer documents, investigators say.

- Homeowners struggling to pay their existing mortgages signed up for what they believed to be redemption: a new loan. They were unaware of the warnings from lending and legal experts that New Century loaned money with a devil-may-care-attitude.

- New Century typified the book-'em-at-any-cost mentality that fueled the national mania for high-rate mortgages, commonly called subprime.

Jill Riepenhoff & Doug Haddix, *Risky Refinancings Deepen Financial Hole*, Columbus

Dispatch, June 2, 2008, at 1A.

179.    New Century's foreclosure rates reflected its inattention to underwriting

standards. Indeed, New Century appeared in the OCC's 2008 "Worst Ten in the Worst Ten"

Report in every housing market highlighted. 2008 Worst Ten Report at 2. Incredibly, New

Century appeared in the top five in every market—1st in Las Vegas, Nevada and Riverside,

California; 2nd in Cleveland, Ohio, Denver, Colorado, Sacramento, California and Stockton,

California; 3rd in Bakersfield, California and Detroit, Michigan; and 5th in Miami, Florida and

Memphis, Tennessee. *Id*. When the OCC issued its updated 2009 "Worst Ten in the Worst Ten"

Report, New Century rose to the top three in every one of the ten worst markets, holding 1st

place in Reno, Nevada, Bakersfield, California, Riverside-San Bernardino, California and Fort

Myers-Cape Coral, Florida; 2nd place in Modesto, California, Las Vegas, Nevada, Merced,

California, and Stockton-Lodi, California; and 3rd place in Fort Pierce-Port St. Lucie, Florida

and Vallejo-Fairfield-Napa, California. 2009 Worst Ten Report.

180.    The U.S. Bankruptcy Court for the District of Delaware presiding over New

Century's bankruptcy case appointed Michael J. Missal ("the Examiner") to examine "any and

all accounting and financial statement irregularities, errors and misstatements" in connection

with New Century's practices and procedures. The Examiner engaged a law firm, forensic

accountants, and financial advisors to assist in his investigation and reporting. His final report to

the Bankruptcy Court dated February 29, 2008 was unsealed and publicly released on March 26,

2008. Final Report of Michael J. Missal, *In re New Century TRS Holdings Inc*, No. 07-

10416(KJC) (Bankr. D. Del. Feb. 29, 2008) (the "Examiner's Report").

181.    The Examiner concluded that New Century "engaged in a number of significant

improper and imprudent practices related to its loan originations, operations, accounting and

financial reporting processes." Examiner's Report at 2. The Examiner summarized the findings:

- New Century had a brazen obsession with increasing loan
  originations, without due regard to the risks associated with that

64

business strategy. Loan originations rose dramatically in recent years, from approximately $14 billion in 2002 to approximately $60 billion in 2006. The Loan Production Department was the dominant force within the Company and trained mortgage brokers to originate New Century loans in the aptly named "CloseMore University."  Although a primary goal of any mortgage banking company is to make more loans, New Century did so in an aggressive manner that elevated the risks to dangerous and ultimately fatal levels. *Id*. at 3.

- The increasingly risky nature of New Century's loan originations created a ticking time bomb that detonated in 2007. Subprime loans can be appropriate for a large number of borrowers. New Century, however, layered the risks of loan products upon the risks of loose underwriting standards in its loan originations to high risk borrowers. *Id*.

- 'More than 40% of the loans originated by New Century were underwritten on a stated income basis. These loans are sometimes referred to as "liars' loans" because borrowers are not required to provide verification of claimed income, leading a New Century employee to tell certain members of Senior Management in 2004 that "we are unable to actually determine the borrowers' ability to afford a loan." *Id*.

- New Century also made frequent exceptions to its underwriting guidelines for borrowers who might not otherwise qualify for a particular loan. A Senior Officer of New Century warned in 2004 that the "number one issue is exceptions to guidelines." Moreover, many of the appraisals used to value the homes that secured the mortgages had deficiencies. *Id*. at 3–4.

- Senior Management turned a blind eye to the increasing risks of New Century's loan originations and did not take appropriate steps to manage those risks. New Century's former Chief Credit Officer noted in 2004 that the Company had no standard for loan quality. Instead of focusing on whether borrowers could meet their obligations under the terms of the mortgages, a number of members of the Board of Directors and Senior Management told the Examiner that their predominant standard for loan quality was whether the loans New Century originated could be initially sold or securitized in the secondary market. *Id*. at 4.

182.    New Century's information technology and data entry and processing systems were not "state of the art" and were not sufficient for a business of the size and nature of New

Century's. In particular, New Century's loan production processes were apparently manual and people-intensive through the fall of 2005. Up to that time, New Century apparently used an outdated DOS-based loan underwriting and appraisal operating system, which according to one management interviewee, allowed users to "finagle anything." *Id*. at 54

183.    Brad Morrice, New Century's CEO beginning in 2006, acknowledged that "bad appraisals were a frustrating source of concern and the main cause of loan 'kickouts,'" *i.e.*, a rejection of certain loans by investors, and that "improper appraisals were the biggest contributors to losses when loans went bad." *Id*. at 61–62.

184.    The Examiner identified several "red flags" that were indicative of the poor quality of New Century's loans and the fact that New Century was not adhering to its underwriting guidelines. Specifically, the Examiner noted that "defective appraisals, incorrect credit reports and missing documentation" had led to a high number of kick-outs by investors, all of which "suggested that New Century's loan origination processes were not consistently producing loans that met New Century's underwriting standards and investor guidelines." *Id*. at 109.

185.    The Examiner found:

> New Century's Senior Management recognized that the Company had serious loan quality issues beginning as early as 2004. For example, in April 2004, New Century's Chief Credit Officer reported that "the QA [quality assurance] results [pertaining to the loan origination processes] are still at unacceptable levels" and that "Investor Rejects [kickouts] are at an incline as well." Two months later, in June 2004, the head of Secondary Marketing remarked in an email that "we have so many issues pertaining to quality and process!"

*Id*. at 110.

186.    Further adding to the problem was the fact that exceptions were frequently

granted to underwriting guidelines, but "New Century had no formal exceptions policy." *Id.* at 174. With no policy in place, the granting of exceptions was arbitrary. Despite upper management's awareness of the tremendous problems regarding loan quality, the Examiner concluded that "New Century continued to focus on generating greater quantities of ever riskier loans, devoting little effort to such basic issues as making sure that the Company's loan origination and underwriting policies and procedures were followed to avoid kickouts of loans offered for sale." *Id*. at 111.

