# EXHIBIT 6

NEW YORK STATE
FEB 26 1935
GOVERNMENT DOCU...

# REPORT

To His Excellency Herbert H. Lehman, Governor of the State of New York, by George W. Alger, Commissioner, appointed under the Executive Law to examine and investigate the management and affairs of the Insurance Department with reference to the operation, conduct and management of title and mortgage guarantee corporations under its supervision.

Oct 5, 1934

(Moreland Commission report no. 3)

GEORGE W. ALGER
Commissioner

ALFRED A. COOK
Counsel

New York, October 5, 1934.

To His Excellency Herbert H. Lehman,
Governor of the State of New York:

On December 18, 1933, your Excellency appointed me Moreland Commissioner under Section 8 of the Executive Law to examine and investigate the management and affairs of the Insurance Department with reference to the operations, conduct and management of the title and mortgage guarantee corporations under its supervision. Your Excellency's appointment was accompanied by an informal letter of instructions, in which you said:

> "In acting as Moreland Commissioner I hope that you will seek to accomplish the following: (1) Examine and investigate the management and affairs of the Insurance Department with respect to the title and mortgage guarantee corporations under its supervision; (2) In connection with this, examine and investigate into the operations, conduct and management of the title and mortgage guarantee corporations themselves; and (3) Make recommendations with respect to the legislation providing for the supervision to be exercised by the Insurance Department over title and mortgage guarantee corporations, and with respect to the conduct and practices of such corporations to be permitted under law; in addition, make recommendations as to what can be done to assist the thousands of holders of whole mortgages and certificates guaranteed by the title and mortgage guarantee corporations.
>
> If in the conduct of your work as Commissioner you should find evidence of any violation of law, I would like you to advise me promptly.
>
> It is my earnest desire that no effort should be spared to aid these thousands of people in recouping their savings and once again instilling public confidence in real estate as an investment."

I was fortunate in being able to secure as my counsel Mr. Alfred A. Cook, who has for many months given his time almost exclusively to the conduct of my investigation. His assistance has been invaluable and I wish at the outset to express my appreciation of his untiring labors, rendered without compensation and at great personal sacrifice in the finest spirit of public service.

My appointment by you arose out of one of the greatest disasters which has fallen upon our investing community in the history of

our state. It involved the taking over by the Insurance Department for rehabilitation or liquidation of some eighteen companies previously engaged in the business of guaranteeing and selling whole mortgages and mortgage certificates in whole and group mortgages. The Superintendent of Insurance in his first interim report to you has set forth the extent of the extraordinary burden that was cast upon the Insurance Department in connection with these companies as follows:

> "In size, I think it is fair to say that no court or administrative agency of any state has had imposed upon it at one time a problem as vast in dollars and cents or involving so many human beings. The properties to be administered and serviced by the Department in these rehabilitation proceedings are valued at more than forty times the amount of assets involved in all liquidation proceedings handled by the Insurance Department from its inception in 1859 until January 1, 1933. The rehabilitation of the fourteen companies involves more than four times the total moneys involved in involuntary and voluntary bankruptcy proceedings concluded in the Southern District of New York for the four-year period preceding September 30, 1932."

A further word as to the problem as a whole. It is not merely a matter of size. It is primarily a matter of the number and kind of people involved in the consequences of this calamity. A large part of them are poor people or people of modest means who had invested their savings in securities offered by concerns which they thought were safe, both by reason of their advertising and because they were under the supervision of the Insurance Department of the State. They were people who did not want to speculate as others did in the stock markets of 1927, 1928 and 1929. They were conservative people especially deserving of the protection of the State, who fall quite in a class with depositors in savings banks. Moreover, the institutions which bought these securities were in the main institutions supported by similar funds contributed by citizens of the same class.