187.    On April 7, 2010, Patricia Lindsay, former Vice President of Corporate Risk at New Century, who worked for the company from 1997 through December 2007, corroborated the Examiner's findings in her testimony before the FCIC. She testified that New Century's risk managers were often viewed as a roadblock rather than a resource and that:

> Account executives, who were New Century employees who brought loans in from brokers, were primarily compensated on commission of closed loans that they brought in. . . . Many of the sales managers and account executives lacked any real estate or mortgage experience. They were missing the depth of experience necessary to make an informed lending decision. These same sales managers had the ability to make exceptions to guidelines on loans, which would result in loans closing with these exceptions, at times over the objections of seasoned appraisers, underwriters or risk personnel. . . .

*Subprime Origination and Securitization: Hearing Before the Fin. Crisis. Inquiry Comm'n, Sect. 2* (Apr. 7, 2010) (testimony of Patricia Lindsay, former Vice President of Corporate Risk, New Century).

188.    Lindsay also testified to systematic problems in the appraisal process:

> In my experience at New Century, fee appraisers hired to go to the properties were often times pressured into coming in "at value," fearing if they didn't, they would lose future business and their livelihoods. They would charge the same fees as usual, but would find properties that would help support the needed value rather than

finding the best comparables to come up with the most accurate value.

*Id.*

189.     Lindsay noted that at the end, New Century's approach to lending lacked "common sense"—that the business became "volume driven and automated" with a broker being able to get a loan pre-approved in "12 seconds or less."  *Id.*

190.     New Century's volume-driven abandonment of its underwriting guidelines resulted in enforcement actions by (and subsequent settlements with) numerous government agencies, including the SEC and Massachusetts and Ohio Attorneys General.

191.     Finally, private litigation has also illustrated the fact that New Century failed to comply with its stated underwriting guidelines. For example, in *Cambridge Place Investment Management Inc. v. Morgan Stanley & Co.*, No. 10-cv-2741 (Mass. Super. Ct. filed July 9, 2010), confidential witnesses stated that New Century abandoned underwriting guidelines to approve more loans; employees were told to do whatever they had to in order to increase volume; and loans that were not initially approved by underwriters were often later approved by superiors.

Q.        **Nomura Credit & Capital, Inc.**

192.    Nomura Credit & Capital, Inc. ("Nomura") operates as a mortgage financing company. Nomura frequently served as the sponsor of securitizations, including for the NAA 2006-AR3, NHELI 2005-FM1, AND NHELI 2005-HE1 and NHELI 2006-WF1 Trusts.

193.    In January 2011, Clayton issued a report that was publicly disclosed by the FCIC. The FCIC Report, which Nomura had in its possession, shows that Nomura knowingly included nearly half of the loans Clayton had identified as both failing to comply with applicable underwriting guidelines and lacking any compensating factors. According to the FCIC Report, which summarized the Clayton report's findings, Clayton initially rejected 1,188 of the 3,366 loans that it reviewed in connection with Nomura securitizations, grading 35 percent of the loans it reviewed as a "3" for failing to comply with applicable underwriting standards and lacking compensating factors. Despite this, Nomura waived 47 percent of those loans into their trusts.

194.    Nomura has been a defendant in at least six other RMBS lawsuits over the past three years. In these suits, plaintiffs have conducted numerous forensic investigations and loan level reviews that revealed pervasive breaches of representations and warranties in Nomura securitizations.

195.    In September of 2011, FHFA filed suit against Nomura alleging untrue or misleading statements regarding the LTV ratios of mortgage loans, owner occupancy status, and compliance with underwriting guidelines in seven Nomura-sponsored securitizations. *See* Compl., *FHFA v. Nomura Holding Am. Inc.*, No. 11-cv-6201 (S.D.N.Y. Sept. 2, 2011).

196.    FHFA performed a review of securitized by Nomura and found that the offering materials had understated the actual amount of loans with LTV ratios of: (i) 80 percent or greater by more than 35 percent; and (ii) 100 percent or greater by more than 3 percent. *Id.* ¶ 107. FHFA

further found that the offering materials overstated the actual percentage of owner occupied properties by more than 7 percent, and that more than 32 percent of the loans were in default, had been foreclosed upon, or were delinquent as of July 2011. *Id.* ¶¶ 103, 127.

197.    According to the complaint filed in *Ambac v. Nomura*, No. 651359/2013 (N.Y. Sup. Ct. Apr. 15, 2013), plaintiffs hired a third party to perform a forensic underwriting review of loans securitized by Nomura. This review revealed that a staggering 95 percent of loans in certain transactions failed to comply with mortgage loan representations. *Id.* The breaches identified evidence of gross misconduct in connection with the origination of the loans pooled, reflecting a gross abandonment of any attempt to accurately determine the ability and willingness of borrowers to repay their obligations. *Id.*

198.    In *Blackrock v. HSBC*, No. 651869/2014 (N.Y. Sup. Ct. June 18, 2014), plaintiffs pointed to Clayton's reports which revealed that from the first quarter of 2006 to the first quarter of 2007, 37.85 percent of the mortgage loans Nomura submitted to Clayton to review in RMBS groups were rejected as failing to meet applicable underwriting guidelines. Nomura waived in 58 percent of the mortgage loans Clayton found to be defective without proper consideration and analysis of compensating factors and included them in securitizations.

199.    Finally, in September 2014, HSBC, as trustee, commenced an action against Nomura for making material misrepresentations with respect to $613 million of mortgage loans. *See* Compl., *Nomura Asset Acceptance Corp., et al., v. Nomura Credit & Capital Inc.*, No. 652842/2014 (N.Y. Sup. Ct. Sept. 17, 2014). Based on information uncovered by the mortgage insurers' investigations, the breaches of  representations and warranties included fundamental issues such as:  (i) misrepresentations of borrower income, occupancy status and the borrowers' debt obligations; (ii) violations of underwriting guidelines without compensating factors; (iii)

incorrect calculations of debt and debt-to-income ratios; (iv) excessive loan-to-value ratios; (v)

violation of high cost loan statutes and other applicable laws; and (vi) significant inaccuracies in

Mortgage Loan Schedules. *Id.* Nomura conceded to materially breaching its representations and

warranties on 111 of these mortgage loans and still failed to cure or repurchase a single loan. *Id.*

**R.**      **Ownit Mortgage Solutions, Inc.**

200.     Ownit Mortgage Solutions Inc. ("Ownit") was a California-based company that specialized in the origination of mortgages for individuals who earned less than $100,000 annually, and had less than $100,000 in personal assets. Ownit originated mortgage loans included in the ACE 2006-HE1 Trust.

201.     From December 2005 through May 2006, Ownit began to experience a high level of first payment defaults and EPD (*i.e.*, defaults on any one of the first three mortgage repayments). The Federal Reserve Board's 2008 Finance and Economics Discussion Series entitled "The Rise in Mortgage Defaults" noted:

> reports at the end of 2006 from lenders such as Ownit that an unusually high share of their loans were becoming delinquent almost immediately were a cause for alarm. This surge in EPD is evident in our data. On average, 1.5 percent of subprime loans in the 2000-2004 vintages were in default after 12 months, and the situation was just a bit worse for the 2005 vintage (Figure 2). However, 2 percent of outstanding loans in the 2007 vintage were in default within six months of origination, and 8 percent were in default after 12 months.