From the beginning of my work the human aspects of this matter were pressed upon me and my counsel by the flood of letters from these investors, many of them in want, all of them in need of their expected income. Here are eighteen companies with guaranteed mortgages and certificates amounting to over two and a half

holders. Subsidiaries and affiliates were used for many other purposes. For instance, State Title and Mortgage Company itself was one of a maze of thirteen corporations all of which were, in the last analysis, owned by National American Company, Inc. These subsidiaries, some of which were, again, partly owned by each other, consisted in addition to the State Title and Mortgage Company, of a security selling company, a surety company, various real estate holding companies and a mortgage company which sold unguaranteed mortgages. New York Title and Mortgage Company, during a part of the time that it was almost wholly owned by the holding company for the Manhattan group, itself owned two trust companies, another guaranteed mortgage company and two safe deposit companies, besides the other subsidiaries previously mentioned. Hempstead Bond and Mortgage Guarantee Company, a small company, had an affiliate in the same office known as Commonwealth Funding Corporation, which was controlled by its president, Adrian H. Courtenay. His fantastic manipulations of the mortgage guarantee company's funds in furtherance of the real estate developments of his Commonwealth company are too long to recount here, but they present an extreme illustration of the evil of affiliates.

I think it would be in the public interest to prohibit any mortgage guarantee company in the future from having subsidiaries except such as shall be approved by the supervising department of the State, and from being more than let us say 25% owned by any other person, firm or corporation.

## 2. Making the Loan.

The chief business of the companies which I have examined was of course the sale, with guarantee as to principal and interest, of mortgages which the companies themselves had placed. Bond and Mortgage Guarantee Company was an exception in that it made practically no loans itself, and sold neither mortgages nor certificates. A few of the other companies also, from time to time, and in limited amounts, guaranteed mortgages which they had not themselves made and did not themselves own.

It is my purpose to discuss the practices which I found with respect to the making of loans. I shall first refer to the kinds of

property on which loans were made, and then to objectionable appraisal methods and other objectionable features occurring in connection with the making of the loan.

The ordinary procedure followed in making the loan was, first, the filling out of an application form by the applicant, second, an appraisal and approval or rejection of the loan with or without conditions, third, the making of a title search, and fourth, the closing of the loan and the addition of the mortgage to the list of mortgages for sale.

### (a) Objectionable kinds of loans.

#### 1. Loans on Vacant Land.

Nearly all of the companies made loans on vacant land, and many advertised that their loans were only on "homes", "income producing property", "improved property", etc. This is more fully considered under the heading "Advertising", at p. 104. I have already discussed the question whether vacant land is "improved property". For instance, 61% of the mortgages certificated by Long Island Title Guarantee Company were on vacant land, although the company advertised that it sold only mortgages on "improved property". This percentage is far above the average. Nevertheless, since a majority of the purchasers of certificates did not, I believe, inquire into the property behind the mortgage certificated, the possibility of intentionally or unintentionally deceiving a purchaser is apparent. It seems to me obvious that the ordinary purchaser of a certificate would deduce from the representation that the mortgage was on "improved property", that it was on property which had a substantial building on it. Many of the certificate holders learned for the first time after the companies were taken over by the Superintendent that their certificates covered vacant land. They also learned that they could expect no income, nor indeed any other result except an accumulation of taxes until the vacant land could be sold in a better market. The fact that vacant property mortgages were certificated and often deposited in group series by the companies which maintained such series, is an indication that the officials of the companies were not unaware that these mortgages

were undesirable. A vice-president of the Long Island Title Guarantee Company testified under examination by the Department:

> "When the mortgage couldn't be sold or I had certain objections given me on a certain mortgage, why then the next time a certificate request came in we would check a certificate against it, or if there were any vacant land mortgages, they would undoubtedly be put in certificates."

### 2. Specialty Loans.

In the mortgage business loans on churches, theatres, moving picture houses, hotels, garages, golf courses, clubs, and the like, are known as specialty loans. Such loans are regarded as involving a higher degree of risk than loans on residential property since they are dependent for their success upon management, rather than upon intrinsic earning power. Lawyers Mortgage Company appears to have been the only company which made no loans whatever on properties of this character. The less careful the company, the more specialty loans it made and sold guaranteed. In many cases I have little doubt but that the certificate holders found after rehabilitation that their certificates would have been more valuable at the time had the specialty never been erected. In other words, a loan on a specialty which fails is likely to suffer all of the disadvantages of a loan on vacant land, plus the incubus of an unusable building.

I could cite a long list of peculiarly distressing cases where certificate holders hold certificates on specialty loans. I believe that this practice should be prohibited if the mortgage guarantee business is to continue on any basis.