Chris Mayer, Karen Pence, & Shane M. Sherlund, The Rise in Mortgage Defaults (Nov. 2008), *available at* http://www.federalreserve.gov/pubs/feds/2008/200859/200859pap.pdf.

202.     According to a December 8, 2006 article in Workout Wire entitled *BuyBacks Appear to Shutter Two Firms*, Ownit unsurprisingly filed for bankruptcy "amid reports that the subprime lender had been hit by huge loan buyback requests from an investor."

203.     Numerous lawsuits followed in the years after Ownit's bankruptcy. These lawsuits repeatedly alleged systematic abandonment of Ownit's underwriting guidelines and many included specific loan re-underwriting results demonstrating remarkably high breach rates. These complaints include *Stichting Pensioenfonds ABP v. Credit Suisse*, No. 653665/2011 (N.Y.

Sup Ct. Dec. 29, 2011).

204.     Another lawsuit was filed in August 2011 by several American International Group ("AIG") companies against Bank of America Corporation, Merrill Lynch & Co, Inc., and Countrywide, among others, alleging that defendants had defrauded plaintiffs in connection with their sale of RMBS to the plaintiffs. *See* Compl., *Am. Int'l Grp., Inc. v. Bank of Am. Corp.*, No. 652199/2011 (N.Y. Sup. Ct. Aug. 8, 2011). In connection with drafting the allegations, the plaintiffs interviewed several former Ownit employees. Those former employees confirmed that Ownit had abandoned its underwriting guidelines, as follows:

- A former corporate underwriter at Ownit stated that Ownit was "the worst example" of a lender making risky loans that should never had been made in the first place. *Id.* ¶ 298.

- According to a former Ownit senior underwriter from September 2004 through July 2006, Ownit loan officers falsely inflated incomes on loan applications, and even when she complained to managers that "there's no way" the borrower could be making the claimed income, the amount was accepted anyway. *Id.* ¶ 299.

- The former senior underwriter also observed "excessive adjustments" inflating appraisals at Ownit. *Id.* ¶ 300.

- According to a former Ownit loan funder, from December 2004 to December 2006, when she brought questionable incomes to the attention of her supervisors she was told to "mind her own business" and was instructed to fund the loans. *Id.* ¶ 299.

205.     Additionally, on September 2, 2011, FHFA filed suit against Merrill Lynch and others in connection with seventy-two securitizations. *FHFA v. Merrill Lynch & Co.*, No. 11-cv-06202 (S.D.N.Y. Sept. 2, 2011). FHFA found that the offering materials for one trust with Ownit-originated mortgage loans had understated the actual amount of loans with LTV ratios of: (i) 80 percent or greater by more than 22 percent; and (ii) 100 percent or greater by more than 8 percent. *Id.* ¶ 105. FHFA further found that the offering materials overstated the actual

percentage of owner occupied properties by more than 9 percent, and that 46.92 percent of the loans were in default, had been foreclosed upon, or were delinquent as of July 2011. *Id.* ¶¶ 101, 130.

206.    Based on figures the OCC updated in 2010, Ownit ranked among only 21 companies that "in various combinations occupy the Worst Ten slots in the Worst Ten metro areas."  Press Release, John C. Dugan, Comptroller of the Currency, Appendix B: Activities of National Banks Related to Subprime Lending, remarks before the FCIC, Washington, D.C. (Apr. 8, 2010), *available at* http://www.occ.treas.gov/ftp/release/2010-39d.pdf.

**S.**     **PHH Mortgage Corporation**

207.     PHH Mortgage Corporation ("PHH"), formerly known as Cendant Mortgage, was engaged in the business of the origination of mortgage loans.

208.     PHH originated loans that were included in the JPMMT 2006-A7 and JPMMT 2006-A5 Trusts.

209.     In May 2014 Residential Capital ("ResCap"), filed lawsuits against 12 lenders, including PHH. In each of the twelve lawsuits, ResCap alleges that the lenders are "legally and contractually responsible for the liabilities and losses caused by the poor quality of the mortgage loans in question."  Compl., *ResCap Liquidating Trust v. PHH Mortg. Corp.*, No. 12-12020 (MG) (Bankr. S.D.N.Y. May 13, 2014). ResCap claims that it was the lenders' responsibility to collect information from the borrower, verify its accuracy and underwrite the loan. *Id.* It claims that many of the loans it purchased included various defects, such as: income misrepresentation, employment misrepresentation, owner occupancy misrepresentations, undisclosed debt, and missing or inaccurate documents. *Id.*

210.     ResCap also alleges that "PHH materially breached its extensive contractual representations and warranties by delivering loans that were not originated or underwritten in accordance with the requirements of the Agreement; did not meet the representations and warranties made as to those loans; and/or failed to comply with applicable state and federal law." *Id.*

**T.**   **Quick Loan Funding, Inc.**

211.   Quick Loan Funding Inc. ("Quick Loan") was founded in 2002 and offered

subprime lending and mortgage financing services in California. Quick Loan closed in 2007.

Quick Loan originated mortgage loans included in the FRBSI 2005-2 and NHELI 2005-HE1

Trusts.

212.   Media reports exposed Quick Loan's practice of ignoring its stated underwriting

guidelines and failing to evaluate its borrowers' true repayment ability. A December 18, 2007

article on Bloomberg demonstrated how Quick Loan ignored its stated underwriting guidelines,

falsified incomes, did not determine whether borrowers could afford to repay their loans, forged

documents and put borrowers into loans they obviously could not afford to repay. Bob Ivry,

*'Deal With Devil' Funded Carrera Crash Before Bust (Update 3)*, Bloomberg, http://www.

bloomberg.com/apps/news?pid=newsarchive&sid=awOhpZQuyd6k (last updated Dec. 18,

2007).

213.   One borrower, Christopher Aultman, approached Quick Loan about refinancing

his mortgage to pay off debt, and he was passed from loan officer to loan officer. *Id.* Despite an

average credit score of 465, Aultman was told he could "take the mortgage, make the payments

and once everything is paid off, within 30 days your credit will shoot up 150 points and we'll get

you a better rate and everybody wins." *Id.* When the notary arrived at his house, it was 9:30 p.m.

and Aultman did not notice that the contract contained a pre-payment penalty if he refinanced

within two years, that his income was inflated by $2,500 on the contract and that he needed to

pay over $10,000 in fees. *Id.*

214.   According to Bloomberg, such practices were common by Quick Loan officers,

who turned over regularly, were poorly trained and "were motivated by fear." *Id.* Loan officers

were bullied into ordering appraisals and selling loans, with a car salesman's mentality of "close 'em, close 'em, close 'em" instilled by founder and CEO Daniel Sadek. *Id.* When the Bohan Group was hired to evaluate forty Quick Loan mortgages for a bank before they were purchased for securities, every single loan was rejected. *Id.*

215.    Vanity Fair named Daniel Sadek number 86 of the 100 institutions and people most responsible for the national economic crisis. Marilyn Kalfus, *Bank seizes subprime high-roller's Newport home*, Orange County Register, http://www.ocregister.com/articles/span-567508-ocregister-mortgage.html (last updated Dec. 17, 2013).