### 3. Mortgages on Foreclosed Properties.

It was a practice of many of the companies when title was acquired by a subsidiary after foreclosure of a guaranteed mortgage, to inspect or reappraise the property and have the subsidiary issue a new mortgage to the parent company in a reduced amount. This mortgage would then be guaranteed and certificated, or deposited in a group series. The purchaser of the certificate would not ordinarily be told that the property had been through foreclosure, or that the property was held by a subsidiary of the guaranteeing company. Some of the companies advertised that an additional safeguard to their invest-

anty fund of the State Title and Mortgage Company was impaired to the extent of more than 50% as of December 31, 1930. The company twice reduced its capital to correct this impairment but the correction was never effective. Impairment progressed too fast to be caught up with. Nevertheless, the company continued its sales, selling over $27,000,000 of guaranties during 1931, 1932 and 1933 until closed by the bank holiday.

### (g) Sales when the mortgage was in difficulties.

#### (1) *Sales of Past Due Mortgages.*

Some of the companies sold certificates in mortgages which had matured and had not been extended. This practice was comparatively rare and probably was not deliberate.

#### (2) *Sales of Foreclosed and Reissued Mortgages.*

Part of the regular stock in trade of these companies consisted of mortgages made by their subsidiaries covering properties which had been taken over by the subsidiaries on foreclosure. I have not found that the customer was ever told that the mortgage had been through foreclosure or that the "bond of a responsible borrower" was in fact the bond of the subsidiary of the guarantor, the only excuse for whose existence was the avoidance of liability by the mortgage company. Some mortgages went through foreclosure several times, and on occasion the issuance of certificates against a new mortgage of the subsidiary was repeated. Sometimes certificate holders were asked to take certificates in the new mortgage in place of their old certificates. In one case, Bond and Mortgage Guarantee Company foreclosed a certificated mortgage, took title in its subsidiary, Remsen-Montague Corporation, and sent the following letter on September 28, 1932 to certificate holders, some of whom accepted certificates in the new mortgage made by Remsen-Montague Corporation presumably without knowing that the property had been through foreclosure:

> "You hold a guaranteed mortgage certificate for $200, secured by the Manhattan Bridge Plaza Co. mortgage for $42,500, due June 1st, 1934.
>
> "The owner of this property got behind with taxes and interest and to liquidate the situation the property has been

sold and the present mortgage of $42,500 is being replaced by a new mortgage of $37,500 for a term of three years. On account of these arrears it was necessary to enforce payment of the present mortgage, which necessitates the payment of your mortgage certificate.

"*The property is now in strong hands and the mortgage reduced $5,000. If you desire, we can re-invest your money in another certificate in the new mortgage for three years guaranteed at 5½%.*\* Or if you prefer, we would be glad to submit other applications for your consideration. Will you kindly return the certificate you now hold, with your instructions, at your earliest convenience and oblige."

### (3) *Sales of Certificates and Mortgages in Default.*

All of the companies sold certificates and mortgages which were in default either for interest, taxes or principal. The amounts of these sales were very large. The better companies, such as Home Title Insurance Company and Lawyers Mortgage Company, were likewise delinquent in this respect, although to a smaller extent. Over 75% of the certificates sold by Westchester Title and Trust Company in 1932 and 1933 were in default when they were sold. Every sale of group series certificates made by State Title and Mortgage Company in 1932 and 1933 was made at a time when some of the mortgages in the group were in default. About 80% of all the certificates in specific mortgages sold by the same company during that time were likewise in default. The practice was inexcusable, and worked a fraud on the public.

It would seem impossible that such a practice could have been anything but wilful, particularly in view of the advertising from which I have quoted. Yet practically all of the officers and directors of these companies denied that they knew that any such thing was taking place; and this, although it was customary with most of the companies to furnish their boards of directors with statements of the amount of mortgages in default, which amount increased rapidly and became staggering in 1932 and the early months of 1933. The reason given by the company executives is even more surprising, but to some extent, I believe, true; it is that the Tax Departments and Arrears

---

\* Italics mine.

Departments of these companies, which kept, at least in the case of interest, careful records as to payments made by the mortgagor, were segregated from the Sales Departments to such an extent that the Sales Department was practically never notified to remove a mortgage from its offering list; and the Sales Department never thought to look to see whether there were arrears before it made a sale.