216.    The California Department of Corporations also later found that Quick Loan had not maintained and filed the lending reports required by state law. Order Summarily Revoking California Finance Lenders Law License of Quick Loan Funding, Inc., *In re Commissioner of Corp. of Ca. v. Quick Loan Funding, Inc.*, No. 603-8736 (May 27, 2008), *available at* http://www.dbo.ca.gov/ENF/pdf/q/QuickLoanFunding_Order.pdf. The company was ordered to cease lending and servicing activities in the state, and later had its license revoked. *Id.* Similar orders were entered against Quick Loan in Washington and Connecticut. *See* Final Order, *In re Quick Loan Funding, Inc. & N. Daniel Sadek*, No. C-08-307-09-FO01 (May 22, 2009), *available at* http://www.dfi.wa.gov/sites/default/files/consumer-services/enforcement-actions/C-08-307-09-FO01.pdf?q=CS%20Orders/C-08-307-09-FO01.pdf; Notice of Automatic Suspension, Notice of Intent to Revoke First Mortgage Lender/Broker License, and Notice of Right to Hearing,  *In re Quick Loan Funding, Inc.*, (Oct. 22, 2007), *available at* http://www.ct.gov/DOB/cwp/view.asp?a=2246&q=397868.

U.    **ResMAE Mortgage Corporation**

217.    ResMae Mortgage Corporation ("ResMae"), now known as Bridgefield Mortgage

Corporation, was formerly a top 20 subprime mortgage lender. In 2007, ResMae filed for

bankruptcy and was purchased by Citadel Investment Group. ResMae originated mortgage loans

included in the ACE 2007-HE4, FBRSI 2005-2, and FBRSI 2005-4 Trusts.

218.    ResMae's success as a subprime lender and its eventual bankruptcy can both be

attributed to the company's abandonment of its underwriting standards. According to DataQuick,

a national real estate database, approximately 70 percent of loans originated by ResMae from

August to November 2006 are in default. *See Golden State Mortgage Defaults Jump to Record*

*High*, DQNews, http://www.dqnews.com/Articles/2009/News /California/CA-

Foreclosures/RRFor090422.aspx (last updated Apr. 22, 2009).

219.    Former ResMae employees have confirmed that ResMae encouraged its

employees to disregard underwriting standards in an effort to generate more loans. The amended

complaint in *Plumbers' & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan*

*Acceptance Corp. I*, No. 09-cv-3209 (E.D.N.Y. Mar. 8, 2010) cites confidential witness

testimony from a former credit manager at ResMae who worked with the company from 2004

through 2005. ¶ 112. This former manager stated that exceptions to ResMae's underwriting

guidelines accounted for 50 percent of all underwritten loans and that the sales department

pushed through stated income loans that listed incomes that were obviously false. *Id.*  Exceptions

were mostly requested by "loan officers and sales [department employees], who would often take

the requests to sales managers for approval."  *Id.* ¶ 113. Another former Senior Vice President of

ResMae from 2003 to 2006 confirmed these statements, stating that "exceptions were not

uncommon" and "everybody was incentivized by commissions to [generate a high loan]

volume." *Id.* ¶ 114. A former regional credit manager who worked at ResMae from March 2004 through March 2007 also noticed problems with stated income loans and appraisals, particularly from 2005 to 2006. She stated that she saw "fraud from appraisers, title companies, and . . . borrowers" and believes that they were altering documents, especially with stated income loans. *Id.* ¶ 115–16. During her last six months of employment at ResMae, she saw a large percentage of exceptions as a result of "an effort to increase [loan] production." *Id.* Additionally, she witnessed many borrowers falsely listing their properties as "owner occupied" on their loan applications. *Id.* ¶ 118. Despite this, the underwriters were told not to investigate when they suspected the buyer had made a misrepresentation. *Id.* ¶ 117. She also noted several instances where the property did not exist, but rather was a vacant lot, and yet ResMae still had an address and pictures and funded the loan. *Id.* ¶ 118.

V.   **Silver State Mortgage Company**

220.    Silver State Mortgage Company ("Silver State") was a national wholesale and residential mortgage lender headquartered in Las Vegas, Nevada. Silver State ceased operations in February 2007 amid the turmoil of the subprime mortgage crisis. The details of Silver State's mortgage lending practices slowly emerged after it ceased operations. Silver State originated mortgage loans included in the NAA 2005-AR3 Trust.

221.    A former Silver State employee, Mike Garner, recounted his experiences as a loan officer with Silver State in a May 9, 2008 *This American Life* story on NPR entitled "The Giant Pool of Money."  Mike Garner, explained that under Silver State's "stated income" product Silver State did not adequately assess whether the income of borrowers under Silver State's "stated income" product was reasonable compared to the borrowers' line of work:

> Garner:  The next guideline lower is just stated income, stated assets. Then you state what you make and state what's in your bank account. They call and make sure you work where you say you work. Then an accountant has to say for your field it is possible to make what you said you make. But they don't say what you make, they just say it's possible that they could make that.

Alex Blumberg & Adam Davidson, *The Giant Pool of Money* (National Public Radio broadcast May 9, 2008), *available at* http://www.thisamericanlife.org/sites/default/files/355_transcript.pdf.

222.    Alex Blumberg, one of the NPR interviewers, commented on how easy it could have been to simply provide a W-2. Garner responded by describing the means by which loan officers would determine whether the income was reasonable for the occupation:

> Blumberg:  It's just so funny that instead of just asking people to prove what they make, there's this theater in place of you have to find an accountant sitting right in front of me who could very easily provide a W2, but we're not asking for a W2 form, but we do want this accountant to say yeah, what they're saying is plausible in some universe.

> Garner:  Yeah, and loan officers would have an accountant they could call up and say "Can you write a statement saying a truck driver can make this much money?" Then the next one, came along, and it was no income, verified assets. So you don't have to tell the people what you do for a living. You don't have to tell the people what you do for work. All you have to do is state you have a certain amount of money in your bank account. And then, the next one, is just no income, no asset. You don't have to state anything. Just have to have a credit score and a pulse.