All now concede that mortgages in default should have been withdrawn from sale, and it is hard for me to believe that none of these officers ever thought of it before. An extreme case is that of the Long Island Title Guarantee Company, which never troubled itself to examine into the status of either taxes or interest when it sold certificates. 52½% of its outstanding certificates were in arrears when they were sold. The opinions of the directors on the subject ranged widely. One testified before the Department: "I didn't think there was anything wrong. We only had in mind selling the guaranty"; another said "It was not the practice to examine records; during all my experience with the title companies we never did"; a third declared that he didn't understand the whole business of selling certificates and would not buy them himself; there was one who condemned the practice and said that it showed a criminal intent.

I believe that at least some of the officers of every company knew that certificates were being sold on mortgages in default and I believe that the companies continued the practice partly because they had to continue to sell certificates, if they were to continue to live, and partly because the officers deluded themselves into the belief that since their guaranties had always been met, they would continue always to be met. Neither of these theories satisfies me any more than it satisfied the certificate holder who found, after rehabilitation, that the mortgage to which he had to look for his security was two or more years in default for taxes when he bought the certificate, or that the mortgage, when he bought it, was in process of foreclosure for a series of interest defaults.

This practice is one of the worst that I have found, and affects more investors than any other.

### (a) Companies acting as their own depositaries.

In a number of instances the mortgage companies in connection with the issuance of group series certificates, acted as their own depositaries, that is, they themselves held as custodian or trustee for the certificate holders the bonds, mortgages, assignments, title policies, fire insurance policies and all other instruments of title. State Title and Mortgage Company, for instance, had, as of the date of rehabilitation, six separate group series outstanding and was its own depositary in three of these. In this connection, there was found in the files of the State Title and Mortgage Company a memorandum, dated September 9, 1931, in part as follows:

> "Unless a customer requests a certificate of a specific series, it should be understood that sales of certificates in series for which the State Title & Mortgage Company acts as its own depositary should be promoted in preference to certificate series where there is an outside trustee."

National Title Guaranty Company used as its depositary for group series certificates the National Exchange Bank, which, while neither a subsidiary nor an affiliate, had been organized by the officers of the mortgage company. In addition to its group series certificates, the company issued guaranteed mortgage certificates in specific mortgages, and in connection with all such issues it acted as its own depositary. Other companies also acted as their own depositaries. The substitutions hereafter referred to were facilitated by this practice.

### (b) Substitutions.

The great vice of the group series was the abuse of the power reserved to the mortgage companies to withdraw certain mortgages and to substitute others. The result of this right to substitute was that the companies at all times considered all mortgages in the group series as being for sale, and in the last years made strenuous efforts to sell such mortgages. An intelligent and well informed customer such, for instance, as a life insurance company or a savings bank, seeking to make an investment in a whole mortgage, would, of course,

pick out from the offerings of the company the mortgage it liked best. If this happened to be a mortgage on deposit in a group series, it was withdrawn from the group series for sale to the customer and another for a similar face amount substituted. This system resulted in the continued withdrawal from the group series of the best mortgages and the substitution of others not equally salable and not equally safe. The president of the Title & Mortgage Guarantee Company of Buffalo testified before the Department:

> "There was no intention ever here to put a poor mortgage in and take a good mortgage out. *The only reason a mortgage may have been taken out was to sell to some investor who wanted a particular mortgage.*"

If there were good mortgages left in the group series they were usually taken out when the company found itself in need of cash and required mortgages which were acceptable collateral to banks or government agencies.

Extreme illustrations of the operations of this inevitable tendency are to be found in the wholesale withdrawal from group series, in the summer of 1932, by New York Title and Mortgage Company and State Title and Mortgage Company for the purpose of pledging the mortgages withdrawn as collateral to loans made to them by Reconstruction Finance Corporation. The securities deposited in the group series to replace the mortgages withdrawn were definitely affected with greater defaults and less desirable than those withdrawn. A vice-president of the New York Title and Mortgage Company testified:

> "Q. So the net result of it would be that so far as the holders of the certificates in B-K, for example, were concerned, they were rather the worse off by the Reconstruction Finance transactions than otherwise, were they not? A. They were.
>
> "Q. Very much worse off? A. Yes.
>
> "Q. Whatever benefit may have happened to the title companies by those loans, it was at the expense of certificate-holders who had certificates in those issues? A. That is my opinion."

The amount of mortgages withdrawn from group series by New York Title and Mortgage Company in connection with the loans from