*Id.*

223.    Garner recounted how his boss at Silver State despised these types of loan

products that permitted such wanton disregard of underwriting standards. Garner concluded:

> Garner:  Yeah. And my boss was in the business for 25 years. He hated those loans. He hated them and used to rant and say, "It makes me sick to my stomach the kind of loans that we do." He fought the owners and sales force tooth and neck about these guidelines. He got [the] same answer. Nope, other people are offering it. We're going to offer them too. We're going to get more market share this way. House prices are booming, everything's gonna [sic] be good. And . . . the company was just rolling in the cash. The owners and the production staff were just raking it in.

*Id.*

224.    Silver State, like many other originators, focused on keeping up with the

competition, sacrificing adherence to underwriting guidelines. This quixotic quest for higher

profits and more market share ultimately failed as Silver State ceased operations in 2007, no

longer maintaining any share of the mortgage market.

225.    Silver State's questionable underwriting practices are the subject of a number of

lawsuits against it alleging that it sold defective loans to the secondary market. These lawsuits

were brought by entities—including CitiMortgage, Inc. ("CMI"), Indymac Bank, F.S.B.

("IndyMac"), Terwin Advisors LLC ("Terwin") and UBS Real Estate Securities Inc. ("UBS

Securities")—who purchased loans originated by Silver State. The defects alleged include

misrepresentations of borrowers' income and assets, misrepresentations regarding occupancy

status, defective appraisals and a large number of early payment defaults.

226.    In a lawsuit entitled *CitiMortgage, Inc. v. Silver State Financial Services, Inc., d/b/a Silver State Mortgage*, No. 07-cv-01533 (E.D. Mo. 2008), CMI alleged that between 2004 and 2006, Silver State sold 48 loans to CMI:

> that were underwritten and/or originated based upon materially inaccurate information or on material misrepresentation made by the borrower, Silver State, Silver State's directors, officers, employees, agents, independent contractors and/or affiliates; (b) where CMI has discovered discrepancies regarding property ownership, mortgage or other debts, and occupancy; (c) that suffer[ed] from first payment/early payment defaults; and/or (d) that have turned out to be otherwise defective or not in compliance with the CMI Manual or trade confirmation.

227.    The CMI lawsuit resulted in a $12,118,344.78 default judgment being entered against Silver State.

228.    In a lawsuit captioned *Indymac Bank, F.S.B. v. Silver State Mortg.*, No. 07-cv-00405 (D. Nev. 2007), Indymac alleged that in 2006, Silver State sold 36 loans to Indymac, 35 of which had at least one of the following defects:

- Early Payment Defaults because the borrowers did not make their first payment after Indymac's purchase of the loan, and failed to make a timely payment to anyone within the first three months after Indymac's purchase of the loan;

- Misrepresentations of borrower's income and assets;

- Misrepresentations of the occupancy status of the subject property;

- Defective appraisals;

- Incomplete documentation—including incomplete purchase contracts and/or deeds of trust;

- Were "flip transactions" in that the property had sold within the preceding nine months at an increased price with no explanation for the increased value; and

- Title issues were not resolved prior to the sale as required in the preliminary title report.

229.   In *Terwin Advisors LLC v. Silver State Fin. Services, Inc.*, No. 07-cv-03647 (S.D.N.Y. 2007), Terwin alleged, inter alia, that a number of the loans it purchased from Silver State between 2004 and 2007 were early payment defaults. The court entered a default judgment against Silver State in the amount of $4,498,517.91.

230.   Further, in *UBS Real Estate Sec. Inc. v. Silver State Fin. Services, Inc. d/b/a Silver State Mortg.*, No. 07-cv-03702 (S.D.N.Y. 2007), UBS Securities alleged that a number of loans it purchased from Silver State between 2005 and 2007 were early payment defaults. On January 15, 2008, the court entered a default judgment against Silver State in the amount of $2,955,603.55.

231.   Additionally, the Nevada Mortgage Lending Division launched an investigation into the collapse of Silver State in February of 2007. By March of 2007, Scott Bice, Nevada's Mortgage Lending Commissioner, said his agency's investigation revealed some evidence of fiduciary mismanagement at Silver State and moved to revoke the mortgage broker licenses of Michael Stoddart and Lynn Woodrum, Silver State's owners.

**W.**   **SunTrust Mortgage, Inc.**

232.     SunTrust Mortgage, Inc. ("SunTrust") is one of the largest residential lenders in the United States, and according to *Mortgage Daily*, SunTrust ranked fifth in residential lending, originating $13.4 billion in loans in 2009. SunTrust originated mortgage loans included in the JPMMT 2006-A5 Trust.

233.     On April 14, 2010, SunTrust's Executive Vice President for Capital Markets, Anthony T. Reed, addressed the House Financial Services Committee of the United States House of Representatives. Reed admitted that the "recent crisis in our financial system" resulted from "[l]enders and securitizers relax[ing] underwriting standards and risk management practices."

234.     In addition, an investigation by the NECA-IBEW Health & Welfare Fund revealed that SunTrust did not apply its underwriting standards to evaluate a prospective borrower's credit standing and repayment ability. Instead, SunTrust applied a more lax set of standards. A former Senior Underwriter, who worked with SunTrust from 2001 until November 2007, stated that in 2004, SunTrust began using an automated underwriting system ("AUS") to underwrite 75 percent of the loans that the Senior Underwriter saw. The AUS approved loan applications as long as they met minimum requirements that were well below SunTrust's stated underwriting guidelines.

235.     The Senior Underwriter estimated that each month, she refused to approve approximately 10 percent of the loan applications that the AUS approved because the applications did not meet SunTrust's underwriting standards. Typically, the Senior Underwriter's rejection of the loan application would be overruled by a supervisor because SunTrust did not care about the risk associated with these loans as long as an investor purchased them. The unwritten rule at SunTrust was, "make the loan so we can sell it, so we can make more money."

236.     In order to increase loan volume, SunTrust also approved a high level of stated income and low documentation mortgage loans, which attracted mortgage brokers and borrowers who would provide false information in order to secure loans. SunTrust fostered an environment where these individuals could perpetrate fraud by requiring only minimal data to approve new loans. In addition, SunTrust emphasized speeding up the loan origination process, and deemphasized the quality control and due diligence necessary to reduce the risk associated with loan origination. Finally, SunTrust paid loan officers based on the number of loans they approved, further discouraging due diligence and increasing the number of high-risk loans that were later packaged into RMBS and sold to investors.

237.     SunTrust's lack of adherence to underwriting guidelines is set forth in great detail in a case filed by the Federal Home Loan Bank of Indianapolis. *See* Am. Compl., *FHLB of Indianapolis v. Banc of Am. Mortg. Sec., Inc.*, No. 49D051010PL045071 (Ind. Sup. Ct. July 14, 2011) ("Indianapolis Complaint"). The Indianapolis Complaint contains detailed allegations from a confidential source who was a mortgage loan officer at SunTrust from 2005 until 2008, and provided evidence of SunTrust's failure to adhere to its stated underwriting guidelines. *Id.* ¶¶ 412–23. The confidential source's statements reveal that: (1) SunTrust employees were pressured to close loans at any cost; (2) SunTrust employees manipulated loan files in order to get loans approved; (3) SunTrust coaxed elderly borrowers into loans they could not afford; and (4) SunTrust abandoned its underwriting guidelines and granted exceptions when there were no reasonable compensating factors. *Id. See also* Royal Park Complaint (additional allegations concerning SunTrust's lack of adherence to underwriting guidelines).

238.     According to the confidential source in the Indianapolis Complaint, "SunTrust employees were pressured to close at least $1 million in loans each month. Inside loan officers at

SunTrust received a salary and commission based upon the number of loans closed. Outside loan officers only worked for commissions, and did not receive any payments unless they surpassed the quota for closed loans."  Indianapolis Complaint ¶ 414. As the confidential source explained, "if a loan officer surpassed the $1 million quota, they received a set commission; loan officers who surpassed $2.5 million in closed loans received a $3,000 bonus. *Id.* "That's where the greed came in," said the confidential source. *Id.*

239.    The confidential source described SunTrust loan officers as being "cut-throat." For example, SunTrust loan officers would team up with realtors to coax elderly borrowers into using SunTrust as their lender on a new home purchase. *Id.* ¶ 415. "They'd approach an elderly woman and get her to list her house," and then the SunTrust loan officers would talk the elderly woman into buying a new home before the old one had sold. *Id.* These loan officers would convince the woman "to go into a balloon note [interest only]" on the new house, but the borrower "never got her old house closed," so she was left with two mortgages, one of which she could not afford. *Id.* "This happened a lot," said the confidential source. *Id.*

240.    Besides issuing loans to borrowers who could not afford them, the confidential source explained that SunTrust employees manipulated loan files in order to get loans approved. According to the confidential source, "there was a lot of crazy paper" at her branch in Florida. *Id.* ¶ 416. For example, the confidential source said that SunTrust loan officers ran loan applications through the desktop underwriting ("DU") system and if the borrower's "numbers" (LTV and DTI ratios) did not meet the company's guidelines, it was not uncommon for a loan officer to falsify the ratios and pretend that they never ran the loan through DU by erasing the evidence. *Id.* The confidential source also recalled that SunTrust loan officers called borrowers and coached them into giving a verbal statement of their ratios that would enable their loans to qualify. *Id.*

241.     Additionally, the confidential source said that some loan officers at SunTrust knowingly assisted self-employed borrowers in inflating their income and employment histories by ignoring false data in letters provided by the borrowers' certified public accountants ("CPAs"). *Id*. ¶ 417. For example, the confidential source explained, "if SunTrust's loan product guidelines required that a self-employed borrower had to have worked for a company for a minimum of two years, but the borrower fell short of that timeline, the loan officer allowed the borrower to file a letter from their CPA falsely stating that the borrower had indeed been employed for two years." *Id.* The confidential source said that she knew the letters were falsified because she knew "the borrower had told the loan officer that they had worked for 'almost two years.'" *Id*.

242.     The confidential source also recalled that "some CPA letters falsely supported inflated incomes, but SunTrust loan officers nevertheless accepted these letters as valid documentations of income." *Id*. ¶ 418.

243.     Besides these examples of manipulating loan files, the confidential source also recalled that some loan officers coached borrowers on how to change their tax documentation so that the numbers would support loan approval. In this regard, the confidential source said that "SunTrust offered 'no-ratio loans' for self-employed borrowers who had been in business for three to five years." *Id*. ¶ 419.

244.     The confidential source described two reasons that SunTrust approved loans which should not have been approved: (1) "Some loan officers knew how to smooth [the confidential source's manager] over with loan documents," so that the manager would not notice false ratios or inflated income; and (2) managers approved loans that did not meet SunTrust's guidelines because the loans came from "high producers" or "strong money makers" for the

company. With respect to the second issue, the confidential source explained that if a loan officer closed a lot of loans, they had more room to make exceptions to guidelines. *Id.* ¶ 420.

245.    Finally, the confidential source said that all of these deviations from underwriting guidelines, which she said were motivated by greed, continued throughout her entire tenure at SunTrust. *Id.* ¶ 421.

246.    SunTrust's consistent deviation from its underwriting standards eventually took its toll. On January 22, 2009, *Mortgage Daily* reported that SunTrust's fourth quarter earnings report for 2008 contained statements by SunTrust Chairman and CEO, James M. Wells, III, explaining that continued declines in home values increased loan delinquencies and resulted in higher than expected credit losses. That same month, the parent company of SunTrust and SunTrust Bank, announced that it was ceasing all business activities in FHA loan originations.

247.    Finally, on June 17, 2014, the DOJ announced that the DOJ, HUD, Consumer Financial Protection Board ("CFPB"), 49 state attorneys general, and the District of Columbia's attorney general reached a $968 million settlement agreement with SunTrust to address mortgage origination, servicing and foreclosure abuses. According to the DOJ's press release:

> SunTrust admitted that between January 2006 and March 2012, it originated and underwrote FHA-insured mortgages that did not meet FHA requirements, that it failed to carry out an effective quality control program to identify noncompliant loans, and that it failed to self-report to HUD even the defective loans it did identify. SunTrust also admitted that numerous audits and other documents disseminated to its management between 2009 and 2012 described significant flaws and inadequacies in SunTrust's origination, underwriting, and quality control processes, and notified SunTrust management that as many as 50 percent or more of SunTrust's FHA-insured mortgages did not comply with FHA requirements. For example, a 2012 internal SunTrust document noted two "significant" issues that had been plaguing the company for years – a "Broken Loan Origination Process" coupled with a "Deficient Government Insuring Process." Other reports received by SunTrust

management described its quality control program as "severely flawed" and "ineffective."

Press Release, Dep't of Just., Federal Government and State Attorneys General Reach Nearly $1 Billion Agreement with SunTrust to Address Mortgage Loan Origination as Well as Servicing and Foreclosure Abuses (June 17, 2014), *available at* http://www.justice.gov/opa/pr/2014/June/14-civ-638.html.

X.    **Wachovia Mortgage Corporation**

248.    Wachovia Mortgage Corporation is an affiliate of Wachovia Corporation (collectively, "Wachovia"). Wachovia originated mortgage loans included in the NAA 2006-AR3 Trust.

249.    In 2006, Wachovia acquired Golden West Financial Corporation ("Golden West"), an Oakland, California-based mortgage lender. Golden West's main mortgage product, the Pick-A-Payment ("Pick-A-Pay") mortgage, allowed borrowers to choose from multiple payment options each month. The options were: (i) full payment of interest and principal sufficient to pay down the loan in a traditional 30 year term; (ii) a higher payment that would pay off the loan in 15 years; (iii) an interest-only payment; or (iv) a minimum payment that did not cover all the necessary interest, with the unpaid interest added to the loan balance.

250.    Wachovia did not merely seek to integrate Golden West operations into its business. Instead, as noted by *Business Week* "right after Wachovia bought Golden West, executives from [Golden West] took control of all mortgage lending at Wachovia."  Dean Foust, *Wachovia: Golden West Wasn't Golden*, BloombergBusinessweek Mag., June 3, 2008, http://www.businessweek.com/stories/2008-06-03/wachovia-golden-west-wasnt-golden.

251.    Far from employing conservative underwriting standards that minimized exposure to mortgage defaults, which Wachovia represented was the case in its offering materials, Wachovia made very little effort to ascertain, let alone verify, borrower income and thus borrower ability to uphold the mortgage payment burden.

252.    Paul Bishop was a loan consultant/loan salesperson at Golden West in San Francisco, California from November 2002 until May 2006. In that capacity, he regularly interacted with numerous other employees with knowledge of Golden West's lending operations,

including the rest of the San Francisco loan sales force as well as the staff responsible for instructing the sales force on how to sell its loans, the underwriters responsible for approving the loans and the managers responsible for approving any exceptions to underwriting standards.

253.     According to a February 15, 2009 *60 Minutes* interview of Bishop, Golden West significantly lowered its underwriting standards in order to increase its volume of loans during the housing boom. *World of Trouble* (CBS 60 Minutes Feb. 15, 2009), *available at* http://www.youtube.com/watch?v=ovllHgvUJpQ ("*World of Trouble*"). As Bishop told *60 Minutes*, "[i]t was all about volume—quantity over quality." *Id*. To generate an increasing number of loans, Bishop explained that Golden West salespeople regularly inflated borrowers' incomes on loan documents. *Id*. The term for this, Bishop stated, was "packaging the loan" so that it ostensibly met underwriting standards. *Id*.

254.     Plaintiffs in *In re Wachovia Preferred Securities and Bond/Notes Litigation*, No. 09-cv-6351 (S.D.N.Y. May 28, 2010) also interviewed Bishop. Bishop stated that loan sales people "would take a look at whatever [the borrower's] income was and just adjust it" in order to "make sure their income matche[d] the loan payment . . . . In other words, doctor it." Am. Compl. ¶ 98. Bishop also reported that Golden West "easily" made loans to subprime borrowers with FICO scores as low as the "mid-500s," and that the loan sales force played "fast and loose" with the incomes listed on these subprime loan applications as well. *Id*. According to Bishop, this practice routinely occurred at Golden West throughout his entire tenure and "accelerated" from 2004 through his departure in May 2006. *Id*. Bishop also confirmed that Golden West's sales force did not verify the borrowers' information during the underwriting process. *Id*.

255.     Bishop told *60 Minutes* that Golden West conducted "instant underwriting events in an office where we would assemble five underwriters right there," and would "approve

between 80 [and] 100 loans per day." *World of Trouble.* Thus, lending at Golden West was "one grand wink, wink, nod, nod" between the borrower, the loan salesman and the underwriter. *Id*. According to Bishop, the result of these practices was that Golden West was "granting too many people loans who simply can't qualify."  *Id*. Indeed, as *60 Minutes* reported, "By 2005, 38% of [Golden West's] clients had subprime credit scores, and customers were shown fliers that told them that their income would not be checked by the bank." *Id*.

256.     Plaintiffs in *In re Wachovia Preferred Securities and Bond/Notes Litigation* interviewed additional former Wachovia employees with first-hand knowledge of its mortgage operations, including loan officers and sales managers, who confirmed that Golden West's loan sales force and outside brokers regularly fabricated borrowers' income and employment information on loan applications, that underwriters failed to check this false information and that Wachovia abused exceptions as a mechanism for approving loans that failed to satisfy Golden West's underwriting standards. Am. Compl. ¶ 96, *In re Wachovia Preferred Securities and Bond/Notes Litigation*, No. 09-cv-6351 (S.D.N.Y. May 28, 2010).

257.     Wachovia agreed to pay $627 million to the plaintiffs in *In re Wachovia Preferred Securities and Bond/Notes Litigation* to settle claims relating to its misrepresentation of its underwriting practices. This appears to be the largest settlement ever entered into involving claims filed solely under the Securities Act of 1933. Timothy Raub, *Wachovia, KPMG Reach $627 Million Settlement with Investors*, LexisNexis Legal Newsroom (Aug. 9, 2011) http://www.lexisnexis.com/legalnewsroom/litigation/b/litigation-blog/archive/2011/08/09/wachovia-kpmg-reach-627-million-settlement-with-investors.aspx.

## Y.   **Wells Fargo Bank, N.A.**

258.    Wells Fargo Bank, N.A. ("Wells Fargo") is the fourth largest bank in the U.S. by assets and the largest bank in the U.S. by market capitalization.  Wells Fargo originated mortgage loans included in the ACE 2005-WF1 and NHELI 2006-WF1 Trusts.

259.    The City of Memphis sued Wells Fargo in 2010 over its mortgage practices claiming violations of the Fair Housing Act. *See* Am. Complaint, *City of Memphis v. Wells Fargo Bank, N.A.*, No. 09-cv-2857 (W.D. Tenn. Apr. 7, 2010) ("Memphis Complaint"). The Memphis Complaint includes sworn declarations from former Wells Fargo employees describing Wells Fargo's abandonment of underwriting guidelines.

260.    Camille Thomas was a loan processor at Wells Fargo from January 2004 to January 2008. She handled the paperwork involved in the loan, including processing the file for review and approval by the underwriters. To do her job, she had to be familiar with Wells Fargo's underwriting guidelines. Memphis Complaint Ex. D at 1-2. Thomas recounted how the bonus structure placed pressure on credit managers to make loans that should not have been made. She stated that managers manipulated LTV ratios by using inflated appraisals they knew were not accurate. *Id.* at 4. She also knew that documents were falsified to inflate borrowers' incomes. When she complained, a branch manager told her, "we gotta do what we gotta do."  *Id.* at 5. Finally, she stated that borrowers were not informed that their loans were adjustable-rate mortgages with low "teaser rates," or about prepayment penalties, potential violations of lending laws, which would also be violations of the underwriting guidelines. *Id.* at 4.

261.    Doris Dancy was a credit manager at Wells Fargo from July 2007 to January 2008. She stated that the district manager put pressure on credit managers to convince people to apply for loans even if the person could not afford the loan or did not qualify for it. To her shock,

many people with bad credit scores and high DTI ratios were approved for subprime loans. Memphis Complaint Ex. A at 1-3. Dancy would shake her head in disbelief and ask herself, "How could that happen?" *Id.* at 3. She knew that Wells Fargo violated its underwriting guidelines to make those loans. Although she never witnessed it herself, she also heard from other employees that some branch managers falsified information to get customers to qualify for subprime loans. *Id.* at 4. She stated that a bonus system was used to pressure her to make loans she thought should not be funded. *Id.*

262.    Michael Simpson was a credit and branch manager at Wells Fargo from 2002 to 2008. Simpson stated that Wells Fargo was "very aggressive" in mortgage lending. Memphis Complaint Ex. B at 3. The culture was "completely results driven." *Id.* at 6. According to Simpson, Wells Fargo employees did not tell customers about the fees and costs associated with closing a loan – again, potential violations of lending laws, and also violations of the underwriting guidelines. *Id.* at 4-5. He also knew managers who falsified information in loan files, such as income documentation, to get loans approved. *Id.* at 5. Simpson further confirmed that Wells Fargo's bonus system was "lucrative" for those employees generating the loans. *Id.* at 6.

263.    Mario Taylor was a credit manager at Wells Fargo from June 2006 to February 2008. His job was to find potential borrowers and to get them to apply for loans. His manager pressured him to push loans on borrowers whether they were qualified for the loan or not, disregarding whether they could pay back the loan. Memphis Complaint Ex. C at 1-3. He was also told to mislead borrowers by only telling them the "teaser rate" without disclosing the rate was adjustable and by not telling them about the "fine print." *Id.* at 4. One of his branch managers changed pay stubs and used white-out on documents to alter the borrower's income.

94

Finally, Taylor confirmed that Wells Fargo employees were heavily incentivized by the bonus structure to generate large volumes of loans. *Id.* at 5.

264.    Elizabeth Jacobson was a loan officer and sales manager at Wells Fargo from 1998 to December 2007. She described the financial incentives to sign borrowers up for loans. In two years, she made more than $1.2 million in sales commissions. Memphis Complaint Ex. G at 1-2. She knew loan officers who would lie to potential borrowers about whether they could refinance their loan once the "teaser rate" period expired. *Id.* at 4. Jacobson also knew loan officers who falsified loan applications to qualify them for loans they should not have received. One loan officer would "cut and paste" the credit report of an approved borrower into other borrowers' applications. *Id.* at 6-7. She reported this conduct to management but was not aware of any action taken to correct the problems. *Id.* at 11.

265.    The district court denied a motion to dismiss. *City of Memphis v. Wells Fargo Bank, N.A.*, No. 09-cv-2857, 2011 WL 1706756 (W.D. Tenn. May 4, 2011). The case subsequently settled.

266.    The FCIC's investigation supports the affidavits of these former Wells Fargo employees. The FCIC interviewed Darcy Parmer, a former employee of Wells Fargo, who worked as an underwriter and a quality assurance analyst from 2001 until 2007. According to Parmer, at least half the loans she flagged as fraudulent were approved. She also told the FCIC that "hundreds and hundreds and hundreds of fraud cases" within Wells Fargo were never referred to the Treasury Department's Financial Crimes Enforcement Network. FCIC Report at 162.

267.    In July 2011, the Federal Reserve Board issued a consent cease and desist order, and assessed an $85 million civil money penalty against Wells Fargo & Co. (the parent company

of Wells Fargo Bank) and Wells Fargo Financial, Inc. Press Release, Federal Reserve Board
(July 20, 2011), *available at* http://www.federalreserve.gov/newsevents/press/enforcement
/20110720a.htm. At the time, this was the largest penalty assessed by the Federal Reserve Board
in a consumer-protection enforcement action. The order addressed allegations that Wells Fargo
had falsified income information in mortgage applications. These practices were allegedly
fostered by Wells Fargo's incentive compensation and sales quota programs and the lack of
adequate controls to manage the risks resulting from these programs. *Id.*

**Z.**     **WMC Mortgage Corporation**

268.   In 2004, General Electric ("GE") purchased WMC Mortgage Corporation

("WMC") from a private equity firm. At that time, WMC was the sixth-largest subprime lender

in the country and specialized in nonprime loans and jumbo loans of up to $1 million. WMC

originated mortgage loans included in the ACE 2007-WM2 Trust.

269.   On the radio program "This American Life," broadcast May 9, 2008, reporter

Alex Blumberg interviewed a WMC sales manager who made over a million dollars a year by

making loans to "people [who] didn't have a pot to piss in."  Blumberg reported that the manager

"didn't worry about whether the loans were good . . . . That was someone else's problem." *This

American Life, 355: The Giant Pool of Money* (May 9, 2008), http://www.thisamericanlife.org/

radio-archives/episode/355/the-giant-pool-of-money.

270.   In June 2008, the Washington State Department of Financial Institutions filed a

"Statement of Charges and Notice of Intention to Enter an Order to Revoke License, Prohibit

From Industry, Impose Fine, Order Restitution and Collect Investigation Fees" against WMC

and its owners. The Statement of Charges stemmed from an investigation that found WMC had

originated loans with unlicensed or unregistered mortgage brokers, understated amounts of

finance charges on multiple loans, understated amounts of payments made to escrow companies,

understated annual percentage rates by almost 5 percent and committed numerous other

violations of Washington State deceptive and unfair practices laws. In July 2009, WMC entered

a consent order under which it agreed to pay fines, restitution and the costs of the investigation to

settle the matter. *In re WMC Mortg. Corp.*, Consent Order, C-07-557-09-CO02 (July 21, 2011),

*available at* http://*www.dfi.wa.gov/CS%20Orders/C-07-557-09-CO02.pdf.*

.

271.     Several complaints have alleged that WMC's loans breached the associated representations and warranties. *See e.g.*, Compl., *Cambridge Place Inv. Mgmt. Inc. v. Morgan Stanley & Co.*, Case No. 10-2741 (Mass. Super. July 9, 2010); Compl., *FHFA v. Gen. Elec. Co.*, No. 11-cv-07048 (S.D.N.Y. Sept. 2, 2011). The complaints provide direct evidence based on re-underwriting that a substantial portion of the loans originated by WMC were likely in breach.

272.     In *MASTR Asset Backed Sec. Trust 2006-HE3 v. WMC Mortg. Corp.*, No. 11-cv-02542 (D. Minn. Sept. 2, 2011), a trustee sued to require WMC to repurchase loans that were fraudulent and did not comply with the stated underwriting guidelines. A review of a sample of 200 loans within the trust indicated that **75 percent** of the loans were fraudulent, not originated pursuant to the underwriting guidelines and/or did not reflect a proper determination of whether the borrower could afford to repay the loan. *Id*. ¶ 20.